# 12-3859

## United States Court of Appeals

*for the*

## Second Circuit

IN RE: FANNIE MAE 2008 SECURITIES LITIGATION

John A. Genovese, Robert M. Rollins, Nicholas Crisafi, Stella Crisafi, Fogel Capital Management, Inc., Dennis Sandman, Karen Orkin, Anthony Esposito, Frank McAlonan, William R. White, Steve Latimer, Brian Jarmain, Malka Krausz, Donald W. McCauley, David L. Frankfurt, Frankfurt Family Ltd., The David Frankfurt 2000 Family Trust, The David Frankfurt 2002 Family Trust, Cheryl Strong, William Berman, Stephen H. Schweitzer, Linda P. Schweitzer, Lynn Williams, Steveann Williams, Susan Kraus, Phillip Melton, Daniel Kramer, David Gwyer, Comprehensive Investment Services, Inc., Mary P. Moore, Individually and on behalf of all others similarly situated, Edward Smith,

*Plaintiffs,*

*(continuation of caption on next page)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, 09-md-2013 AND 10-cv-9184

## OPENING BRIEF AND SPECIAL APPENDIX
## OF PLAINTIFFS-APPELLANTS

THOMAS B. HATCH, ESQ.
JAMES R. SAFLEY, ESQ.
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
800 LaSalle Avenue
Minneapolis, Minnesota 55402
(612) 349-8206

CHRISTOPHER P. SULLIVAN, ESQ.
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
800 Boylston Street
25th Floor
Boston, Massachusetts 02199
(617) 267-2300

*Attorneys for Plaintiffs-Appellants, Liberty Life Assurance Company of Boston, Liberty Mutual Fire Insurance Company, Liberty Mutual Insurance Company, Peerless Insurance Company, and Safeco Corporation*

Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company,
Peerless Insurance Company, Safeco Corporation, Liberty Life Assurance
Company of Boston,

*Plaintiffs – Appellants,*

v.

Stephen B. Ashley, Daniel H. Mudd, Stephen M. Swad, Robert J. Levin, Lehman
Brothers, Inc., J.P. Morgan Securities Inc., Citigroup Global Market Inc., Merrill
Lynch, Pierce Fenner & Smith Incorporated, Morgan Stanley & Co. Incorporated,
UBS Securities LLC, Wachovia Capital Markets LLC, Washington Mutual Bank,
FA, Federal National Home Mortgage Association, Dennis Beresford, Dennis
Beresford, Louis Freeh, Brenda Gaines, Frederick B. Harvey, III, David Hisey,
Karen Horn, Bridget Macaskill, Peter Niculescu, Leslie Rahl, John Sites, Jr., Greg
Smith, H. Patrick Swygert, John Wulff, Banc of America Securities LLC,
Barclays Capital Inc., Deutsche Bank Securities Inc., FTN Financial Securities
Corp., Wells Fargo Securities LLC, Bear Stearns & Co. Inc., Federal National
Mortgage Association, AKA Fannie Mae, Fitch Ratings, Moody's Investors
Service, Inc., Herbert M. Allison, David C. Benson, Brian Cobb, Judith C. Dunn,
John Does, 1 - 10, Linda K. Knight, Anthony F. Marra, Brian P. McQuaid, Anne
F. Pankau, David H. Sidwell, Betty Thompson, Christina A. Wolf, Robert T.
Blakely, Enrico Dallavecchia, JPMorgan Chase & Co., Fannie Mae,

*Defendants,*

Goldman Sachs & Co.,

*Defendant- Appellee.*

_____

## CORPORATE DISCLOSURE STATEMENT

Liberty Mutual Insurance Company is a subsidiary of Liberty Mutual Group Inc.  No publicly held entity owns any portion of Liberty Mutual Insurance Company.

Peerless Insurance Company is a subsidiary of Liberty Mutual Agency Corporation.  No publicly held entity owns any portion of Peerless Insurance Company.

Liberty Mutual Fire Insurance Company is a subsidiary of Liberty Mutual Group Inc.  No publicly held entity owns any portion of Liberty Mutual Fire Insurance Company.

Safeco Corporation is a subsidiary of Liberty Mutual Agency Corporation. No publicly held entity owns any portion of Safeco Corporation.

Liberty Mutual Insurance Company owns 90% of the stock of Liberty Life Assurance Company of Boston, and Liberty Mutual Fire Insurance Company owns the remaining 10%.  No publicly held entity owns any portion of Liberty Life Assurance Company of Boston.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iv

TABLE OF ABBREVIATIONS ............................................................ix

I.     JURISDICTIONAL STATEMENT ...............................................1

II.    ISSUES PRESENTED .................................................................1

III.   STANDARD OF REVIEW .........................................................2

IV.   STATEMENT OF THE CASE ....................................................3

     A.    Nature of the Case ..........................................................3

     B.    Course of Proceedings.....................................................5

     C.    Disposition Below ...........................................................6

V.    STATEMENT OF FACTS ..........................................................8

     A.    The Parties and Claims....................................................8

     B.    FNMA's Capital Requirements and the Offerings .............9

     C.    Goldman Wrote the Offering Documents and Successfully Solicited Liberty's Investment in the Offerings..................11

     D.    The Offering Documents Drafted and Distributed by Goldman Falsely Represented that FNMA Exceeded its Capital Requirements........................................................13

           1.    FNMA took astronomical write-downs and loss reserves on its subprime and Alt-A RMBS and mortgage loans after it went into conservatorship ........................................15

           2.    FNMA's actual exposure to subprime and Alt-A loans was twice the amount falsely disclosed in SEC filings that were incorporated by reference in the Offering Documents ............16

           3.    Goldman knew that FNMA did not meet its capital requirements..........................................................19

     E.    Liberty Relied Upon Goldman's False Representations, Omissions and Deceptive Conduct ....................................26

VI.   SUMMARY OF ARGUMENT.......................................................27

i

VII.   ARGUMENT .................................................................................30

A.   Liberty Has Stated A Claim Against Goldman For Each of Its
State Law Counts ...............................................................30

1.   The Offering Documents Were False and Misleading ............30

a.   The district court erred in relying solely upon its
2010 Opinion, which involved different parties,
claims, and factual allegations ........................................34

2.   The Other Elements of Liberty's State Law Claims are
Well-Pleaded .................................................................40

a.   Under the Massachusetts and Washington
securities statutes, Goldman is liable as a seller for
the misstatements and omissions in the Offerings
Documents ................................................................40

i.   Goldman is liable as a seller under Mass.
Gen. Laws ch. 110A, § 410(a) because it
successfully solicited Liberty's investment
in the Offerings ....................................................40

ii.   Goldman is a seller under the Washington
State Securities Act because it was a
substantial contributive factor in Safeco's
purchase of the preferred stock ............................43

b.   The claims under the unfair or deceptive practices
statutes are adequately stated because Goldman
drafted and distributed the false and misleading
Offering Documents .......................................................46

c.   Liberty's negligent misrepresentation and common
law fraud claims are adequately stated...........................48

i.   Goldman is liable under Liberty's common
law fraud and negligent misrepresentation
counts for the misstatements and omissions
in the Offering Documents ....................................50

ii.   Goldman knew or should have known that
its statements and omissions were false ..............53

iii.   Liberty reasonably relied on Goldman's
statements ...........................................................54

iv.     Goldman caused Liberty's losses.........................55

v.     Liberty is not required to plead a special relationship to support its negligent misrepresentation claim......................................55

3.     The District Court's Other Conclusions About the Adequacy of Liberty's State Law Claims Were Wrong...........57

a.     The district court erred in ruling Goldman did not represent or supply the false statements in the SEC filings .............................................................................57

b.     The district court erred in ruling that Liberty did not adequately plead reliance ........................................60

VIII.  CONCLUSION............................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)..................................................................52

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................2

*Bain v. Metro. Mortg. Grp., Inc.*,
285 P.3d 34 (Wash. 2012) .......................................................47

*Capital Ventures Int'l v. UBS Sec. LLC*,
No. 11-11937-DJC, 2012 U.S. Dist. LEXIS 140663 ...................42

*Casavant v. Norwegian Cruise Line*, *Ltd.*,
952 N.E.2d 908 (Mass. 2011)...................................................61

*Colavito v. New York Organ Donor Network, Inc.*,
438 F.3d 214 (2d Cir. 2006) .....................................................2

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith., Inc.*,
395 F.3d 25 (2d Cir. 2005), *vacated on other grounds*,
547 U.S. 71 (2006).....................................................................7

*Dalis v. Buyer Adver.*,
636 N.E.2d 212 (Mass. 1994)...................................................46

*Dodona I, LLC v. Goldman, Sachs & Co.*,
847 F. Supp. 2d 624 (S.D.N.Y. 2012) .......................................33

*Dolphin and Bradbury, Inc. v. SEC*,
512 F.3d 634 (D.C. Cir. 2008)..................................................52

*Equip. & Sys. for Indus., Inc. v. Northmeadows Constr. Co.*,
798 N.E.2d 571 (Mass. App. Ct. 2003) .....................................49

*ESCA Corp. v. KPMG Peat Marwick*,
959 P.2d 651 (Wash. 1998) ................................................48, 53

*Fed. Hous. Fin. Agency v. Goldman, Sachs & Co.*,
1:11-cv-06198-DLC, 2012 U.S. Dist. LEXIS 162281
(S.D.N.Y. November 12, 2012)..........................................50, 58

iv

*Fox v. F & J Gattozzi Corp.*,
    672 N.E.2d 547 (Mass. App. Ct. 1996) ...................................................48, 53

*Golber v. BayBank Valley Trust Co.*,
    704 N.E.2d 1191 (Mass. App. Ct. 1999) ..........................................47, 51, 55

*Haberman v. Wash. Pub. Power Supply Sys.*,
    744 P.2d 1032 (Wash. 1987) ................................................................*passim*

*Hanly v. SEC*,
    415 F.2d 589 (2d Cir. 1969) ........................................................................52

*Hoffer v. State of Wash.*,
    776 P.2d 963 (Wash. 1989) ........................................................................44

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ........................................................38

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010) ...................................................*passim*

*In re Fannie Mae 2008 Sec. Litig.*,
    No. 08 Civ 7831, 2012 U.S. Dist. LEXIS 124008
    (S.D.N.Y. Aug. 30, 2012)...............................................................................7

*In re Metropolitan Sec. Litig.*,
    532 F. Supp. 2d 1260 (E.D. Wash. 2007)...................................................45

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ...........................................................................3

*Janus Capital Group, Inc. v. First Derivative Traders, Inc.*,
    131 S. Ct. 2296 (2011)................................................................................58

*Johnson v. Harrigan-Peach Land Dev. Co.*,
    489 P.2d 923 (Wash. 1971) ........................................................................50

*Kannavos v. Annino*,
    247 N.E.2d 708 (1969) ...............................................................................51

*King Cnty. Wash. v. Merrill Lynch & Co.*,
    No. C10-1156-RSM, 2011 U.S. Dist. LEXIS 16483
    (W.D. Wash. Feb. 18, 2011).................................................................43, 61

*Kittilson v. Ford*,
    608 P.2d 264 (Wash. 1980) ........................................................................43

*Knapp v. Neptune Towers Assocs.*,
  892 N.E.2d 820 (Mass. App. Ct. 2008) .........................................................51

*Kreidler v. Pixler*,
  No. C06-0697RSL, 2009 U.S. Dist. LEXIS 47713
  (W.D. Wash. May 22, 2009) .........................................................56

*Lawyers Title Ins. Corp. v. Baik*,
  55 P.3d 619 (Wash. 2002) .........................................................54, 56

*Livid Holdings Ltd., v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) .........................................................44

*Marram v. Kobrick Offshore Fund, Ltd.*,
  809 N.E.2d 1017 (Mass. 2004).........................................................*passim*

*Martin v. Mead Johnson Nutrition Co.*,
  No. 09-cv-11609-NMG, 2010 U.S. Dist. LEXIS 104923
  (D. Mass. Sept. 30, 2010) .........................................................47

*Miller Inv. Trust v. Morgan Stanley & Co.*,
  No. 1:11-cv-12126-JLT, 2012 U.S. Dist. LEXIS 102537
  (D. Mass. July 24, 2012).........................................................41, 42

*Neale v. Suarez*,
  No. C09-0770-JCC, 2011 U.S. Dist. LEXIS 15231
  (W.D. Wash. Feb. 15, 2011).........................................................43

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) .........................................................2-3, 33

*Nota Constr. Corp. v. Keyes Assocs.*,
  694 N.E.2d 401 (Mass. App. Ct. 1998).........................................................55

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .........................................................2, 34

*Nycal Corp. v. KPMG Peat Marwick LLP*,
  688 N.E.2d 1368 (Mass. 1998).........................................................55

*Panag v. Farmers Ins. Co. of Wash.*,
  204 P.3d 885 (Wash. 2009) .........................................................47, 61

*Pinter v. Dahl*,
  486 U.S. 622 (1988).........................................................40

*Reale v. Ernst & Young, LLP*,
  No. 43932-4-1, 2000 Wash. App. LEXIS 1239
  (Wash. Ct. App. July 10, 2000) ........................................................ 44-45, 48

*Reisman v. KPMG Peat Marwick LLP*,
  787 N.E.2d 1060 (Mass. App. Ct. 2003) .................................................... 56

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ............................................................. 34

*SEC v. Mudd*,
  No. 11 Civ. 09201, 2012 U.S. Dist. LEXIS 115087
  (S.D.N.Y. Aug. 10, 2012) .......................................................... 18, 36, 59

*St. Paul Surplus Lines Ins. Co. v. Feingold & Feingold Ins. Agency, Inc.*,
  693 N.E.2d 669 (Mass. 1998) .......................................................... 55-56

*Stiley v. Block*,
  925 P.2d 194 (Wash. 1996) ............................................................. 49

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, *Inc.*,
  552 U.S. 148 (2008) .................................................................. 52

**Statutes & Other Authorities:**

15 U.S.C. § 78j ...................................................................... *passim*

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1331 ......................................................................... 1

28 U.S.C. § 1332 ......................................................................... 1

28 U.S.C. § 1367 ......................................................................... 1

Securities Act of 1933, § 12(a)(2) .................................................... 40, 43

Restatement (Second) of Torts § 552 (1977) ........................................... 48, 55

Fed. R. Civ. P. 8(a) ..................................................................... 3

Fed. R. Civ. P. 9(b) .............................................................. 3, 37, 53

37 C.J.S. Fraud § 105 ................................................................... 50

Mass. Gen. Laws ch. 93A ........................................................... 46, 47, 61

Mass. Gen. Laws ch. 93A, § 2 ......................................................... 9, 46

Mass. Gen. Laws ch. 93A, § 11 ........................................................ 9, 46

Mass. Gen. Laws ch. 110A, § 410 (a)..............................................................40, 41

Mass. Gen. Laws ch. 110A, § 410(a)(2)..................................................9, 40, 41, 42

Washington State Securities Act...............................................................................43

Wash. Rev. Code. § 19.86.020.............................................................................9, 46

Wash. Rev. Code. § 19.86.090.............................................................................9, 46

Wash. Rev. Code § 21.20.010..............................................................................9, 44

Wash. Rev. Code § 21.20.430..............................................................................9, 43

## TABLE OF ABBREVIATIONS

**FHFA**              **Federal Housing Finance Agency**

**FNMA**              **Federal National Mortgage Association**

**Goldman**           **Defendant-Appellee Goldman, Sachs & Co.**

**Liberty**           **Plaintiffs-Appellants Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company, Safeco Corporation, and Liberty Life Assurance Company of Boston**

**Non-Prosecution Agreement**    **FNMA's non-prosecution agreement with the SEC, dated December 13, 2011**

**Offerings**         **Collectively, the Series P and Series S preferred stock offerings of FNMA made in September and December 2007**

**Offering Documents**    **Collectively, the Series P Private Placement Memorandum and the Series S Offering Circular**

**OFHEO**             **Office of Federal Housing Enterprise Oversight**

**RMBS**              **Residential Mortgage-Backed Securities**

**SAC**               **Liberty's Second Amended Complaint in *Liberty Mutual Insurance Company et al. v. Goldman, Sachs & Co.*, dated March 2, 2012**

**SEC**               **United States Securities Exchange Commission**

**SEC Complaint**     **SEC's Complaint in *SEC v. Mudd et al.*, No. 11 Civ. 9202 (S.D.N.Y.), dated December 16, 2011**

**Staff Report**      **Staff Report of the Permanent Subcommittee on Investigations of the United States Senate released on April 13, 2011**

## II.    JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 over Liberty's Section 10(b) claim under Section 27 of the Exchange Act, 15 U.S.C. § 78j, and supplemental jurisdiction over Liberty's state law claims under 28 U.S.C. §1367. The district court also had jurisdiction under 28 U.S.C. § 1332 because Liberty lost $62.5 million in its investment and, for purposes of diversity analysis, Goldman is a citizen of New York and Delaware, and Appellants are citizens of Massachusetts, Washington, New Hampshire and Wisconsin.   This appeal follows the district court's August 30, 2012 final order dismissing all of Liberty's claims.  *See* SPA27-66[1]. Liberty timely-filed its notice of appeal on September 27, 2012, appealing from the dismissal of its state law claims only.  JA-A2114. This Court has jurisdiction to review the final order under 28 U.S.C. § 1291.

## III.    ISSUES PRESENTED

1.  Does Liberty's complaint adequately state claims against Goldman pursuant to Massachusetts and Washington state law for violation of securities and deceptive practices statutes, as well as common law fraud and negligent misrepresentation, which laws prohibit a broad range of fraudulent, deceptive and

---

[1] This brief designates materials reproduced in the appended Special Appendix as "SPA__;" and in the parties' Joint Appendix as "JA-__."  Numbered entries in the district court's Civil Docket that are not reproduced in either of the appendices are designated as "ECF No.__."

negligent conduct in the sale of securities?

a.     Did the district court err by ignoring Liberty's detailed allegations of falsity against Goldman, and relying instead solely on an earlier decision involving different parties, different claims, and materially different factual allegations, in finding that the statements in the Offering Documents were not false?

b.     Did the district court err in finding that Liberty failed to state claims where Liberty alleged that Goldman provided false information and engaged in other conduct violative of state law, when the law does not require Liberty to plead that Goldman "made the statement" or that Liberty "relied" on the statement?

## IV.     STANDARD OF REVIEW

A district court's dismissal for failure to state a claim is reviewed *de novo*. *Novak v. Kasaks*, 216 F.3d 300, 305 (2d Cir. 2000).  A district court's determination of state law is also reviewed *de novo*.  *Colavito v. New York Organ Donor Network, Inc*., 438 F.3d 214, 220 (2d Cir. 2006).  In adjudicating a motion to dismiss, all non-conclusory allegations in the complaint should be accepted as true, and all reasonable inferences should be drawn in plaintiff's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *NECA-IBEW Health & Welfare Fund v.*

2

*Goldman, Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012).  The facts alleged in the complaint should be viewed in the light most favorable to the plaintiff.  *NECA-IBEW Health & Welfare Fund,* 693 F.3d at 149 n.1.

Rule 8(a) of the Federal Rules of Civil Procedure simply requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  Averments of fraud are subject to Fed. R. Civ. P. 9(b), which requires the complaint to identify the false statements and who made them, when and where they were made, and why they were fraudulent.  *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69-70 (2d Cir. 2001).  However, Rule 9(b)'s heightened pleading standard does not require plaintiffs in securities litigation to plead "detailed evidentiary matter."  *Id*. at 72.

## V.    STATEMENT OF THE CASE

### A.    Nature of the Case

This appeal is from the district court's dismissal of Liberty's state law claims arising from Goldman's fraud, deceptive acts and negligent conduct as a lead underwriter of the Series P and Series S preferred stock offerings of the Federal National Mortgage Association in September and December 2007 (collectively, "Offerings").  Goldman wrote and disseminated the Offering Documents, which falsely stated that FNMA's capital exceeded its regulatory capital requirements.  Notably, Goldman's Offering Documents failed to disclose

anything close to the full extent of FNMA's exposure to the subprime and Alt-A mortgage market.

Liberty's state law claims do not require Goldman to have "made" the statements within the meaning of 10(b) of the Exchange Act, and most of the state law claims do not require Liberty to plead reliance. Most of Liberty's state law claims also do not require scienter, but Liberty alleges with specificity that Goldman knew, recklessly disregarded or should have known from its due diligence that FNMA did not meet its capital requirements and had not taken adequate write-downs and loss reserves for its exposure to almost $700 billion in risky subprime and Alt-A mortgages. Hardly an innocent conduit, Goldman sold billions of dollars' worth of impaired securities directly to FNMA, and knew that FNMA held or guaranteed billions of dollars of Countrywide subprime and Alt-A mortgages that Goldman knew had ***already*** experienced substantial declines in value.

Beginning in late 2006 and during the first three quarters of 2007, Goldman had radically altered its own investment strategy based on its specialized knowledge of the residential mortgage market. In the months before the Offerings, Goldman took a short position of $13.9 billion in the subprime market; sold off its own subprime and Alt-A assets to investors; increased its collateral demands by

4

$3.2 billion to AIG for securities backed by subprime and Alt-A mortgages; shut down its program of warehouse lending to subprime and Alt-A loan originators such as Countrywide, FNMA's largest client; and significantly marked down its own subprime mortgage inventory.

As a lead underwriter, Goldman should have been on high alert in conducting due diligence to determine if FNMA met its capital requirements, which was critical information to Liberty and other investors. But acting knowingly, recklessly, and without reasonable care, Goldman drafted and distributed the Offering Documents designed to lead Liberty to believe that a desperately undercapitalized FNMA had met its capital requirements, when Goldman knew or at the very least should have known this was not the truth. Goldman solicited Liberty to invest in the Offerings. Liberty bought $62.5 million of the preferred stock in reliance on Goldman's false representations and omissions in the Offering Documents. Once FNMA's true financial condition was revealed, the price for the preferred stock collapsed and Liberty's substantial investment was lost.

## B.    Course of Proceedings

Liberty filed this action against Goldman in the District of Massachusetts on July 8, 2010, alleging violations of 10(b) under Section 27 of the Exchange Act, 15

U.S.C. § 78j, and the statutory and common laws of Massachusetts and Washington.  Over Liberty's objection, on December 8, 2010 the United States Judicial Panel on Multidistrict Litigation transferred the action to the Southern District of New York for coordination with pretrial proceedings before the Honorable Paul A. Crotty.  JA-A130-131.  Unlike the other actions in the MDL, Liberty asserts claims for relief against Goldman only.

After FNMA agreed to a Non-Prosecution Agreement with the SEC in which FNMA agreed not to contest the allegations contained in the SEC Complaint alleging false and misleading disclosures about FNMA's exposure to subprime and Alt-A loans, the district court authorized Liberty to file an amended complaint. JA-A186.  Liberty filed the SAC on March 2, 2012.  JA-A206-JA-A258.  Goldman moved to dismiss the SAC on April 4, 2012, JA-A62, and Liberty filed its opposition to the motion on May 21, 2012.  ECF No. 134.  Oral argument was held on July 18, 2012.  JA-A63.

### C.    Disposition Below

On August 30, 2012, the district court (Crotty, J.) dismissed the SAC in its entirety, first concluding that Liberty failed to state a claim under Section 10(b).

SPA56-SPA58.[2]  Applying the Second Circuit's claim-by-claim SLUSA analysis set forth in *Dabit v. Merrill Lynch, Pierce, Fenner & Smith., Inc.,* 395 F.3d 25 (2d Cir. 2005) *vacated on other grounds,* 547 U.S. 71 (2006), the district court concluded that SLUSA does not bar Liberty's state law claims.  SPA50-SPA51.  But the district court held that Liberty failed to adequately allege each of the eight Massachusetts and Washington state law claims asserted in the SAC.  SPA61.[3]  This appeal concerns the dismissal of Liberty's state law claims only.

        The district court offered three grounds for its dismissal of Liberty's state law claims.  First, the district court held that Liberty does not allege a false statement in the Offering Documents prepared and distributed by Goldman.  In so holding, the district court relied exclusively on its 2010 Opinion issued in a separate action involving different parties, claims, and factual allegations. Second, the district court found that Liberty does not allege that Goldman supplied or otherwise represented the facts in FNMA's SEC filings even though they were incorporated by reference in Goldman's Offering Documents and the SEC filings failed to disclose FNMA's additional exposure to hundreds of billions of dollars of subprime and Alt-A mortgage loans.  Third, the district court found that Liberty

---

[2] The district court's Order can be found at *In re Fannie Mae 2008 Sec. Litig.*, No. 08 Civ. 7831, 2012 U.S. Dist. LEXIS 124008 (S.D.N.Y. Aug. 30, 2012).

[3] The parties did not dispute that Massachusetts and Washington substantive law applies to Liberty's claims.

does not explicitly allege that it relied on the false statements contained in the SEC filings.

Liberty timely-filed a notice of appeal on September, 27, 2012, appealing from the district court's dismissal of Liberty's state law claims. JA-A2114-JA-A2116.

## VI.   STATEMENT OF FACTS

### A.    The Parties and Claims

Following the loss of its $62.5 million investment in FNMA preferred stock issued in September and December 2007, Liberty seeks recovery against Goldman under the statutory and common law of Massachusetts and Washington. JA-A206:¶1; JA-A245-JA-A250:¶¶127-160.  As a lead underwriter for the Offerings, Goldman wrote and disseminated the Offering Documents[4], and successfully solicited Liberty's investment in the Offerings.  JA-A206-JA-A207:¶2; JA-A218-JA-A219:¶¶45-46; JA-A220-JA-A221:¶50; JA-A245:¶¶129-130; JA-A247:¶142-143.  Liberty alleges that Goldman falsely represented that FNMA exceeded its regulatory capital requirements and failed to disclose the full extent of FNMA's exposure to the risky subprime and Alt-A mortgage market.  JA-A206-JA-

---

[4] The "Offering Documents" are the Private Placement Memorandum used to sell the Series P preferred stock and the Offering Circular used to sell the Series S preferred stock. JA-A218-JA-A219:¶45; JA-A1149-JA-A1227.

8

A207:¶2; JA-A222-JA-A225:¶¶56-65.  Liberty brings its claims under the

Massachusetts securities statute, Mass. Gen. Laws ch. 110A, §410(a)(2), JA-

A245:¶128; the Massachusetts unfair and deceptive trade practices statute, Mass.

Gen. Laws ch. 93A, §§ 2 and 11, JA-A246:¶135; the Washington securities statute,

Wash Rev. Code §§ 21.20.010 and 21.20.430, JA-A247:¶141; the Washington

unfair and deceptive trade practices statute, Wash. Rev. Code. §§ 19.86.020 and

19.86.090, JA-A248:¶149; and for common law fraud and negligent

misrepresentation under the laws of Massachusetts and Washington, JA-A249.

### B.    FNMA's Capital Requirements and the Offerings

In 2007, FNMA was a privately-managed corporation, organized under

federal charter to provide stability and liquidity to the residential mortgage market.

JA-A211:¶18.  FNMA was not an originator of mortgage loans, but generated

revenue by (1) guaranteeing loans made by others for a fee, and (2) maintaining an

investment portfolio of mortgage loans and residential mortgage-backed securities

("RMBS").  JA-A211:¶19.

By statute, FNMA was required to maintain a certain level of "core capital,"

which is the sum of the stated value of the common and preferred stock, paid-in

capital, and retained earnings. JA-A211-JA-A212:¶20.[5] In addition, a federal oversight agency, OFHEO, required FNMA to maintain a 30% capital surplus over the statutory minimum core capital. JA-A212:¶22. Unless both the statutory core capital requirement and the additional 30% capital surplus were met, FNMA could not declare or pay any dividends, and thus could not successfully sell its securities to investors like Liberty. JA-A222:¶54.

In late 2007, FNMA had two preferred stock offerings. JA-A214:¶¶27-28. Goldman was a lead underwriter in both Offerings. JA-A206:¶1; JA-A218-JA-A219:¶45; JA-A219:¶47. In the "Series P Offering" on September 28, 2007, FNMA issued 40,000,000 shares of preferred stock to raise nearly $1 billion in capital. JA-A214:¶27. In the "Series S Offering" on December 11, 2007, FNMA issued 280,000,000 shares of preferred stock, raising nearly $7 billion of additional capital. JA-A214:¶28. The Offering Documents each made specific representations assuring investors that FNMA exceeded its capital requirements. JA-A221:¶¶51-52. Investors relied on these representations because, as described above, without adequate capital FNMA could not make dividend payments on the preferred shares of stock and the stock would have little or no value.

---

[5] Core capital had to equal or exceed 2.5% of FNMA's assets plus 0.45% of adjusted off-balance-sheet obligations. JA-A212:¶20

**C.    Goldman Wrote the Offering Documents and Successfully Solicited Liberty's Investment in the Offerings.**

As a lead underwriter for the Offerings, Goldman's name appears prominently on the cover pages of the Offering Documents. JA-A206:¶1; JA-A218-JA-A219:¶45; JA-A219:¶47.  Goldman performed due diligence, wrote the Offering Documents, solicited potential investors, and provided potential investors with the Offering Documents.  JA-A206-JA-A207:¶2; JA-A218-JA-A219:¶¶45-47; JA-A220-JA-A221:¶50; JA-A245:¶¶129-130; JA-A247:¶¶142-143; JA-A1917-A1968.  Investors were expected to request any information about the Offerings from Goldman, and not from FNMA. JA-A220-JA-A221:¶50; JA-A1150.  Liberty and other investors expected Goldman to use its expertise to perform a reasonable due diligence investigation to ensure that the Offering Documents did not include false or misleading statements of material information, or omit any material information. JA-A219:¶47.

This expectation was reasonable.  Goldman's website assures investors that as an underwriter, Goldman will act as a "gatekeeper" and Goldman will "prepare [the] disclosure" in the offering documents. JA-A219:¶46; JA-A1812-JA-A1813.  Goldman acknowledges that "[a]n underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors."  JA-A1813.  Goldman also represents that its "Basic Responsibilities" as an

underwriter are to "*[c]onduct appropriate and thorough due diligence*" on the issuer so as to "[e]ndeavor to *ensure that there is no material misstatement/omission in disclosure*" in the offering documents.  JA-A1812 (emphasis added).  As a result, the disclosures in the Offering Documents about FNMA's financial capital condition were considered by investors to be Goldman's statements based on its thorough due diligence investigation of FNMA. JA-A219:¶47. [6]

      Goldman should have been on high alert when conducting its due diligence investigations for the Offerings. JA-A219-JA-A220:¶48.  Goldman was aware that FNMA had weak internal controls, and had a 30% capital surplus requirement because of previous misstatements of its financial condition.  JA-A219-JA-A220:¶48.  Goldman also knew that Countrywide was FNMA's largest customer, and that Countrywide had lax policies and poor origination practices. JA-A207:¶3; JA-A236-JA-A237:¶91.  As a lead underwriter, Goldman had extensive knowledge, including access to non-public information, about FNMA's capital inadequacy. JA-A226:¶68.

---

[6] This allegation is substantiated by William H. Purcell, an investment banker and underwriting expert. *See* JA-A177.

12

Goldman offered and sold the Series P and S preferred stock to Liberty by means of the Offering Documents. JA-A221:¶¶51-52; JA-A245:¶129; JA-A247:¶142. [7] Goldman communicated with Liberty about the Offerings and Liberty's purchase, and prepared and distributed emails and the Offering Documents to Liberty. JA-A245:¶130; JA-A247:¶143; JA-A1917-JA-A1968. Liberty purchased the FNMA preferred stock in the primary market pursuant to the Offering Documents. JA-A245:¶128; JA-A247:¶141. Goldman successfully solicited Liberty and other investors for its own benefit and was paid a percentage of the total dollar amount of the Offerings. JA-A245:¶¶ 129-130; JA-A247:¶142-143.

**D.     The Offering Documents Drafted and Distributed by Goldman Falsely Represented that FNMA Exceeded its Capital Requirements.**

The Offering Documents drafted and distributed by Goldman falsely claimed FNMA exceeded its capital requirements, when it did not. JA-A222-JA-

---

[7] Plaintiffs-Appellants who purchased either the Series P or Series S Preferred Stock in Massachusetts were Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company, and Liberty Life Assurance Company of Boston. JA-A245:¶128. Plaintiff-Appellant Safeco Corporation, a Washington corporation with its principal place of business in Seattle, Washington in 2007, purchased the Series S stock. JA-A241:¶106.

A223:¶56.[8]  Nowhere did the Offering Documents state what Goldman knew or

recklessly disregarded— that these figures could not be relied upon, or that the

capital "surplus" did not exist.[9]

As noted above, FNMA's core capital is the sum of the stated value of the

common and preferred stock, paid-in capital, and retained earnings.  Retained

earnings are reduced by any write-downs in the fair market value of assets such as

RMBS held by FNMA and the amount of reserves set aside to absorb credit losses

on FNMA's investment loan portfolio and its guaranteed loan portfolio.  The size

of the write-downs and loss reserves depended upon FNMA's exposure to risky

subprime and Alt-A loans, which had a much higher rate of default than prime

loans.  However, FNMA took no write-downs against its holdings of $76.5 billion

of subprime and Alt-A RMBS prior to the Series P Offering, and wrote down only

0.1 percent against its holdings in subprime and Alt-A RMBS prior to the Series S

---

[8] The Series P Memorandum represented that FNMA was adequately capitalized, and that FNMA exceeded its statutory minimum capital requirement by $12.055 billion and its OFHEO requirement by $2.959 billion as of June 30, 2007.  JA-A221:¶51.  Similarly, the Series S Offering Circular represented that FNMA had a surplus of core capital over the statutory minimum of $11.410 billion, and a surplus over the OFHEO minimum of $2.319 billion.  JA-A221:¶52.

[9] While OFHEO periodically reviewed FNMA's calculations, the review consisted only of a mathematical assessment of calculations provided by FNMA's management.  OFHEO did not audit, investigate, or otherwise attempt to verify the information supplied to it by FNMA. JA-A212-JA-A213:¶24.  This allegation is supported by Richard Stevens, an accounting expert who has been engaged by the SEC and other regulatory agencies.  *See* JA-A182-JA-A183.

Offering. JA-A223:¶58, JA-A224:¶60.[10]  Moreover, FNMA increased loss reserves

for its subprime and Alt-A loans to only 0.38 percent at the time of the Series P

Offering, and just 0.45 percent at the time of the Series S Offering. JA-A223:¶58,

JA-A224:¶60. [11]

      1.    **FNMA took astronomical write-downs and loss reserves on its subprime and Alt-A RMBS and mortgage loans after it went into conservatorship.**

On September 6, 2008, only nine months after the Series S Offering, a new

regulator, the FHFA, found FNMA did not have adequate capital and placed it into

conservatorship. JA-A214:¶30.  In its Form 10- K issued for the period ending

December 31, 2008, FNMA recorded write-downs of $6.752 billion and

established loan loss reserves of $24.753 billion. JA-A225:¶ 65.  The combined

write-downs and loss reserves had increased by more than *2,000 percent* within a

one-year period, to $31.505 billion. JA-A214:¶31.  This huge increase was not the

product of losses that occurred just in 2008, but reflected years of losses that

---

[10] FNMA reported that it held $76.2 billion in subprime and Alt-A RMBS, but recorded write-downs of only $81 million, or 0.1 percent. JA-A224:¶60.

[11] FNMA set loss reserves of $1.158 billion against $300.755 billion of subprime and Alt-A loans disclosed at the time of the Series P Offering, and $1.407 billion in loss reserves against $314.113 billion of subprime and Alt-A loans disclosed at the time of the Series S Offering. JA-A223:¶58; JA-A224:¶60.  Thus, FNMA's loss reserves were set at less than one half of one percent.

Goldman knew or should have known required much higher write-downs and loss reserves before the time of the Offerings. JA-A214:¶32. [12]

The lack of write-downs and inadequate loan loss reserves caused FNMA's core capital to be dramatically overstated in the Offering Documents.  Had adequate write-downs and loan loss reserves been set aside, FNMA would not have met its capital requirements at the time of the Offerings and the preferred stock could not have been sold. JA-A222:¶54; JA-A223:¶59; JA-A224:¶61.

> ### 2. FNMA's actual exposure to subprime and Alt-A loans was twice the amount falsely disclosed in SEC filings that were incorporated by reference in the Offering Documents.

When Goldman prepared and disseminated the false and misleading Offering Documents assuring Liberty and other investors that FNMA exceeded its capital requirements, Goldman knew or recklessly disregarded the reality that FNMA had not disclosed the full extent of its exposure as a guarantor of subprime and Alt-A loans.  JA-A225:¶64.  The concealment of FNMA's hidden sea of red ink became publicly known on December 16, 2011, when the SEC filed a complaint alleging securities fraud against several former FNMA officers. JA-A224:¶62; JA-A1840-JA-A1898.  Notably, FNMA entered into a Non-Prosecution

---

[12] This allegation is also substantiated by Mr. Stevens, who said "there is little doubt that the facts and circumstances associated with these adjustments were known to exist at least as early as the first quarter of 2007."   JA-A184.

Agreement with the SEC agreeing not to dispute or contest the factual allegations of the SEC Complaint. JA-A224:¶62; JA-A1900-JA-A1915.  Accordingly, the allegations of the SEC Complaint are highly plausible.

In its 2006 Form 10-K Report filed shortly before the Series P Offering Document was distributed by Goldman, FNMA disclosed its exposure to subprime and Alt-A mortgage loans in its single-family mortgage credit book of business. JA-A1870-JA-A1871:¶114.  The 2006 10-K claimed FNMA was exposed to only $4.8 billion in subprime loans and $296 billion in Alt-A loans.  JA-A1871:¶115; JA-A1888:¶181.  This was false.  FNMA's true exposure at that time was $57.1 billion in subprime loans and $534 billion in Alt-A loans.  JA-A1871:¶115; JA-A1888:¶181.  A similar pattern of misrepresentation occurred with respect to FNMA's Form 10-Q filings made on November 9, 2007.  JA-A1872:¶119.  FNMA reported exposure of $4.8 billion to subprime loans and $306 billion in Alt-A loans. JA-A1873:¶121; JA-A1889:¶185.  This too was false.  FNMA was actually exposed at that time to $60.6 billion in subprime loans and $573 billion in Alt-A loans.  JA-A1873:¶121; JA-A1889:¶185.  The 2006 10-K and the 2007 10-Q (collectively, the "SEC filings") are integral to and specifically referenced in the Offering Documents.  For example, the Series S Offering Circular "incorporates these documents by reference," and adds that "[t]hey are considered part of this Offering Circular and you should read them before you consider an investment in

17

the Preferred Stock." JA-A1185.  Obviously, investors expected that Goldman's

due diligence would require it to check the accuracy of the SEC filings before

representing that FNMA was adequately capitalized— especially given Goldman's

extensive involvement with the subprime and Alt-A markets.

FNMA's concealment of its large exposure to subprime and Alt-A mortgage

loans is startling.  At the time of each Offering, FNMA's actual exposure to

subprime and Alt-A loans was $600 billion— more than double the amount

disclosed to investors.  In a recent opinion, the district court held that "[t]he SEC

has adequately alleged that FNMA's quantitative subprime and Alt-A disclosures

were false because they failed to include all loans that fell within FNMA's

subprime and Alt-A description."  *SEC v. Mudd*, No. 11 Civ. 09201, 2012 U.S.

Dist. LEXIS 115087, at *24 (S.D.N.Y. Aug. 10, 2012).

If adequate write-downs and reasonable loan loss reserves had been taken

for all the subprime and Alt-A loans and RMBS actually held or guaranteed by

FNMA at the time of the Offerings, FNMA's core capital would have been far

below its minimum capital requirements. JA-A240:¶100.  Thus, no dividend could

be paid on the preferred stock and no investor would have bought it.  The only

plausible inference that can be drawn from Liberty's allegations is that the

Offering Documents prepared and distributed by Goldman contained false material

representations and omissions calculated to mislead Liberty and other investors to believe FNMA exceeded its capital requirements and would enjoy surplus capital after the Offerings. This inference is even more plausible in light of Liberty's specific factual allegations against Goldman.

### 3.   Goldman knew that FNMA did not meet its capital requirements.

By 2007, Goldman had developed sophisticated and proprietary models that gave it unique information that subprime and Alt-A securities were not as safe as had been represented to investors, and that these types of securities had already experienced substantial losses that were not yet recognized by the market. JA-A207-JA-A208:¶4; JA-A225-JA-A226:¶66; JA-A228-JA-A229:¶74. Internal emails circulated by Goldman senior executives throughout 2007 evidence its knowledge that the subprime and Alt-A residential mortgage market was overvalued and ready to collapse. JA-A231-JA-A232:¶82.[13] In a presentation by

---

[13]  Examples of emails circulated by Goldman executives in 2007 are as follows: "Subprime Loans- net short spreads significantly . . . Alt-A Sector has not been effected yet by lower credit contagion but we expect it to come up so we've upped dilg and are turning the books fast." February 11, 2007 email received by, and responded to by, Goldman CEO Lloyd Blankfein. JA-A232:¶82(b).

"Just fyi not for the memo, my understanding is that desk is no longer buying subprime. (We are low balling on bids.)" March 2, 2007 email from Patrick Welch, Goldman Credit Dept., to Chief Credit Officer Craig Broderick. JA-A232:¶82(c).

"[W]e are trying to close everything down, but stay on the short side . . . and we will likely do some other things like buying puts on companies with exposure to

*Footnote continued on next page . . .*

David Viniar, Goldman's Executive Vice President and CFO, to Goldman's Board of Directors on  September 17, 2007 (just days prior to the Series P Offering), Goldman had "[a]ssumed that subprime losses changed from approx. 4% to low teens." JA-A208:¶6; JA-A226:¶67; JA-A1829 .[14]  In other words, ***Goldman knew before the Offerings that subprime and Alt-A mortgage loan values and the securities based upon these loans had declined on average by at least 13%.***

Goldman gained this knowledge as a result of its substantial and multifaceted involvement in the subprime and Alt-A residential mortgage financing industry. JA-A207:¶3.  From Goldman's central vantage point, it knew that underwriting standards had been abandoned by lenders who did business with FNMA. JA-A227: ¶71; JA-A236-237: ¶91.  Goldman had provided billions of dollars in "warehouse" lines of credit to provide funding to subprime and Alt-A lenders such as Countrywide to originate pools of high risk residential mortgage loans that could be securitized and sold to investors.  JA-A207:¶3.  These "warehouse" lines of credit were repaid when the originators' loans were sold to

--------------------------------------------------------

*. . . footnote continued from prior page*

mortgages." March 8, 2007 email from Goldman's Head of Mortgage Dept. Daniel Sparks to Goldman CFO and Executive VP David Viniar, Co-COO Gary Cohn, Goldman Managing Director Tom Montag, and Co-President of Goldman Sachs Group Jon Winkelried, among others. JA-A232:¶82(d).

"Tells you what might be happening to people who don't have the big short." July 25, 2007 email from Viniar to Cohn. JA-A234:¶82(i).

[14]  Goldman by this time had defined its subprime mortgage business to include both subprime and Alt-A loans.  JA-A1827.

Goldman for securitization. JA-A207:¶3. Goldman actively helped these lenders securitize pools of high risk, poor quality mortgage loans to investors while Goldman also acted as an underwriter in selling these securities to investors like FNMA. JA-A207:¶3. As an underwriter of these RMBS offerings, Goldman regularly used an outside firm, Clayton Holdings, to conduct due diligence and to review loans for quality. JA-A215:¶36. Clayton reported to Goldman that these loans were poorly underwritten and were of low quality. JA-A215:¶36.

Goldman repositioned itself to profit from the collapse of the subprime and Alt-A markets. JA-A207-JA-A209:¶¶4-7. The Viniar presentation on September 17, 2007 describes the "Tactical Positioning" of Goldman's business that occurred during the first three quarters of 2007 in reaction to "the ensuing mortgage credit and liquidity crisis." JA-A1825. As of January 31, 2007, Goldman had funded $1.5 billion in warehouse lines of credit to loan originators. JA-A1828. By September 2007, Goldman had completely shut down all residential loan warehouses, and its remaining warehouse funding was reduced to $60 million. JA-A1825; JA-A1828.

Based on its specialized knowledge, Goldman systematically took short positions on securities backed by subprime and Alt-A mortgages throughout most of 2007. JA-A208:¶5; JA-A227-JA-A228:¶¶71-72. Goldman's net short position

reached a peak of $13.9 billion on June 22, 2007, including a massive short position of $9 billion against subprime securities that were rated AAA. JA-A228:¶73. Goldman locked in large profits on its net short positions, realizing a $2.8 billion gain in the third quarter of 2007 alone. JA-A228:¶73. In other words, Goldman profited handsomely on its knowledge that the same type of subprime and Alt-A mortgage loans that were owned or guaranteed by FNMA had already experienced significant declines in value before the time of the Offerings. Goldman also knew that FNMA had set aside loss reserves that were woefully inadequate.

At the same time, Goldman was taking actions to off-load to others the losses already realized on its own subprime and Alt-A inventory. JA-A208:¶5. In doing so, Goldman systematically engaged in fraudulent and deceptive practices, as documented in the comprehensive majority and minority Staff Report of the Permanent Subcommittee on Investigations of the United States Senate released on April 13, 2011.[15] Following a two-year investigation, the Staff Report concluded that Goldman regularly failed to disclose key information to investors, misrepresented sources of assets, and sold securities designed to fail. JA-A209:¶8; JA-A216-JA-A218:¶¶40-43; ECF No. 135:EX#18.pp.602-603. The Staff Report

---

[15] Some 240 pages of the Staff Report address Goldman's practices alone. ECF No. 135.

also concluded that Goldman "magnified risks in the market by selling high risk, poor quality mortgage products to investors around the world."  ECF No. 135:EX#18,p. 376.

Goldman's securitizations directly targeted FNMA as an investor.  The FHFA has filed a complaint alleging that from September 29, 2005 through May 24, 2007, Goldman, acting as an underwriter, sold FNMA billions of dollars of RMBS and in the offering documents made material misstatements about the quality of the underlying mortgage loans. JA-A215:¶34.  The performance of those loans resulted in huge losses to FNMA. JA-A215-JA-216:¶¶35-39.  Goldman knew FNMA had purchased devalued securities because Goldman had sold these securities to FNMA in the first place.

As shown by the recent Non-Prosecution Agreement and SEC Complaint, a majority of the subprime and Alt-A loans guaranteed by FNMA and not disclosed by Goldman at the time of the Offerings originated with Countrywide. JA-A1873-JA-A1874:¶¶126-128; JA-A1883-JA-A1884:¶¶165-167.  Goldman had provided warehouse funding to Countrywide, and had purchased and underwritten securities backed by Countrywide loans from 2004-2007.  Through its dealings with Countrywide, Goldman learned of the lax origination practices and poor underwriting standards at Countrywide. JA-A236-JA-A237:¶¶91-93.  As an

underwriter familiar with the books and records of both FNMA and Countrywide, Goldman knew, recklessly disregarded, or should have known that FNMA had additional exposure to billions of dollars in Countrywide subprime and Alt-A loans that were not disclosed to investors, for which substantial additional write-downs and loss reserves should have been taken. JA-A225:¶64; JA-A236-JA-A237:¶91.

In August and November 2007, Goldman demanded billions of dollars in additional collateral on credit default swap contracts from AIG because of Goldman's belief that the value of securities backed by subprime and Alt-A mortgage loans had significantly declined. JA-A235:¶¶84-86. The $3.2 billion collateral demand made by Goldman to AIG in November 2007 shows that the securities had already experienced a 15% loss in value. JA-A235:¶86. These collateral demands are consistent with the Viniar presentation in September 2007, which concluded that losses had already reached the "low teens" for subprime and Alt-A mortgages.

In stark contrast, Goldman knew FNMA's write-downs of its RMBS were zero and its loss reserves represented only 0.38% of the $300 billion subprime and Alt-A loans that were disclosed to investors at the time of the Series P Offering. JA-A223:¶58. These loss reserves were actually a much lower fractional percentage, because FNMA's *actual* subprime and Alt-A loan exposure was $600

24

billion. The same was true regarding the Series S Offering. Goldman knew or at least recklessly disregarded that FNMA had billions in exposure to subprime and Alt-A loans that was not yet recognized, and, thus, that the write-downs and loan loss reserves were significantly understated. JA-A225:¶64; JA-A237-JA-A238:¶94.[16]

Goldman possessed a strong motive and incentive to conceal FNMA's true financial condition. JA-A238:¶95. By failing to disclose the fair value of FNMA's portfolio, Goldman could continue selling its own inventory of subprime and Alt-A investments at significantly inflated values. JA-A238:¶95. Goldman was also able to continue generating huge profits as an underwriter of residential mortgage products. JA-A238:¶95. Goldman had enormous financial incentives to complete as many offerings as possible, regardless of the accuracy of the Offering Documents. JA-A239:¶98. Goldman's actions in underwriting the Series P and S Offerings were fraudulent and deceptive under state law— just another part of Goldman's scheme in 2007 to defraud investors, as more fully described in the Staff Report. JA-A209:¶8.

---

[16] If FNMA had taken write-downs and loss reserves of only one percent of its subprime and Alt-A exposure, FNMA would have been far below its OFHEO capital requirement. At just two percent, FNMA would also not have met its statutory minimum requirement.

At minimum, Goldman as a lead underwriter failed to exercise reasonable care or competence in exercising due diligence in violation of the state laws of Massachusetts and Washington. JA-A219-JA-A220:¶¶46-49; JA-A250:¶159.  A reasonable due diligence investigation would have uncovered that FNMA had failed to disclose over $300 billion in exposure to subprime and Alt-A loans, and that FNMA's write-downs and loan loss reserves were unreasonably too low.

### E.   Liberty Relied Upon Goldman's False Representations, Omissions and Deceptive Conduct.

Liberty alleges it relied on Goldman's false representations and omissions in deciding to invest $62.5 million in the Offerings. JA-A206:¶1; JA-A239-JA-A241:¶¶99-108; JA-A244:¶123; JA-A246:¶137; JA-A248:¶145; JA-A249:¶155; JA-A250:¶160.  Had Liberty been informed that the valuation placed on the billions of dollars of subprime and Alt-A loans was overstated, that the reported write-downs and loan loss reserves were grossly inadequate, or that FNMA would not meet its capital requirements even with the additional proceeds from the Offerings, Liberty would not have purchased the Series P and S preferred stock. JA-A240:¶101.

It was foreseeable that investors such as Liberty would pay an inflated price for the Series P and Series S preferred stock in reliance on Goldman's misrepresentations and omissions. JA-A242:¶110.  It was also foreseeable that

26

after the deteriorating value of its subprime and Alt-A assets became known,

FNMA's core capital would be revealed to be vastly overstated and its preferred

stock would essentially become worthless.  JA-A242:¶110.  In fact, after a series of

partial disclosures was finally made in 2008 regarding the deterioration of

FNMA's financial condition, FNMA was placed into conservatorship, dividend

payments were suspended, and the stock lost almost all of its value. JA-

A242:¶¶111-112.  As a direct and foreseeable consequence of Goldman's

misrepresentations, Liberty has suffered huge losses on its purchase of the

preferred stock. JA-A242:¶114.

## VII.  SUMMARY OF ARGUMENT

When all non-conclusory allegations in the SAC are accepted as true, all

reasonable inferences are drawn in Liberty's favor, and the facts alleged in the

SAC are viewed in the light most favorable to Liberty, it is clear that Liberty has

alleged detailed and plausible facts that support each of its state law claims.  This

Court should reverse the district court's judgment dismissing Liberty's SAC for the

following reasons:

*First,* Liberty alleges with specificity that the Offering Documents drafted

and distributed by Goldman falsely represented FNMA's core capital.  Liberty

makes plausible factual allegations that the Offering Documents misrepresented

that FNMA exceeded its core capital requirements, and failed to disclose FNMA's exposure to hundreds of billions of dollars of subprime and Alt-A mortgage loans. Liberty also makes plausible factual allegations that Goldman, while acting as a lead underwriter for the Offerings, knew or recklessly disregarded that FNMA did not meet its capital requirements because of substantial declines in value in its subprime and Alt-A holdings. The district court did not address these factual allegations. Instead, the district court relied solely on its earlier 2010 Opinion, which found that the class action plaintiffs in a different case had not adequately pleaded that FNMA and its officers misrepresented that FNMA met its capital requirements. Unlike the class plaintiffs, Liberty has made factual allegations that Goldman knew that FNMA's enormous exposure to Alt-A and subprime mortgages had already impaired its ability to meet its critical capital requirements at the time of the Offerings. These allegations are substantiated by the U.S. Senate Staff Report and a host of internal Goldman documents released after the 2010 Opinion. The district court also failed to address Liberty's allegation that Goldman knew FNMA had not fully disclosed its exposure to $600 billion in subprime and Alt-A mortgage loans, for which substantial additional loss reserves should have been taken. In short, Liberty adequately alleges the Offering Documents' statements concerning FNMA's capital position were false.

*Second*, Liberty pleads sufficient facts to support all of the elements of its state law claims. The Massachusetts and Washington securities fraud statutes, unfair or deceptive trade practices statutes, and common law causes of action reach well beyond Section 10(b) to prohibit a range of false, unfair, deceptive or negligent conduct. The state law claims do not require Goldman to have "made" the statements in the Offering Documents, and material omissions (as well as misstatements) are actionable under several of Liberty's state law claims. The SAC properly states a claim for relief under each of Liberty's state law counts.

*Third*, the district court's additional grounds for dismissing the SAC are unsupportable. Although recognizing that the SEC filings made at the time of the Offerings contained false information that misled investors, the district court improperly treated the SEC filings as being separate from the Offering Documents. The SEC filings were incorporated by reference and integral to the representations regarding FNMA's core capital made in the Offering Documents prepared and distributed by Goldman. The district court also failed to recognize that Goldman, as a lead underwriter that knew or should have known of the materially false information, was not required to "make" or "supply" the false information to be liable under Liberty's state law claims. The district court also erred in ruling that Liberty did not explicitly plead reliance on the false statements contained in the SEC filings. Most of the state law claims simply do not require reliance, and even

29

when reliance must be shown it is a fact question for the jury. The district court also overlooked Liberty's allegations that it relied on Goldman's false representations in the Offering Documents that FNMA exceeded its capital requirements and the valuation placed on FNMA's subprime and Alt-A mortgages.

## VIII.  ARGUMENT

### A.    Liberty Has Stated A Claim Against Goldman For Each of Its State Law Counts.

#### 1.    The Offering Documents Were False and Misleading.

Liberty alleges the Offering Documents that Goldman drafted and distributed misrepresented FNMA's core capital, and explains with specificity why these statements were false.  *Supra*, Section V, D.  Hundreds of billions of dollars of subprime and Alt-A mortgages held and guaranteed by FNMA had already declined in value at the time of the Offerings.  JA-A214:¶32; *supra*, Section V, D, 3.  At the time of the Offerings, FNMA had taken virtually no write-downs for its $76.5 billion portfolio of subprime and Alt-A RMBs, and set loan reserves of only a small fraction of one percent against its portfolio of $600 billion in subprime and Alt-A loans.  JA-A223:¶58; JA-A224:¶60.  A year later, the FHFA (as conservator for FNMA) took write-downs and set aside loss reserves of more than $31 billion, an amount more than *30 times* what FNMA had set aside.  JA-A214:¶31.  Liberty alleges that these higher write-downs and loss reserves should have been established at the time of the Offerings, JA-A214:¶32, because it is not plausible

30

that a 2,000 percent increase in subprime and Alt-A losses occurred only after the Offerings in 2008.

At the pleading stage, it is not plausible to infer that the minimal FNMA write-downs and loss reserves in 2007 were reasonable estimates in light of the allegations Liberty has made against Goldman.  The only permissible inference from the SAC is that Goldman knew that FNMA did not meet its capital requirements because inadequate write-downs and loss reserves had been taken on its own subprime and Alt-A holdings.  *Supra*, Section V, D. 3. The Staff Report documents Goldman's knowledge, through its role securitizing mortgages and as a warehouse lender, that subprime and Alt-A mortgages had already lost substantial value in 2007, and reveals that Goldman made billions of dollars by systematically shorting subprime and Alt-A mortgages prior to the Offerings.  JA-A216-JA-218:¶¶40-43; JA-A228:¶¶73-74.

In contrast to FNMA, Goldman had already recognized substantial losses on its own subprime and Alt-A investments and inventory, and was either selling or writing down those investments and inventory.  JA-A226:¶67.  Goldman's senior management advised its Board of Directors in September 2007 that subprime and Alt-A losses had now reached the "low teens." JA-A226:¶67; JA-A1829.  Acting on this knowledge, Goldman made multibillion dollar collateral demands to AIG

on credit default swap contracts, immediately prior to both the Series P and S Offerings.  JA-A235:¶¶84-86.  These collateral demands evidenced Goldman's understanding that the underlying mortgage securities had already lost 15 percent of their value, which was consistent with Goldman's internal valuations, JA-A235:¶¶84-86, and far greater than the minimal write-downs and loan reserves Goldman knew FNMA took at the time of the Offerings. JA-A223-JA-A224:¶¶58-61.

The district court held that Liberty's allegation with respect to the significantly higher ($31 billion) write-downs and loss reserves taken a year after the Offerings was "an allegation of fraud by hindsight."  SPA56.  The district court, however, ignored Liberty's allegations that Goldman had superior knowledge that write-downs and loss reserves of this magnitude should have been set aside by FNMA *at the time of the Offerings*.  JA-A208-JA-A209:¶7; JA-A223:¶59; JA-A224:¶61; JA-A225:¶64; JA-A226-JA-A227:¶¶68-70.  The district court even ignored Liberty's allegation, based on the credible FHFA complaint, that Goldman had misrepresented the quality of billions of dollars in mortgage loans in securities that it sold to FNMA prior to the Offerings, causing substantial losses to FNMA.  JA-A215-JA-A216:¶¶34-39.

Liberty has made plausible allegations that Goldman knew FNMA did not meet its capital requirements at the time of the Offerings because the risky subprime and Alt-A mortgages that FNMA guaranteed or owned had already suffered significant declines in value. *Supra*, Section V, D. 3. This Court recently considered the adequacy of allegations that Goldman defrauded other investors who purchased mortgage-backed securities in October 2007 and May 2008. This Court found it "not just plausible- but obvious- that mortgage-backed securities like the Certificates would suffer a decline in value as a result of (1) ratings downgrades and (2) less certain cash flows." *NECA-IBEW Health & Welfare Fund,* 693 F.3d at 166. Here, Liberty alleges that Goldman had the same knowledge when it underwrote and sold the FNMA preferred stock, which was heavily backed by subprime and Alt-A mortgages.[17]

Liberty alleges that FNMA on December 31, 2008 finally reported write-downs of $6.752 billion and loss reserves of $24.753 billion, and the write-downs and loss reserves of this magnitude ***should have been taken and the capital shortfall disclosed by Goldman to Liberty prior to the Offerings***. JA-A225:¶65. The extraordinary increase in combined write-downs and loss reserves shortly after

---

[17] Goldman's scheme in 2007 to eliminate "its enormous financial exposure" to subprime mortgage-backed investments is addressed in *Dodona I, LLC v. Goldman, Sachs & Co*., 847 F. Supp. 2d 624 (S.D.N.Y. 2012). Goldman's overall conduct is described as "not only reckless, but bordering on cynical." *Id*. at 641.

the Offerings, coupled with the detailed factual allegations made with respect to

Goldman's knowledge and conduct and the reality that FNMA had more than

double the quantitative exposure to subprime and Alt-A loans than reported in the

Offering Documents, support Liberty's contention that FNMA was far short of its

core capital at the time of the Offerings.  *See Novak*, 216 F.3d at 312-13

(significant write-off supported plaintiffs' contention that inventory was seriously

overvalued when misleading statements were made); *see also Rothman v. Gregor*,

220 F.3d 81, 92 (2d Cir. 2000) (magnitude of write-off evidences defendant's

fraudulent intent).  Liberty more than adequately pleads that the Offering

Documents' statements concerning FNMA's core capital were false.

>        a.    **The district court erred in relying solely upon its 2010**
>              **Opinion, which involved different parties, claims, and**
>              **factual allegations.**

In dismissing Liberty's claims for lack of falsity, the district court failed to

address Liberty's detailed factual allegations against Goldman in this case.

Instead, the district court relied on its 2010 Opinion, which addressed the class

plaintiffs' 10(b) allegations made against FNMA and its officers.  There, the court

held that the class plaintiffs did not adequately plead that FNMA or its officers

made material misrepresentations regarding FNMA's core capital. *In re Fannie*

*Mae 2008 Sec. Litig.*, 742 F.Supp.2d 382, 417 (S.D.N.Y. 2010).

34

As an initial matter, the court's holding in the 2010 Opinion about the accuracy of FNMA's core capital representations is undermined by the district court's additional ruling that the class plaintiffs did sufficiently allege that FNMA and its officers made misstatements to the market regarding internal risk management and control safeguards. *Id*. at 404-06. In a subsequent order, the district court explained that part of the 2010 Opinion as follows:

> At the most general level, the Court held that Fannie Mae's risk management and controls were insufficient to evaluate the risks of subprime and Alt-A mortgages; and that Fannie Mae misinformed the market concerning its risk management capabilities.

JA-A168. It would seem axiomatic that if FNMA could not evaluate these risks, it was in no position to make reasonable estimates of the write-downs and loss reserves required for its enormous subprime and Alt-A portfolio, or to make accurate representations regarding its capitalization. On the other hand, ***Goldman***, with its unique insight into the deteriorating condition of the subprime and Alt-A mortgage market, knew that the minimal write-downs and loan loss reserves of FNMA were grossly inadequate. *Supra* Section V, D. 3.

There are many other reasons why the district court should not have relied on the 2010 Opinion as a basis to dismiss Liberty's state law claims against Goldman. The class plaintiffs could not adequately plead that FNMA made

35

material misrepresentations regarding its exposure to subprime and Alt-A

mortgages, *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d at 402, because

they did not then have the benefit of the facts and allegations in the SEC complaint

and FNMA's Non-Prosecution Agreement.  Liberty makes allegations, now

uncontested by FNMA, that FNMA was exposed to $300 billion in additional

subprime and Alt-A loans that were not disclosed to investors at the time of the

Offerings.  *Supra*, Section V, D. 2.  This additional exposure had a direct bearing

on the reasonableness of the write-downs and loss reserves.  While the district

court recently ruled that FNMA and its officers misled investors by failing to

disclose this additional subprime and Alt-A exposure,  *Mudd*, 2012 U.S. Dist.

LEXIS 115087, at *24-*27, the district court failed to consider Liberty's plausible

allegation that this additional exposure required substantially greater write-downs

and loss reserves at the time of the Offerings.  JA-A225:¶64.

The district court also never addressed Liberty's allegations that show

Goldman knew that the residential housing market was collapsing and that

FNMA's subprime and Alt-A mortgage assets were grossly overvalued at the time

of the Offerings.  *Supra*, Section V, D. 3. Liberty has made detailed factual

allegations, based upon Goldman's own loss valuations, that FNMA's subprime

and Alt-A exposure of almost $700 billion required write-downs and loss reserves

far greater than a small fraction of one percent.  These allegations are supported by

the heavily documented Staff Report, which was not released until April 2011, and thus was not available to the class plaintiffs.

The class plaintiffs conceded that FNMA "invested principally in low-risk subprime and Alt-A securities" rated AAA. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d at 402. The district court concluded in its 2010 Opinion that because these AAA-rated securities were conceded to be low risk investments, class plaintiffs failed to meet the pleading requirements of Rule 9(b). *Id.* In stark contrast, with the benefit of the Staff Report, Liberty alleges that Goldman knew that (so-called) AAA-ratings were grossly inflated, and that the AAA-rated subprime and Alt-A RMBS held by FNMA was substantially overvalued at the time of the Offerings. JA-A228-JA-A230:¶¶73-78.

Liberty has pleaded specific examples of huge losses realized before the Offerings on AAA-rated RMBS marketed by Goldman, as well as the fact that Goldman held a $9 billion short position on AAA-rated RMBS as late as June 2007. JA-A228-JA-A230:¶¶73-78. Liberty alleges that Goldman paid a $550 million fine for misleading investors in just one large AAA-rated securitization deal called "Abacus" that had failed by October 2007. JA-A229-JA-A230:¶76. The district court overlooked these allegations, again relying on its earlier 2010

37

Opinion holding that FNMA did not overstate its core capital because its subprime and Alt-A loan holdings were not risky.

Lacking the detailed factual allegations made by Liberty, the class plaintiffs alleged that FNMA misstated its core capital claims by relying *solely* on the timing of the large write-downs that occurred in 2008, and a Home Price Forecasting Report that predicted a 50% decline in the market over three to five years. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d at 407. The district court characterized these allegations, made without other corroboration, as fraud by hindsight. *Id.,* at 411. However, the concept of fraud by hindsight does not apply where, as here, plaintiffs allege the misrepresentations and omissions were false and misleading at the time they were made. *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 487, 504-05 (S.D.N.Y. 2011).[18]

The district court also based its dismissal of the class plaintiffs' claim in the 2010 Opinion on its finding that OFHEO "reported repeatedly that [FNMA] was adequately capitalized" and that FHFA had not asked for a restatement of FNMA's

---

[18] The court in its 2010 Opinion also found that class plaintiffs' scienter allegations were lacking, in part because the defendant FNMA officers had not sold their FNMA stock prior to FNMA's collapse in 2008. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d at 403. In contrast, here Liberty alleges that Goldman unloaded and wrote down its own subprime inventory and took huge short positions on the same type of subprime and Alt-A loans that proved to be the undoing of FNMA.

financial statements. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d at 408. Here, the district court overlooked Liberty's allegation that OFHEO only periodically reviewed FNMA's core capital calculations, and never audited or tested FNMA's underlying information. JA-A212-JA-A213:¶24. The district court also overlooked Liberty's allegation that FHFA was not required to restate FNMA's 2007 financial statements only because no reasonable investor would continue to rely on those statements after FNMA was placed in conservatorship. JA-A215:¶33. These allegations are substantiated by the declaration of an accounting expert, Richard Stevens, but the district court never addressed this.

In short, the district court erred in ruling as a matter of law that that the Offering Documents prepared and distributed by Goldman contained no false information. Instead of assessing the plausibility of Liberty's specific factual allegations, the district court improperly dismissed Liberty's claims solely in reliance on its 2010 Opinion. SPA56. Liberty has plausibly alleged that the Offering Documents falsely represented that FNMA exceeded its capital requirements, and failed to disclose FNMA's exposure as a guarantor of hundreds of billions of dollars of subprime and Alt-A mortgage loans.

2.     **The Other Elements of Liberty's State Law Claims are Well-Pleaded.**

a.     **Under the Massachusetts and Washington securities statutes, Goldman is liable as a seller for the misstatements and omissions in the Offerings Documents.**

i.     **Goldman is liable as a seller under Mass. Gen. Laws ch. 110A, § 410(a) because it successfully solicited Liberty's investment in the Offerings.**

Count II of the SAC alleges that Goldman violated the Massachusetts securities statute, which makes liable any person who "offers or sells a security *by means of any untrue statement…or* the *omission* of, any material fact…" Mass. Gen. Laws ch. 110A, § 410 (a)(2) (emphasis added). The statute does not require the person offering or selling the security to "make" the statement. Courts construing Section 410(a)(2) look to decisions addressing its federal counterpart, Section 12(a)(2) of the Securities Act of 1933. *Marram v. Kobrick Offshore Fund, Ltd.,* 809 N.E.2d 1017, 1025 (Mass. 2004). Liability under Section 12(a)(2) attaches not only to those who transfer title of the security, but to those who "successfully solicit[] the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988).

In the seminal case addressing Section 410(a)(2), the Massachusetts Supreme Judicial Court in *Marram* observed that the statute "creates a strong

40

incentive for sellers of securities to disclose fully all material facts about the security." *Marram*, 809 N.E.2d at 1025.[19]  A plaintiff is not required to prove that the defendant acted with scienter or negligence. *Id*. at 1026.  Instead, a defendant has the "heavy burden of proof 'that [it] did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." *Id.* (citations omitted).  Nor is a plaintiff required to prove reliance or loss causation. *Id.* at 1027.  And plaintiff's sophistication is irrelevant. *Id.*  In short, the Massachusetts securities statute "provides strong protections for a buyer who received misleading information from a seller of securities." *Id*. at 1026.  Accordingly, Section 410(a) provides much broader protection that that afforded under Section 10(b).

Applying the principles set forth in *Marram*, the court in *Miller Inv. Trust v. Morgan Stanley & Co*., No. 1:11-cv-12126-JLT, 2012 U.S. Dist. LEXIS 102537 (D. Mass. July 24, 2012), rejected a motion to dismiss a Section 410(a)(2) claim made against an underwriter that drafted, in part, a false offering document.[20]  *Id*. at *7.  The underwriter's name was prominently featured on the cover of the

---

[19] Section 410(a)(2) has only four elements: (1) the defendant offered or sold securities in Massachusetts; (2) through an untrue statement, or the omission of, any material fact; (3) the plaintiff did not know of the untruth or omission; and (4) the defendant knew or should have known of the untruth or omission. *Marram*, 809 N.E.2d at 1026-27.

[20] There, the plaintiff alleged that it purchased the securities directly from the defendant. *Id*. at *8.

41

offering document.  *Id*.  The offering document incorporated the issuer's false SEC filings, which overstated the issuer's revenue.  Stating that Section 410(a)(2) "is designed to hold the seller 'liable for inaccurate disclosure or nondisclosure of material information,'" *id*. at *13 (*quoting Marram*, 809 N.E.2d at 2006), the court held that the investor had stated a claim against the underwriter under the statute. *Id*. at *16.  *Accord Capital Ventures Int'l v. UBS Sec. LLC*, No. 11-11937-DJC, 2012 U.S. Dist. LEXIS 140663, *2, *5-6 (denying motion to dismiss Section 410(a)(2) claim made against underwriter for misstatements and omissions in offering materials).

Here, Liberty has stated a claim against Goldman under Section 410(a)(2). Goldman offered the preferred stock in Massachusetts by means of the Offering Documents.  JA-A245:¶129. Goldman communicated with Liberty about the Offerings and Liberty's purchase.  JA-A245:¶¶130; JA-A1917-A1968.  Liberty purchased the securities pursuant to the Offering Documents.  JA-A245:¶128. Goldman solicited the sale for its own benefit and was paid a percentage of the total dollar amount of the Offerings.  JA-A245:¶129.  Goldman successfully solicited the sale of the preferred stock.[21]  JA-A245:¶130.  Under Massachusetts

---

[21] Goldman also performed due diligence, prepared and distributed the Offering Documents, and incorporated the false SEC filings by reference. JA-A206-JA-

*Footnote continued on next page . . .*

law, these facts are sufficient to state a claim against Goldman under the

Massachusetts securities statute for the misstatements and omissions in the

Offering Documents.

> ### ii. Goldman is a seller under the Washington State Securities Act because it was a substantial contributive factor in Safeco's purchase of the preferred stock.

In Count IV of the SAC, Plaintiff-Appellant Safeco alleges that Goldman

violated the Washington State Securities Act ("WSSA").  The WSSA imposes

liability on sellers of securities, and it is construed even more broadly than Section

12(a)(2) to effectuate its purpose of protecting investors.  Wash. Rev. Code §

21.20.430; *King Cnty. Wash. v. Merrill Lynch & Co.*, No. C10-1156 RSM, 2011

U.S. Dist. LEXIS 16483, at *7 (W.D. Wash. Feb. 18, 2011); *Haberman v. Wash.

Pub. Power Supply Sys.*, 744 P.2d 1032, 1049 (Wash. 1987).  Scienter is not an

element of the WSSA.  *Kittilson v. Ford*, 608 P.2d 264, 266 (Wash. 1980); *Neale

v. Suarez*, No. C09-0770-JCC, 2011 U.S. Dist. LEXIS 15231, at *14 (W.D. Wash.

Feb. 15, 2011).[22]

---

*. . . footnote continued from prior page*

A207:¶2; JA-A218-JA-A219:¶¶45-47; JA-A223:¶57; JA-A224:¶60; JA-A245:¶¶129-130; JA-A247:¶¶142-143.

[22] The WSSA provides, in relevant part: "(1) Any person, who offers or sells a security in violation of any provisions of RCW 21.20.010… is liable to the person buying the security from him or her…" Wash. Rev. Code § 21.20.430.  Section

*Footnote continued on next page . . .*

Seller liability attaches to those whose acts were a "substantial contributive factor" in the securities transaction. *Livid Holdings Ltd., v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 952 (9th Cir. 2005); *Hoffer v. State of Wash.*, 776 P.2d 963, 965 (Wash. 1989); *Haberman*, 744 P.2d at 1052 ("[w]hether a defendant's conduct was a substantial contributive factor is necessarily a question of fact").  Further, participants involved in a securities transaction who are not substantial contributive factors may still be subject to secondary liability.  *Haberman*, 744 P.2d at 1052.

Underwriters and others providing professional services are subject to liability under the WSSA for misstatements and omissions in offering documents. *See Livid Holdings Ltd.,* 416 F.3d at 952 (reversing dismissal of claims against defendants alleged to have written misleading statement in sales memorandum); *Haberman*, 744 P.2d at 1044, 1048-52 (reversing dismissal of claims against investment advisors and other professionals alleged to have helped prepare official statements that accompanied bond offerings); *Reale v. Ernst & Young, LLP*, No. 43932-4-1, 2000 Wash. App. LEXIS 1239, at *2, *10-*15 (Wash Ct. App. July 10,

_____ *. . . footnote continued from prior page*

21.20.010 makes it unlawful for any person "in connection with the offer [or] sale… of any security, directly or indirectly: (1) To employ any device, scheme or artifice to defraud; (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading; or (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Wash. Rev. Code § 21.20.010.

2000) (denying motion to dismiss WSSA claim against underwriters alleged to have misrepresented or omitted material information in course of their due diligence and preparation of prospectus); *see also In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1300-01 (E.D. Wash. 2007) (denying motion to dismiss against underwriter and accountants, noting fact-intensive question of "substantial contributing factor test" could not be resolved on motion to dismiss). Underwriters are liable even if they did not sell to the plaintiff, and direct communications between the underwriter and the plaintiff are not necessary. *Reale,* 2000 Wash. App. LEXIS 1239, at *8-*12.

*Reale* is highly instructive. There, plaintiffs alleged a claim under the WSSA against the underwriters of an initial public offering. *Id.* at *2. Plaintiffs claimed that the underwriters misrepresented or omitted material information relating to the company's financial condition. *Id.* Plaintiffs did not allege that they purchased the stock directly from the defendants or even had contact with defendants, but did allege that the defendants "were involved in drafting" the prospectus and registration statement and also performed due diligence. *Id.* at *3. The Washington Court of Appeals reversed the trial court's dismissal of the complaint, finding that it satisfied the "substantial contributive factor test." *Id.* at *10.

45

Here, Liberty alleges that Goldman was a lead underwriter that conducted the due diligence, prepared and distributed the Offering Documents to potential investors, and successfully solicited Safeco's purchase, all of which conduct was a substantial contributive factor in Safeco's purchase of the preferred stock.  JA-A247-JA-A248:¶¶142-144.  If Goldman had disclosed the true financial condition of FNMA there would have been no Series P and S Offerings at all. JA-A239:¶97; JA-A241:¶109.  Under Washington law, these facts are sufficient to state a claim against Goldman as a seller under the WSSA.

> **b.   The claims under the unfair or deceptive practices statutes are adequately stated because Goldman drafted and distributed the false and misleading Offering Documents.**

The SAC states claims under the Massachusetts and Washington unfair or deceptive practices statutes in Counts III and V, respectively.  Massachusetts declares unlawful "the use or employment" of an "unfair method of competition or an unfair or deceptive act or practice." Mass. Gen. Laws ch. 93A, § 2.  The same is true for Washington law.  Wash. Rev. Code §§ 19.86.020.  The statutes provide a civil remedy for those who suffer financial injury as a result of a broad range of unfair or deceptive conduct.  Mass. Gen. Laws ch. 93A, § 11; Wash. Rev. Code § 19.86.090.  The reach of these statutes is even broader than the common law. *Dalis v. Buyer Adver.*, 636 N.E.2d 212, 216 (Mass. 1994) (Chapter 93A "goes far

46

beyond the scope of…fraud" and "any analogies between 'unfair and deceptive

practices' and common law claims for fraud and deceit [are] inappropriate");

*Golber v. BayBank Valley Trust Co.*, 704 N.E.2d 1191, 1194 (Mass. App. Ct.

1999) (Chapter 93A proscribes "negligent misrepresentation of fact the truth of

which is reasonably capable of ascertainment"); *Panag v. Farmers Ins. Co. of

Wash.*, 204 P.3d 885, 898 (Wash. 2009) (statute intended to "provide broader

protection than exists under the common law").  Scienter is not an element of

either state's statute.  *Bain v. Metro. Mortg. Grp., Inc.*, 285 P.3d 34, 49-50 (Wash.

2012) (neither intent nor actual deception required for claim under Washington

deceptive practices statute); *Martin v. Mead Johnson Nutrition Co.*, No. 09-cv-

11609-NMG, 2010 U.S. Dist. LEXIS 104923, at *10-11 (D. Mass. Sept. 30, 2010)

(Massachusetts deceptive practices statute does not require scienter).

The court in *Marram* held that a claim is stated under the Massachusetts

unfair and deceptive practices statute for misstatements made to an investor that

result in proximate and foreseeable losses, noting that "a negligent

misrepresentation may be so extreme or egregious as to constitute a violation of

[Ch. 93A]."  *Marram*, 809 N.E.2d at 1032.  And Washington has applied its statute

to the very context alleged here.  The Washington Court of Appeals sustained a

claim against underwriters for misrepresentations in offering documents that the

underwriters helped prepare, and for marketing materials that they disseminated.

47

*Reale*, 2000 Wash. App. LEXIS 1239, at *3, *14, *19. The claim in that case was also based on the underwriters' failure to disclose "material information" in the documents. *Id*.

Liberty has alleged sufficient facts to show that Goldman's acts are actionable under the unfair and deceptive practice statutes of Massachusetts and Washington.

### c.    Liberty's negligent misrepresentation and common law fraud claims are adequately stated.

Counts VI and VII of the SAC state a claim for common law fraud and negligent misrepresentation, respectively.  A claim for negligent misrepresentation under Massachusetts and Washington state law is made when the defendant: (1) "in the course of his business…or in any other transaction in which he has a pecuniary interest"; (2) "supplies false information for the guidance of others in their business transactions"; (3)  and "fails to exercise reasonable care or competence in obtaining or communicating the information"; (4) causing pecuniary loss to plaintiff; and (5) plaintiff has justifiably relied upon the information.  *Fox v. F & J Gattozzi Corp.*, 672 N.E.2d 547, 551 (Mass. App. Ct. 1996); *ESCA Corp. v. KPMG Peat Marwick*, 959 P.2d 651, 654 (Wash. 1998).  *See* Restatement (Second) of Torts § 552 (1977). A fraud claim under Massachusetts and Washington law requires that 1) defendant misrepresented a fact; 2) with the

48

knowledge of its untruth; 3) the misrepresentation was intended that it be acted upon; 4) plaintiff acted upon the misrepresentation; and 5) damages directly resulted from the misrepresentation. *Equip. & Sys. for Indus., Inc. v. Northmeadows Constr. Co.*, 798 N.E.2d 571, 574 (Mass. App. Ct. 2003); *Stiley v. Block*, 925 P.2d 194, 204 (Wash. 1996).

Liberty alleges that through the Offering Documents Goldman wrote and distributed as a lead underwriter, Goldman falsely stated that FNMA met its capital requirements. JA-A206-JA-A207:¶2; JA-A218-JA-A225:¶¶45-65. Goldman knew, recklessly disregarded or, at the very least, should have known that these statements were false. JA-A207-JA-A209:¶¶3-7; JA-A219-JA-A220:¶¶47-49; JA-A222:¶54; JA-A223:¶¶58-59; JA-A224:¶61; JA-A225-JA-238:¶¶64-94; JA-A246:¶131; JA-A250:¶159. Liberty alleges it relied on Goldman's misstatements and omissions in purchasing the preferred stock in the Offerings, and has suffered substantial damages as a result of the Goldman's misconduct. JA-A206-JA-A207:¶¶1-2; JA-A239-JA-A242:¶¶99-114; JA-A244:¶¶123, 125; JA-A246:¶137; JA-A247:¶139; JA-A248:¶¶145-147; JA-A249:¶155; JA-A250:¶160. These are sufficient facts to satisfy each of the elements of Liberty's common law claims for fraud and negligent misrepresentation.

i.    **Goldman is liable under Liberty's common law fraud and negligent misrepresentation counts for the misstatements and omissions in the Offering Documents.**

Liberty alleges that Goldman made or supplied the misstatements and omissions in the Offering Documents. *Supra*, Section V, C. Under both Massachusetts and Washington common law, Goldman is liable for participating in the misrepresentation, authorizing it, or causing it to be made. *See Johnson v. Harrigan-Peach Land Dev. Co*., 489 P.2d 923, 927 (Wash. 1971) (liability for common law fraud arises when defendant "sanctions or approves of the false statements"); *Haberman*, 744 P.2d at 1067 (negligent misrepresentation claim properly stated against financial advisers who "made and participated in making negligent misrepresentations of fact" in the issuer's official statements and annual reports); 37 C.J.S. Fraud § 105 (a party may commit fraud by "authoriz[ing] another to make [a fraudulent statement] for him"; one can also be liable for fraud if one "in some way participated" in the fraudulent statement: "One who participates in a fraud is of course guilty of fraud[.]"). *See also Fed. Hous. Fin. Agency v. Goldman, Sachs & Co*., 1:11-cv-06198-DLC, 2012 U.S. Dist. LEXIS 162281, at *11 (S.D.N.Y. November 12, 2012) (finding claim properly stated for New York common law fraud against underwriter for misstatements in offering documents, "even without allegation that [underwriter] had 'ultimate authority' over the contents" of the offering documents).

50

The common law also imposes on Goldman a duty of disclosure in this situation.  Goldman was required to disclose the material facts necessary to make any statements it made or supplied to Liberty not misleading.  *See Knapp v. Neptune Towers Assocs.*, 892 N.E.2d 820, 824 (Mass. App. Ct. 2008) (duty to disclose arises when non-disclosed fact goes to essence of transaction); *Golber*, 704 N.E.2d at 1193 (one who speaks must to do honestly and divulge all material facts within his knowledge; "half-truths may be as actionable as whole lies." (quoting *Kannavos v. Annino*, 247 N.E.2d 708, 711-12 (1969) (internal quotations and citations omitted))); *Haberman*, 744 P.2d at 1070 (duty to disclose arises in business transaction when defendant "has knowledge necessary to prevent misrepresentation, or facts basic to the transaction where the plaintiff would reasonably expect disclosure").

Goldman's actions in writing the Offering Documents, controlling their content and distribution, soliciting the sale of the stock, and sending the Offering Documents to Liberty, *supra*, Section V, C., are more than sufficient to support Liberty's common-law fraud and negligent misrepresentation claims.  Goldman is also liable under the common law for not disclosing the material facts necessary to make the statements made or supplied by others to Liberty not misleading.  *See Knapp,* 892 N.E.2d at 824; *Golber,* 704 N.E.2d at 1193; *Haberman*, 744 P.2d at 1070.

51

The district court did not address Goldman's liability for its failure to disclose material information under the state laws. Instead, the district court held that Goldman could not be liable for omitting information under Section 10(b) only, "[s]ince Liberty's allegations are insufficient to show that FNMA's core capital financials were misstated." SPA58. The district court also held that Goldman "had no freestanding duty to disclose" under federal law interpreting Section 10(b). *Id.* at *72. However, that view of federal law, even if correct, does not control the state law claims here at issue.[23] The district court wrongly applied the more stringent standards of federal securities laws to Liberty's state law claims. Under state law, Goldman had an obligation to disclose material adverse information.

Goldman is liable under the common law of Massachusetts and Washington not only for making (in the broad sense of the word) and supplying the false statements in the Offering Documents, but also for failing to disclose material information about Fannie Mae's capital impairment.

---

[23] Liberty believes that the district court's narrow view of an underwriter's obligations even with respect to a Section 10(b) omission claim was wrong, ignoring, for example, this Court's seminal decision in *Hanly v. SEC*, 415 F.2d 589, 595-97 (2d Cir. 1969). *See also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc*., 552 U.S. 148, 158 (2008); *Dolphin and Bradbury, Inc. v. SEC*, 512 F.3d 634, 641 (D.C. Cir. 2008).

52

### ii. Goldman knew or should have known that its statements and omissions were false.

To state a claim for negligent misrepresentation under the laws of Massachusetts and Washington, Liberty need allege only that Goldman failed to exercise reasonable care in communicating the false information. *Fox*, 672 N.E.2d at 551; *ESCA Corp.*, 959 P.2d at 654. The SAC more than adequately meets this standard. And even Fed. R. Civ. P. 9(b)'s heightened pleading requirement for fraud expressly provides that intent "and other conditions of a person's mind may be alleged generally."

Liberty alleges with particularity that Goldman knew, or should have known, that the statements in the Offering Documents were untrue. *Supra*, Section V, D. 3. Goldman sold billions of dollars' worth of impaired securities directly to FNMA, JA-A215-JA-A216:¶¶34-39; had a unique understanding that loan underwriting standards in the subprime and Alt-A market had been abandoned, JA-A207-JA-A209:¶¶3-8; JA-A225-JA-A240:¶¶66-99; took a massive short position in the subprime market, JA-A227-JA-A228:¶¶72-73; sold off its own subprime and Alt-A assets to investors, JA-A209:¶8; JA-A238:¶95; increased its collateral demands on AIG for securities backed by subprime and Alt-A mortgages, JA-A235:¶¶84-87; terminated its own warehouse lending program JA-A1821-JA-A1835; and knew that FNMA had undisclosed guarantees on billions of dollars in

distressed loans originated at Countrywide, JA-A236-JA-A238:¶¶91-94. These facts, together with plausible inferences, more than adequately show that Goldman knew or should have known that the Offering Documents were false.

### iii.   Liberty reasonably relied on Goldman's statements.

The element of reliance presents a question of fact for the jury. *Marram*, 809 N.E. 2d at 1031 (reliance for negligent misrepresentation is normally a jury question); *Lawyers Title Ins. Corp. v. Baik*, 55 P.3d 619, 627 (Wash. 2002) (reversing summary judgment for defendant on negligent misrepresentation claim, finding whether plaintiff's reliance was reasonable was a question of fact for jury). The SAC adequately pleads Liberty's reliance.

Liberty alleges it relied on Goldman's false representations and omissions in deciding to invest $62.5 million in the Offerings. JA-A206:¶1; JA-A239-JA-A241:¶¶99-108; JA-A244:¶123; JA-A246:¶137; JA-A248:¶145; JA-A249:¶155; JA-A250:¶160.  Liberty alleges that it would not have purchased the preferred stock if it knew the truth about the valuation placed on the billions of dollars of subprime and Alt-A loans, the inadequacy of reported write-downs and loan loss reserves, or that FNMA would not meet its capital requirements even with the proceeds from the Offerings. JA-A240:¶101.  Liberty adequately pleads reliance for purpose of its state law claims.

54

### iv.    Goldman caused Liberty's losses.

The SAC sufficiently pleads causation.  Liberty alleges that as a direct and foreseeable result of Goldman's misrepresentations and omissions, Liberty suffered a substantial loss of approximately $62.5 million as a result of the purchase of the preferred stock.  JA-A241-JA-A242:¶¶109-114.  Liberty alleges that the economic damages it suffered were a direct result of the misstatements and omissions in Goldman's Offering Documents concerning FNMA's core capital.  JA-A241-JA-A242:¶¶109-114.

### v.    Liberty is not required to plead a special relationship to support its negligent misrepresentation claim.

Massachusetts and Washington follow the Restatement (Second) of Torts, which does not require either privity or a special relationship to state a claim for negligent misrepresentation.  *See Nycal Corp. v. KPMG Peat Marwick LLP*, 688 N.E.2d 1368, 1370-72 (Mass. 1998) (rejecting New York's "near-privity" test and adopting Restatement (Second) of Torts § 552); *Haberman*, 744 P.2d at 1067 (court adheres to the standards in § 552); *Nota Constr. Corp. v. Keyes Assocs.*, 694 N.E.2d 401, 405-06 (Mass. App. Ct. 1998) (privity not required when defendant knows that plaintiff will rely on his services); *Golber*, 704 N.E.2d at 1192-93 (rejecting defendant's argument that "special relationship" required for negligent misrepresentation); *St. Paul Surplus Lines Ins. Co. v. Feingold & Feingold Ins.*

55

*Agency, Inc.*, 693 N.E.2d 669, 672 (Mass. 1998) (affirming judgment for insurer against broker who provided material misinformation on insurance application).

The defendant need not provide the false information directly to the plaintiff, if defendant knew plaintiff was part of a group that would receive and rely on the information.  *See Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1077 (Mass. App. Ct. 2003) (claim for negligent misrepresentation established by evidence that defendant auditors knew that plaintiffs were given documents and would rely on opinions therein); *Lawyers Title Ins. Corp.*, 55 P.2d at 626 (declining to hold as a matter of law that law firm did not know title company would rely on its opinion); *Kreidler v. Pixler*, No. C06-0697RSL, 2009 U.S. Dist. LEXIS 47713, at *14-*20 (W.D. Wash. May 22, 2009) (negligent misrepresentation claim found without finding of "special relationship"); *Haberman*, 744 P.2d at 1067 (investors can sue professionals who knew investors would receive their information and rely on it in decision to purchase bonds).

Here, Liberty alleges that Goldman successfully solicited Liberty.  That solicitation included communicating with Liberty about the Offerings, and sending Liberty emails and the Offering Documents.  JA-A245:¶¶129-130; JA-A247:¶¶142-143; JA-A1917-JA-A1968.  These allegations are sufficient to state a

claim for negligent misrepresentation under Massachusetts and Washington common law.

### 3. The District Court's Other Conclusions About the Adequacy of Liberty's State Law Claims Were Wrong.

As explained above, Liberty plausibly alleges that the Offering Documents written and distributed by Goldman contained false statements and omissions that Liberty relied on when it purchased the FNMA preferred stock. The district court did not hold that Goldman did not make or supply the statements in the Offering Documents as a matter of state law. But the district court inexplicably treated the false SEC filings as being disconnected from the Offering Documents, leading to its erroneous conclusions that Goldman did not make or supply the false statements in the SEC filings to Liberty, and that Liberty did not adequately plead reliance on the SEC filings. Finally, because several of Liberty's state law claims do not require reliance, the district court erred in dismissing Liberty's claims for failure to plead reliance as to those claims.

### a. The district court erred in ruling Goldman did not represent or supply the false statements in the SEC filings.

Liberty sufficiently alleges that Goldman as a lead underwriter made and supplied the statements in the Offering Documents. JA-A206-JA-A207:¶2; JA-A218-JA-A221:¶¶45-53; JA-A245:¶¶129, 130. Relying on the Supreme Court's

57

decision in *Janus Capital Group, Inc. v. First Derivative Traders, Inc*., 131 S. Ct. 2296 (2011), the district court did hold in dismissing Liberty's Section 10(b) claim that Goldman did not make the statements under the Supreme Court's "ultimate authority" test for 10(b) claims.  SPA57.  The district court recognized, however, that *Janus* has no application to Liberty's state law claims. SPA61.  *See also Fed. Hous. Fin. Agency v.* 2012 U.S. Dist. LEXIS 162281, at \*11.

For purposes of the state law claims, the district court did not rule whether Goldman made or supplied the statements in the Offering Documents.  Instead, the district court held that Goldman did not make or supply the SEC filings, which failed to disclose FNMA's exposure to $300 billion in subprime and Alt-A loans. SPA57; SPA61.

While the district court acknowledged the SEC filings were incorporated by reference, SPA57; SPA61, the district court treated the SEC filings as somehow separate and independent from the Offering Documents drafted and supplied by Goldman to Liberty.  This treatment was improper, as the core capital representations made in the Offering Documents related directly to FNMA's exposure to the risky subprime and Alt-A loans and RMBS.  The district court also disregarded Liberty's allegation that investors considered the disclosures about FNMA's capital condition to be Goldman's statements after conducting due

58

diligence.  JA-A219:¶47.  Liberty's allegations show, and the district court ruled in other cases, that FNMA's exposure to Alt-A and subprime was grossly understated in the SEC filings, which were part of the Offering Documents.  SPA36; *Mudd*, 2012 U.S. Dist. LEXIS 115087, at *24-*27.  FNMA's exposure to these risky mortgages with their rapidly declining value would have been integral to an investor's understanding of whether FNMA exceeded its capital requirements, as the Offering Documents falsely represented.

The district court disregarded Liberty's allegations that Goldman knew or recklessly disregarded that FNMA had billions of dollars in additional exposure to subprime and Alt-A mortgages that was not disclosed in the SEC filings, and for which substantial additional write-downs and loss reserves should have been taken.  JA-A225:¶64.  Instead, the district court found that the false SEC filings were statements made by FNMA, not Goldman.  SPA56.  The district court's decision to excuse Goldman from claims related to the false SEC filings that Goldman ratified when it used them in the Offering Documents was erroneous under state law.  The Offering Documents drafted by Goldman expressly referenced and incorporated the SEC filings.  JA-A223:¶57; JA-A224:¶60; JA-A1150; JA-A1185.  In addition, the SEC filings were part and parcel of the total information given to investors concerning the Offerings, and were integral to an understanding of FNMA's core

capital.[24]

The district court erred in holding that Goldman had to literally "make" or "supply" the SEC filings to Liberty to be liable under state law for the false statements regarding FNMA's exposure to subprime and Alt-A mortgages. Goldman is liable not only for the false statements and omissions in the Offering Documents, but also for the SEC filings incorporated therein. As explained above, Liberty alleges sufficient facts to hold Goldman accountable under state law for the misstatements, omissions and plain deception in the Offering Documents. *Supra*, Section VII, A. 1.-2.

> **b.    The district court erred in ruling that Liberty did not adequately plead reliance.**

The district court held that Liberty does not "explicitly allege that it relied on statements contained in FNMA's SEC filings in purchasing the securities." SPA61.  Reliance is not an element of Massachusetts' securities and unfair or deceptive practices statutes, or Washington's unfair or deceptive practices statute. *Marram*, 809 N.E. 2d at 1026-27 ("foremost among the elements that the buyer does not need to prove [under the Massachusetts securities statute] is reliance"));

---

[24] Goldman knew the SEC filings were false.  Goldman was intimately acquainted with and provided warehouse funding to Countrywide, which originated a majority of the subprime and Alt-A loans not disclosed in the SEC filings.  JA-A224-JA-A225:¶¶63-64; JA-A236-JA-A238:¶¶91-94.

*Casavant v. Norwegian Cruise Line*, *Ltd*., 952 N.E.2d 908, 912 (Mass. 2011)

(reliance not required for Chapter 93A claim); *Panag*, 204 P.3d at 902 (proof of

actual deception unnecessary to establish injury and causation under Washington

unfair or deceptive practices statute).[25]  The district court erred in dismissing these

claims on the grounds that Liberty did not adequately plead reliance.

Even as to those claims that require reliance, it presents a question of fact.

*Supra*, Section VII, A. 2.iii.; *see also King Cnty, Wash.*, 2011 U.S. Dist. LEXIS

16483, at *14 (reasonable reliance for Washington securities claim requires

"highly factual inquiry").  Liberty broadly alleges that it relied on the

misrepresentations and omissions in the Offering Documents that FNMA exceeded

is capital requirements.  JA-A206:¶1; JA-A239-JA-A241:¶¶98-108.  The failure to

disclose FNMA's undercapitalization due to its exposure to more than $300 billion

in subprime and Alt-A mortgages would dramatically affect an investor's view of

whether FNMA met its core capital requirements.  If the SEC filings had disclosed

the truth about FNMA's exposure, then the Offering Documents could not have

plausibly represented that FNMA met its capital requirements.  The SEC filings

had a direct bearing on the explicit core capital representations made in the

---

[25] In its motion to dismiss, Goldman raised the issue of reliance only with respect
to Liberty's common law fraud, negligent misrepresentation, and WSSA claim.
ECF No. 125, p.24.

Offering Documents, and were incorporated into the Offering Documents.

Liberty's detailed allegations more than adequately plead reliance.  JA-A206:¶1;

JA-A239-JA-A241:¶¶99-108; JA-A244:¶123; JA-A246:¶137; JA-A248:¶145; JA-A249:¶155; JA-A250:¶160.

## IX.    CONCLUSION

Liberty has more than adequately stated claims pursuant to Massachusetts

and Washington state law against Goldman for its fraudulent, deceptive and

negligent conduct.  The district court's dismissal should be reversed.

DATED: November 16, 2012           Respectfully submitted,

                                    LIBERTY MUTUAL
                                    INSURANCE COMPANY,
                                    LIBERTY MUTUAL FIRE
                                    INSURANCE COMPANY,
                                    PEERLESS INSURANCE
                                    COMPANY, SAFECO
                                    CORPORATION, and LIBERTY
                                    LIFE ASSURANCE COMPANY
                                    OF BOSTON

                                    By their attorneys:

                                    /s/ Christopher P. Sullivan
                                    Christopher P. Sullivan, Esq.
                                    Email: cpsullivan@rkmc.com
                                    ROBINS, KAPLAN, MILLER
                                      & CIRESI L.L.P.
                                    800 Boylston St., 25th Floor
                                    Boston, MA 02199-7610
                                    617-267-2300

Thomas B. Hatch, Esq.
Email: tbhatch@rkmc.com
James R. Safley, Esq.
Email: jrsafley@rkmc.com
ROBINS, KAPLAN, MILLER
  & CIRESI L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402-2015
612-349-8500

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times Roman proportional font and contains 13,266 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(8)(B) of the Federal Rules of Appellate Procedure.

Dated November 16, 2012

/s/ Christopher P. Sullivan
Christopher P. Sullivan, Esq.

# SPECIAL APPENDIX

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

Opinion and Order, dated August 10, 2012 (1:11-cv-09202 PAC docket not
    downloaded) ........................................................................... SPA 1

Opinion and Order, dated August 30, 3012 (1:09-md-02013-PAC) .............. SPA27

i

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

UNITED STATES SECURITIES AND                    :
EXCHANGE COMMISSION,

                                      :

                    Plaintiff,              :

     -against-                                          :

DANIEL H. MUDD, ET AL.,                          :

                   Defendants.            :

-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 10, 2012

11 Civ. 09202 (PAC)
OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

On December 16, 2011, the SEC instituted this action against Daniel Mudd, Enrico

Dallavecchia, and Thomas Lund (collectively, the "Defendants"), for misleading investors

concerning Federal National Mortgage Association's ("FNMA") level of exposure to risky

subprime and reduced documentation "Alt-A" loans.  The SEC charged: (1) Mudd with violating

Section 10(b) of the Exchange Act and Rule 10b-5 (Count One); (2) Mudd and Dallavecchia

with violating Section 17(a)(2) of the Securities Act (Count Two); (3) all Defendants with aiding

and abetting violations of Section 10(b) and Rule 10b-5 (Count Three); (4) Mudd with violating

Rule 13A-14(A) of the Exchange Act (Count Four); and (5) all Defendants with aiding and

abetting violations of Section 13(A) of the Exchange Act and Rules 12B-20, 13A-1 and 13A-13

(Count Five).[1]

On March 30, 2012, the Defendants moved, pursuant to Fed. R. Civ. P. 12(b)(6), to

dismiss the complaint, arguing: (1) Counts One, Three, Four, and Five, must be dismissed

because Section 3(c) of the Exchange Act exempts Defendants from liability; (2) all Counts

should be dismissed for failure to allege an actionable misrepresentation or omission; (3) Counts

One and Three should be dismissed for failure to adequately allege scienter; (4) Count Two

---

[1] The SEC entered into a non-prosecution agreement with FNMA.

should be dismissed for failure to state a claim under Section 17(a)(2); and (5) Counts Three and Five should be dismissed for failure to state a claim under Section 20(e).

For the reasons that follow, Defendants' motion to dismiss is DENIED.

## **BACKGROUND**

FNMA was established by Congress in 1938 to support liquidity, stability, and affordability in the secondary mortgage market. (Compl. ¶ 22.) In 1968, Congress reorganized FNMA "into two separate and distinct corporations": (1) FNMA, which was to be "a Government-sponsored private corporation"; and (2) Ginnie Mae, which was to "remain in the Government." 12 U.S.C.A. § 1716b.

Defendant Mudd was FNMA's Chief Executive Officer from June 2005 through September 2008. During that time, he certified FNMA's 10-Ks and 10-Qs, and reviewed and approved FNMA's Forms 12b-25. (Compl. ¶ 19.) Defendant Dallavecchia was FNMA's Chief Risk Officer from June 2006 through August 2008. During that time, he sub-certified FNMA's 10-Ks and 10-Qs, and reviewed and approved FNMA's Forms 12b-25. (Id. ¶ 20.) Defendant Lund was FNMA's Executive Vice President of Single Family from July 2005 through June 2009. During that time, he sub-certified FNMA's 10-Ks and 10-Qs, and reviewed and approved FNMA's Forms 12b-25. (Id. ¶ 21.)

From December 6, 2006 through August 8, 2008 (the "Relevant Period"), FNMA was a shareholder-owned, government-sponsored enterprise, which was listed on the stock exchange, and issued stocks (common/preferred) and mortgage backed securities ("MBS"). FNMA's primary business during this time was its Single Family Credit Guaranty business ("Single Family"). (Id. ¶¶ 29-30.)

*1.  FNMA's Subprime Exposure*

From at least the 1990s, FNMA acquired and guaranteed subprime mortgage loans made to borrowers with weaker credit histories, primarily through two programs: Expanded Approval/Timely Payment Rewards ("EA") and MyCommunityMortgate ("MCM").[2]  (Id. ¶ 66.) Prior to the Relevant Period, FNMA, both internally and in communications with government agencies, treated EA loans as subprime.  (Id. ¶¶ 69-71, 75.)

By early 2007, investors had become increasingly focused on subprime loans and the risks associated with such loans.  (Id. ¶ 81.)  On a February 23, 2007 call with investors, Mudd defined subprime mortgages as loans "offered to borrowers with damaged credit."  (Id. ¶ 84.) Four days later, on February 27, 2007, FNMA defined subprime mortgages in its Form 12b-25 as loans made to "borrowers with weaker credit histories."  (Id. ¶ 72.)  FNMA's Form 12b-25 stated that 0.2% of FNMA's Single Family book of business consisted of subprime loans or mortgage backed securities ("MBS") backed by subprime loans; and an additional 2% of the book consisted of other subprime securities.  (Id. ¶¶ 85, 87.)  On a conference call that same day, Dallavacchia stated that FNMA's 0.2% subprime exposure was "immaterial," "prudent," and "modest."  (Id. ¶¶ 93-95.)

Beginning on May 2, 2007, FNMA expanded its subprime disclosures, to state:

> *"Subprime mortgage" generally refers to a mortgage loan made to a borrower with weaker credit profile*, than that of a prime borrower.  As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers.  *Subprime mortgage loans are often originated by lenders specializing in this type of business*, using process unique to subprime loans.  In reporting our subprime exposure, *we have classified mortgages loans as subprime if the mortgage loans are originated by one of these specialty lenders* or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as subprime when sold. . . . We also

---

[2]  MCM loans were often made to borrowers who lacked funds to make a sufficient down-payment and, thus, had high loan-to-value ("LTV") ratios.  FNMA defined a LTV ratio above 90% to be a "high LTV Ratio."  (Aug. 2007 Credit Supp. 3-4.)

> estimate that subprime loans represented approximately 2.2% of our single-family mortgage credit book of business as of December 31, 2006, of which approximately 0.2% consisted of subprime mortgage loans or structured FNMA Mae MBS backed by subprime mortgage loans and, to a lesser extent, resecuritizations of private-label mortgage-related securities backed by subprime mortgage loans.

(Id. ¶ 101 (emphasis added).)  In November 2007, FNMA expanded its subprime definition to include loans from "subprime divisions of larger lenders."  (Id. ¶ 119.)

FNMA's publicly disclosed subprime exposure failed to include its exposure to EA and MCM loans, despite the fact that these loans were made to borrowers with weaker credit histories.  In February 2007, FNMA had approximately $43.3 billion worth of EA loans, and $13.8 billion worth of MCM loans.  (Id. ¶ 102.)  FNMA's exposure to EA loans alone was approximately ten times as large as FNMA's disclosed subprime exposure.  (Id. ¶¶ 86-89.)  By February 27, 2008, FNMA had approximately $55.6 billion worth of EA loans, and $38.8 billion of MCM loans.  (Id. ¶ 135.)  FNMA's publicly disclosed subprime exposure also failed to include in full FNMA's acquisition of $28.5 billion worth of loans from Countrywide Home Loans' ("Countrywide") subprime division.  (Id. ¶¶ 126-28.)  Had FNMA's acquisition of such loans been included in full, FNMA's disclosed subprime exposure would have more than doubled.  (Id. ¶¶ 126-28.)

Mudd, however, continued to tell the public that FNMA had "about zero percent" exposure to subprime loans, which he defined as "a loan to a borrower that has had a credit problem in the past."  (Id. ¶ 146 (August 20, 2008 radio interview).)

### 2.  FNMA's Alt-A Exposure

In July 1999, FNMA increased its participation in low-documentation loans, often called "Alt-A" loans.  (Id. ¶ 146.)  Specifically, FNMA and Countrywide entered into an alliance agreement, which included, inter alia, the creation of a reduced documentation


internet loan, eventually called the "Fast and Easy" loan. The Fast and Easy loan allowed

applicants with qualifying FICO[3] credit scores to be preapproved for mortgage loans

without providing documentation to verify income or assets. (Id. ¶ 63.) Internally,

FNMA called low-documentation loans such as Fast and Easy, for which the lender

initiated the reduced documentation process, either "lender-selected" or "special lender

program" loans. (Id. ¶¶ 163, 165.) FNMA referred to other low/no documentation loans,

for which the borrower specifically requested the minimal documentation option, as

"borrower-selected" low-documentation loans. (Id. ¶ 163.) Both borrower-selected and

lender-selected low-documentation loans performed worse than comparable full-

documentation loans, and FNMA internally monitored all reduced documentation loans

for credit risk. (Id. ¶¶ 155-160, 165, 192.)

> FNMA defined Alt-A loans as follows:

> *'Alt-A mortgage' generally refers to a loan that can be underwritten with lower or alternative documentation* than a full documentation mortgage loan but may also include other alternative product features. As a result, Alt-A mortgage loans generally have a higher risk of default than non-Alt-A mortgage loans. In reporting our Alt-A exposure, *we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation* or other product features.

(Id. ¶ 180 (emphasis added).) FNMA did not include lender-selected low-documentation

loans in its Alt-A exposure calculations, because FNMA instructed lenders not to classify

such loans as Alt-A. (Id. ¶¶ 169-71.) Thus, for example, FNMA's August 16, 2007 10-

K stated that Alt-A constituted 12% of FNMA's Single Family mortgage credit book,

when all low-documentation loans totaled 22% of the book. (Id. ¶¶ 181-185.)

---

[3] "FICO refers to the Fair Isaac Corporation, which is the industry standard credit scoring system." Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 467 n. 6 (3rd Cir.2005). "FICO scores are based on a consumer's credit history." Id.

SPA6

### 3. Post-Conservatorship

In its first post-conservatorship filing, in November 2008, FNMA added an additional disclaimer: "we have other loans with some features that are similar to" both subprime and Alt-A loans "that we have not classified as [Subprime or Alt-A] . . . because they do not meet our classification criteria." (Id. ¶¶ 148, 196.)

## GENERAL LEGAL STANDARDS

I.     General Motion to Dismiss Standard

When considering a Fed. R. Civ. P. 12(b)(6) motion, the court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 (2007); see Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009). The court only "assess[es] the legal feasibility of the complaint"; it does not "assay the weight of the evidence which might be offered in support thereof." Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003).

To state a facially plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (citation omitted).

II. Heightened Pleading Standards of Rule 9(b)

Fed. R. Civ. P. 9(b) requires a heightened pleading standard for complaints alleging fraud: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." See In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 632–33

(S.D.N.Y. 2008).  This standard requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999).

III.    Elements of Claims under Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act prohibits any person from using or employing "any manipulative or deceptive device or contrivance in contravention" of SEC rules. 15 U.S.C. § 78j(b).  Rule 10b-5 prohibits "any device, scheme, or artifice to defraud" and "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . ."  17 C.F.R. § 240.10b-5.  To state a claim under Rule 10b-5, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005).

IV.    Materiality

A complaint alleging a Rule 10b-5 claim fails if it relies on statements or omissions "that a reasonable investor would [not] have considered significant in making investment decisions." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).  "An omitted fact may be immaterial if the information is trivial, or is so basic that any investor could be expected to know it."  Id. at 162 (internal citations omitted).  "'[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

Thus, "whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000).

V.     Scienter Pleading Standards in Fraud Claims

A plaintiff claiming fraud can plead scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290–91 (2d Cir. 2006). Recklessness sufficient to establish scienter involves conduct that is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996). A "strong inference" of scienter may arise where the complaint sufficiently alleges that the defendants: "knew facts or had access to information suggesting that their public statements were not accurate . . . ." Novak, 216 F.3d at 311 (internal citations omitted).

**ANALYSIS OF DEFENDANTS' MOTION TO DISMISS**

I.     Section 3(c) of the Exchange Act: As Applied to Counts One and Three-Five

Defendants argue that Section 3(c) of the Exchange Act exempts them from liability under the Act, and thus bars Counts One, Three, Four, and Five. Section 3(c) provides:

*Application to governmental departments or agencies:*

No provision of this chapter shall apply to, or be deemed to include, any executive department or *independent establishment of the United States*, or any lending agency which is wholly owned, directly or indirectly, by the United States, or any officer, agent, or employee of any such department, establishment, or agency, acting in the course of his official duty as such, unless such provision makes specific reference to such department, establishment, or agency.



15 U.S.C.A. § 78c(c) (emphasis added).  Defendants argue that FNMA is an "independent establishment" of the United States because it was established by Congress and, as a private corporation, is largely independent.

The term "independent establishment" is neither defined, nor referred to elsewhere in the Exchange Act.[4]  Our analysis begins with Section 3(c)'s text.  "When interpreting a statute, the 'first step . . . is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.  [The Court's] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"  Virgilio v. City of New York, 407 F.3d 105, 112 (2d Cir. 2005) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Robinson, 519 U.S. at 341.  Where the plain meaning is ambiguous, a court may consult extrinsic materials "to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005).

The ordinary meaning of the words "independent"—meaning "not dependent," "not subject to the control of others," "not subordinate," and "self-governing"—and "establishment"—meaning "that which is established"—do not clarify whether FNMA, a governmental sponsored private corporation, falls within Section 3(c)'s exception.  See

---

[4] There are only three cases where a court has applied Section 3(c) of the Exchange Act.  See Colonial Bank & Trust Co. v. American Bankshares Corp., 439 F.Supp. 797, 803 (D.C.Wis. 1977) (holding that Section 3(c) barred a suit against the FDIC in its corporate capacity for tortious misrepresentation, because the suit was, "by virtue of § 2679(a), a suit against the United States."); Howe v. Bank for Intern. Settlements, 194 F.Supp.2d 6, 23-24 (D.Mass. 2002) (holding that Federal Reserve officials, as "Government officers acting in their official capacities," were exempt under Section 3(c) from liability); OKC Corp. v. Williams, 461 F.Supp. 540, 549 (D.C.Tex. 1978) (holding that SEC employees acting in the course of their official duties were exempt from liability under Section 3(c)). These cases are not binding, do not provide any analytical help, and do not involve similar entities.

Webster's International Dictionary 679 (2d ed.1934). The context in which the term is used sheds some light on it meaning. The term "independent establishment" is placed between "executive *departments*" and a "lending *agency*"; and the statute's title refers to the application of the Exchange Act to "governmental *departments or agencies*." Defendants are correct that the header was added only upon codification, not by Congress (Def. Reply 2 & n.2), but "[i]t is well established that the title of a statute or section is an indication of its meaning." Bell v. Reno, 218 F.3d 86, 91 (2d Cir. 2000) (citing INS v. National Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 189 (1991)).

   If Section 3(c)'s exemption is limited to federal departments and agencies, then it is clear that FNMA is not exempt. Other Circuits considering this issue have concluded that FNMA and Freddie Mac—FNMA's sibling which was established by the Government in 1970 as a private corporation[5]—are not federal agencies. See Judicial Watch, Inc. v. Federal Housing Finance Agency, 646 F.3d 924, 926 (D.C. Cir. 2011) (holding that FNMA and Freddie Mac are not federal agencies for purposes of FOIA requests); Mendrala v. Crown Mortgage Co., 955 F.2d 1132 (7th Cir. 1992)). Mendrala held that Freddie Mac is not a federal agency under the Federal Torts Claims Act ("FTCA"). The FTCA, which was established by Congress in 1948, defines a "federal agency" to include "the executive departments, the judicial and legislative branches, the military departments, *independent establishments of the United States*, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." 28 U.S.C.A. § 2671. The Seventh Circuit considered: "(1) the federal government's ownership interest in the entity; (2) federal government control over the entity's activities; (3) the entity's structure; (4) government involvement in the entity's finances;

_____

[5] Freddie Mac has essentially the same charter as FNMA, and was intended to provide competition to FNMA.

and (5) the entity's function or mission." Id. at 1136. The federal government does not have an ownership interest in Freddie Mac, and Freddie Mac does not receive appropriations from Congress. Id. at 1138. The Seventh Circuit thus concluded that the first and fourth elements were not satisfied. Further, the federal government had only limited control over Freddie Mac, as the Board of Directors determined the general policies and supervised the exercise of Freddie Mac's powers. The Board, in turn, was controlled by private shareholders—thirteen Board members are elected by voting shareholders and only five are appointed by the President. Id. While Freddie Mac is subject to regulation by the Housing and Urban Development ("HUD"), such regulation does not extend to Freddie Mac's daily operations. Id. In any event, the Circuit held that "extensive federal regulation does not convert an entity into a 'federal agency' under the FTCA." Id. Thus, the Circuit concluded that the second and third elements were not satisfied. Finally, the Circuit found that while Freddie Mac furthers an important federal mission, "and does act as a federal agency or instrumentality in this sense," that this factor "is not dispositive when weighted against the other four factors." Id. at 1138-39. Indeed, "[a]ll federally chartered corporations further some congressional mission, but the fact that an entity is federally chartered does not make it a federal agency under the [FTCA]." Id. It thus concluded that Freddie Mac is not a federal agency, and thereby implicitly held that it is not an "independent establishment."

Applying the same test here, there is but one conclusion: FNMA is not an independent establishment within the meaning of Section 3(c). FNMA is a private corporation, whose stock is listed on the exchange and is publicly traded. FNMA is managed and controlled by a Board of Directors, who are elected by the shareholders. See 12 U.S.C. §§ 1716(b), 1723(a), 1723(b), 1718(a). FNMA pays its own way; it raises its operational expenses by generating revenue; and

11

it does not receive federal appropriations.  Of course, FNMA, like Freddie Mac, furthers an

important federal mission, and is subject to regulation by HUD, but these facts are not

dispositive when weighed against the other factors.  Under the Seventh Circuit's test, FNMA is

not an "independent establishment."  Additional external indicia support this conclusion:  the

Defendants in this action are not represented by the federal government;[6] money judgments

against FNMA are not paid from the United States Treasury;[7] and FNMA is not exempt from

federal taxes, see 12 U.S.C. § 1723a(c)(2).  In light of these considerations, it is not a surprise

that no Court has ever held that FNMA is an independent establishment within the meaning of

Section 3(c).

    Section 3(c)'s legislative history and Congress's purpose in enacting the Exchange Act

further reinforces the Court's view that FNMA is not an independent establishment.  The House

and Senate Committee Reports issued in April 1934, reflect that the Exchange Act was initially

drafted to exempt governmental "instrumentalities."  See H.R. Rept. 73-1383, at 18; S. Rep. No.

73-792, at 14.  This mirrored the language Congress used one year earlier in drafting the

Securities Act of 1933.  See In re FNMA Mae 2008 Sec. Litig., 08 Civ. 7831 (PAC), 2009 U.S.

Dist. LEXIS 109886, at *9-10 (S.D.N.Y. Nov. 24, 2009) (discussing how FNMA is exempt from

liability under the '33 Act, because it is a governmental instrumentality).  By May 31, 1934,

however, the exemption had been narrowed to apply to "independent establishments" with no

---

[6] Notably in two of the three cases that have applied Section 3(c), the government defendants were
represented in court by government attorneys, see Howe and OKC; in, Colonia Bank, FDIC's counsel
was not specified.

[7] Cf. O'Rourke v. Smithsonian Institution Press, 399 F.3d 113, 119, 122 (2d Cir. 2005) (holding that the
Smithsonian, which was explicitly designated by Congress as an "independent establishment," qualifies
as "the United States" for purposes of copyright jurisdiction, because "Congress authorizes
appropriations for most" of its works, the persons responsible for its operations are either "United States
officials of the highest rank" or person appointed by Congress, it was "represented by government
attorneys," and judgments against it "are paid by the United States Judgment Fund, with funds
appropriated by Congress.")

mention of "instrumentalities," see H.R. Conf. Rep. 73-1838 (House Conference Report), which

is how the Act read when enacted in June 1934.  Cf. Mendrala, 955 F.2d at 1135 (suggesting that

a federal agency, and thus independent establishment, is on par with corporations that "*primarily*

*act*[ ] as instrumentalities").  Congress clearly knew how to define and exempt instrumentalities

and define independent establishments.  Accordingly, the fact that FNMA qualifies as a

government instrumentality is not dispositive of Defendants' liability under the Exchange Act.

See id. (holding that while Freddie Mac is, in some sense an "instrumentality," it is not an

independent establishment).

     Congress clearly knew how to designate an entity as an "independent establishment."

Congress has explicitly designated the Postal Service, the Armed Forces Retirement Home, the

National Transportation Safety Board, the Office of the Nuclear Waste Negotiator, the National

Archives and Records Administration, and the Federal Maritime Commission as "independent

establishments."  See 39 U.S.C. § 201; 24 U.S.C. § 411; 49 U.S.C. § 1111; 42 U.S.C. §

10242(a); 44 U.S.C. § 2102; 46 U.S.C. §301(a).  Despite having two opportunities to do so—in

1938, when FNMA was created, and in 1968, when FNMA was reorganized into a government

sponsored private corporation—Congress never designated FNMA as an "independent

establishment."

     "The dominant congressional purposes underlying the Securities Exchange Act of 1934

were to promote free and open public securities markets and to protect the investing public from

suffering inequities in trading, including, specifically, inequities that follow from trading that has

been stimulated by the publication of false or misleading corporate information releases."  S.E.C.

v. Texas Gulf Sulphur Co., 401 F.2d 833, 858 (2d Cir. 1968).  Any doubt about the correctness

of the Court's conclusion is eliminated by the FNMA's own conduct with respect to the

Exchange Act. FNMA is a shareholder-owned private corporation that voluntarily registered under the Exchange Act in 2003, and "has, since then, been required to file periodic and current reports with the SEC . . . ." (Compl. ¶ 23.)  In registering under the Exchange Act, FNMA explicitly acknowledged that:

> Voluntary Exchange Act registration will also subject Fannie Mae to the provisions of the Exchange Act, and to the SEC's enforcement jurisdiction thereunder, applicable to issuers with securities registered under Section 12(g), except where the Exchange Act or the rules thereunder explicitly exclude "exempted securities."

(Decl. Natasha S. Guinan, Ex. A.)   Indeed, FNMA has since been sued by the SEC, under the Exchange Act, for accounting fraud. See SEC v. Fed. Nat'l Mortgage Ass'n, No. 06-00959 (RJL) (D.D.C. 2006).  Exempting FNMA's employees from liability for their false and misleading public statements would contravene the Exchange Act's purpose of protecting the investing public from false public filings.  Accordingly, the Exchange Act's purpose suggests that Section 3(c) does not apply to FNMA or the Defendants.

The Court concludes that FNMA is not an independent establishment under Section 3(c), and Defendants are not exempt from liability.

II.    An Actionable Misrepresentation or Omission: Relating to All Counts

The SEC has adequately alleged that FNMA's quantitative subprime and Alt-A disclosures were false because they failed to include all loans that fell within FNMA's subprime and Alt-A description.

FNMA's February 27, 2007 Form 12b-25 defined subprime as loans to borrowers with weaker credit histories.  (Compl. ¶¶ 72, 84.)  FNMA's EA and MCM loans were made to borrowers with weaker credit profiles, and thus fit FNMA's own definition of "subprime."  FNMA's Form 12b-25 subprime exposure calculations were thus

misleading because they failed to include FNMA's exposure to EA and MCM loans. (Id. ¶¶ 66-68.)

Defendants argue that FNMA's expanded definition of subprime, beginning on May 2, 2007, clarified that it categorized a loan as "subprime" only if the loan (i) originated by subprime specialty lenders (ii) using processes unique to subprime. They argue that since EA and MCM loans did not originate from subprime specialty lenders, FNMA's failure to include these loans in its subprime exposure calculations was not inaccurate or misleading.

FNMA's expanded definition stated that subprime loans "generally" are "loan[s] made to a borrower with weaker credit profile," which "often" or "typically" originate from "lenders specializing in this type of business, using process unique to subprime loans," and that FNMA quantified a loan as "subprime" if it originated from "these specialty lenders" or "subprime divisions of larger lenders." (Id. ¶¶ 101, 119.) A reasonable investor could interpret the "loan[s] made to . . . borrower[s] with weaker credit profile[s]" language as describing the "type of business" employed by the "specialty lenders" who "often" originated the loans that FNMA quantified as subprime. Mudd's public statements that FNMA's "definition of what would be a subprime loans, not a predatory loan, [is] typically a loan to an individual that has had a credit blemish in the past," support such an interpretation. (Compl. ¶ 132 (December 2007 newspaper article).) Under this interpretation, EA and MCM loans met FNMA's definition of subprime. Accordingly, it was misleading to exclude these loans from FNMA's subprime exposure calculation.

In addition, FNMA's subprime definition explicitly included loans originated by "subprime divisions of larger lenders" (id. ¶¶ 101, 119), but FNMA's subprime exposure calculations failed to include in full FNMA's acquisition of $28.5 billion worth of loans from Countrywide's subprime division during the Relevant Period (id. ¶¶ 126-28). FNMA misled investors concerning its total subprime exposure by failing to include in full its acquisition of Countrywide's subprime loans. Accordingly, the SEC has adequately alleged that FNMA's quantitative subprime disclosures were misleading.

FNMA chose to define Alt-A as "a loan that can be underwritten with *lower* or alternative *documentation*," and stated that it categorized a loan as Alt-A if "the lenders that deliver the mortgage loan[ ] to us have classified the loan[ ] as Alt-A *based on documentation* or other product features." (Id. ¶ 180.) A reasonable investor could interpret FNMA's definition to mean that lenders classified all low documentation loans as Alt-A, and thus, FNMA's Alt-A exposure calculations include lender-selected low-documentation loans.

FNMA did not disclose, however, that it instructed lenders not to code certain low-documentation loans—including lender-selected loans—as Alt-A, and therefore excluded such low-documentation loans from its Alt-A exposure calculations. (Id. ¶¶ 168-71.) While FNMA's statement that it quantified loans as Alt-A when delivered as Alt-A may have been accurate, "'half-truths'—literally true statements that create a materially misleading impression . . . will support claims for securities fraud." S.E.C. v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011). Accordingly, the SEC has adequately alleged that FNMA's quantitative Alt-A disclosures were misleading.

*1.  The Materiality of FNMA's False Statements*

FNMA's failure to include EA loans understated FNMA's subprime exposure by more than $60 billion; and its failure to include MCM loans understated FNMA's subprime exposure by an additional $41.7 billion.  (Compl. ¶ 144.)  FNMA's failure to include lender-selected low-documentation loans understated its Alt-A exposure by $341 billion.  (Id. ¶ 195.)  Such exposure would have been particularly "important to investors because of the volatility in the housing and secured-transaction markets."  In re MBIA, Inc., Sec. Litig., 700 F.Supp.2d 566, 586 (S.D.N.Y. 2010) (holding that a failure to disclose that 1% of the insurers' portfolio was exposed to assets backed in part by residential-mortgage-backed securities was material).

Defendants argue that FNMA's failure to include EA, MCM, and lender-selected low-documentation loans in its subprime and Alt-A exposure disclosures was immaterial because: (1) FNMA provided extensive credit metrics, which corrected any misimpression created by FNMA's subprime and Alt-A definitions; (2) FNMA increasingly warned investors about attendant risks as the housing market deteriorated; and (3) the market did not react negatively when corrective disclosures were made.

"[N]ot every mixture with the true will neutralize the deceptive.  If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."  Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097 (1991).  FNMA's credit metrics quantified loans to borrowers with FICO credit scores below 620 (constituting approximately 5% of its Single Family portfolio), and loan-to-value ("LTV") ratios above 90% (constituting approximately 8% of its Single Family portfolio).  FNMA, however, did not define

17

subprime loans by FICO scores or LTV ratios. Accordingly, it is not clear that this data would have corrected, clarified, or rendered immaterial FNMA's subprime exposure calculations. Moreover, the credit metrics did not address loans' level of documentation, and thus would not have corrected FNMA's exposure to Alt-A loans.

It is plausible that the reason that the market did not react negatively to FNMA's disclosed credit metrics is that such disclosures were not corrective. In any event, the SEC does not have to show a stock drop to plead or prove materiality. S.E.C. v. Penthouse Intern., Inc., 390 F.Supp.2d 344, 353 (S.D.N.Y. 2005) ("[T]here is no requirement to allege or demonstrate any particular movement in a company's stock price in order to sustain the element of materiality on a Rule 12(b)(6) motion").

Defendants' disclaimers and warnings also do not preclude liability. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004). The SEC alleges that Defendants failed to accurately quantify FNMA's current exposure to subprime and Alt-A loans. Therefore, FNMA's disclaimers and warnings regarding future deterioration in the housing market and subsequent losses do not foreclose liability. Moreover, a reasonable investor might not have been concerned about future risk in the subprime market, given Mudd's representation that FNMA's subprime exposure was "about zero percent." (See Compl. ¶ 146.)

Finally, even if FNMA's credit metrics, warnings, or other disclosures could be considered corrective, to preclude liability the Defendants would have to show that these disclosures were conveyed to the public "'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the

alleged misstatements." Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000) (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir.1989)). Making such a showing is "intensely fact-specific." Id. Thus, this truth-on-the-market defense "is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." Id. at 167-68.

In sum, the Court cannot say at this juncture that FNMA's failure to include approximately $100 billion of EA and MCM loans in its subprime exposure calculations, and approximately $341 billion in lender-selected low-documentation loans in its Alt-A exposure calculations was immaterial.

III.    Scienter: Counts One and Three

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Novak, 216 F.3d at 308.[8]   The SEC has adequately alleged that each Defendant had knowledge of FNMA's exposure to EA, MCM, and lender-selected low-documentation loans, and thus knew or should have known that FNMA's subprime and Alt-A exposure disclosures were inaccurate.

Mudd publicly defined subprime mortgages as loans "offered to borrowers with damaged credit" (Compl. ¶ 84), and signed the Form 12b-25, which contained a nearly identical definition of subprime.  (Id. ¶ 72.)  Meanwhile, Mudd knew that EA loans were made to borrowers with

---

[8] Since the SEC is not pursuing a motive and opportunity theory of scienter, Defendants' arguments premised on their retention of FNMA stock during the Relevant Period are irrelevant.  See In re Regeneron Pharms., Inc. Sec. Litig., 03 Civ. 3111(RWS), 2005 U.S. Dist. LEXIS 1350, at *66-71 (S.D.N.Y. Feb. 1, 2005) (finding that a purchase of stock would undermine a scienter claim under a motive and opportunity theory, but not a recklessness theory).

weaker credit profiles, as intended; personally requested data that showed EA loans had a higher

rate of delinquency that FNMA's disclosed subprime loans; and knew that credit losses from EA

loans were "disproportionate to the amount of the book they constitute." (Id. ¶¶ 110-111, 118,

137.) In addition, Mudd knew that Countrywide originated and sold more than $14.2 billion

worth of subprime loans to FNMA from 2004-2006. (Id. ¶ 126.) With respect to Alt-A, having

signed the SEC disclosures, Mudd should have known that FNMA defined Alt-A based on

documentation features, without drawing a distinction between borrower-selected and lender-

selected low-documentation loans. (Id. ¶ 180.) Mudd tracked the attendant credit risk that both

borrower-selected and lender-selected reduced documentation loans presented, and knew that

low documentation was a strong predictor of delinquency within the first year of the loan's

acquisition. (Id. ¶¶ 155, 156.)

   Lund was the senior executive in charge of Single Family and the sole Single Family

business executive on the disclosure committee. (Id. ¶ 49.) Lund routinely attended disclosure

committee meetings where draft filings were reviewed and issues discussed. (Id.) Lund knew

that EA loans had the highest credit risk on FNMA's book, producing losses that far outweighed

those from loans reported as subprime; that "mcm and ea are much deeper risks that [FNMA]

take[s]"; and that "many (if not all) in the market call EA subprime." (Id. ¶¶ 67, 106, 110-112,

118.) With respect to Alt-A, Lund's Single Family officers prepared presentations and reports

concerning FNMA's increased acquisition of low-documentation loans and the associated credit

risk, including the actual delinquency rates. In one of Lund's staff meetings, in July 2008, it was

reported that lender-selected low-documentation loans from Countrywide's Fast and Easy

program performed as poorly as some of the loans that were included in FNMA's Alt-A

disclosures. (Id. ¶ 192.)

Dallavecchia was the senior most executive in charge of credit risk, a member of the disclosure committee, and head of a team "tasked with developing a definition of 'sub-prime,' as well as providing the numbers." (Id. ¶¶ 53, 54, 83.)  Dallavecchia knew that EA loans had the highest credit risk on FNMA's book, producing losses that far outweighed those from loans reported as subprime; that "mcm and ea are much deeper risks that [FNMA] take[s]"; and that "many (if not all) in the market call EA subprime." (Id. ¶¶ 67, 106, 110-112, 118.)  By July 2008, Dallavecchia was emailing Mudd directly to highlight that EA and MCM loans were generating approximately 20% of FNMA's credit losses. (Id. ¶ 141.)  Additionally, Dallavecchia was briefed on and monitored FNMA's increasing stake in low-documentation loans. (Id. ¶¶ 155, 157.)

Given what Defendants knew about EA, MCM, and lender-selected low-documentation loans, as detailed above, they must have known that FNMA's disclosed subprime and Alt-A exposure calculations were materially misleading.[9]  Defendants' conduct in making, or aiding others that made, these misstatements constitutes an extreme departure from the standard of ordinary care.

Defendants' arguments to the contrary fail.  Defendants argue that FNMA's extensive disclosure process—whereby the purported misstatements were reviewed by, among others, an attorney—negates scienter.  This argument, at best, raises issues of fact that are premature at this juncture.  See S.E.C. v. Escala Group, Inc., No. 09 Civ. 2646(DLC), 2009 WL 2365548, at *14 (S.D.N.Y. July 31, 2009) (rejecting argument that defendant deferred to the judgment of counsel, because while the defendant "may be able to show at trial that he acted in good faith, the SEC's

---

[9]  The SEC's allegations plausibly show that the Defendants had actual knowledge of the misstatements. Thus, the Court need not decide whether a "recklessness" standard suffices to state a Section 20(e) claim for conduct that occurred before the Dodd-Frank Wall Street Reform and Consumer Protection Act.

allegations of scienter are sufficient to withstand his motion to dismiss.")  Defendants argue that FNMA's credit metrics and other disclosures regarding EA, MCM, and lender-selected low-documentation loans negate an inference of scienter.  This argument also fails at this juncture, because, as stated above, it is not clear that such disclosures were corrective, or made with sufficient force to neutralize FNMA's misleading subprime and Alt-A calculations.[10]

Finally, Defendants argue that the fact that FNMA continued to use the same definition of subprime and Alt-A after the Relevant Period negates any inference of scienter.  FNMA's November 2008 post-conservatorship filing, however, adds the additional, and perhaps crucial, disclaimer that "we have other loans with some features that are similar to" both subprime and Alt-A loans "that we have not classified as [Subprime or Alt-A] . . . because they do not meet our classification criteria."  (Compl. ¶¶ 148, 196.)  The Court need not determine whether FNMA's post-conservatorship definitions adequately and completely describe how FNMA calculates its subprime and Alt-A exposure.  The fact that FNMA's post-conservatorship disclosure attempts to explain that its exposure calculations exclude certain loans similar to subprime and Alt-A is sufficient to reject Defendants' argument here.

IV.    Section 17(a)(2) of the Securities Act

Section 17(a)(2) provides that it shall be unlawful for any person in the offer or sale of security, by means of interstate commerce, directly or indirectly "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact

---

[10] While Mudd told investors not to rely upon "vague, prosaic titles that pass for market data—[such as] 'subprime,' [and] 'Alt-A,'" to be "'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" In re Bear Stearns Companies, Inc. Sec., Derivative, and ERISA Litig., 763 F.Supp.2d 423, 495 (S.D.N.Y. 2011) (quoting In re Immune Response Sec. Litig., 375 F.Supp.2d 983, 1033 (S.D.Cal. 2005)).  Given FNMA's definition of subprime and Alt-A, it is not clear at this juncture that Mudd's statements directing investors to FNMA's credit metrics would have clarified FNMA's risk exposure.  Moreover, there is insufficient evidence at this point to find that Mudd's cautionary statements dropped the real risk of deception to nil.

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C.A. § 77q. It is sufficient to allege either that the defendant directly "obtained money or property for his employer while acting as its agent, or, alternatively, for the SEC to allege that [the defendant] personally obtained money indirectly from the fraud." S.E.C. v. Stoker, --- F. Supp. 2d ---, No. 11 Civ. 7388(JSR), 2012 WL 2017736, at *5-6 (S.D.N.Y. June 6, 2012).

The SEC alleges that Mudd and Dallavecchia directly or indirectly obtained money or property by means of their false statements, because each received a bonus that was tied to both FNMA's performance and their own personal performance in attaining individual year-end goals. (Compl. ¶¶ 41, 42, 59, 60.)[11] The complaint further alleges, in an almost verbatim recitation of the statutory language, that such statements were "in the offer and sale of FNMA Mae securities." (Compl. at 54.)

Defendants argue that the SEC failed to plausibly state a claim because it failed to specifically allege that there was an offer or a sale of FNMA stock during the Relevant Period. There is some support for Defendants' argument that a Section 17(a) claim should be dismissed where the SEC fails to include the basic allegation that there "was an offer or sale of [the company's] securities" during the relevant period. See S.E.C. v. Brown, 740 F.Supp.2d 148, 164 (D.D.C. 2010) (dismissing Section 17(a) claim on this ground). As the court in Brown recognized, however, "[t]he Supreme Court has instructed that the 'offer or sale' requirement should be construed broadly so as to encompass fraud in any part of the selling process." Id. (citing United States v. Naftalin, 441 U.S. 768, 772–73, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624

---

[11] Defendants reference to S.E.C. v. Forman, No. 07–11151–RWZ, 2010 WL 2367372 (D.Mass. 2010), is thus inapposite. In that case, there was "no evidence that the employee bonus was tied to company performance or that Forman was an executive within the meaning of the bonus plan." Id. at *8.

(1979)). The complaint here alleges that FNMA's common stock was traded on the New York

Stock Exchange ("NYSE") during the Relevant Period. (Compl. ¶ 24.) Accordingly, the Court

can take "judicial notice of the fact that a common stock listed on the NYSE is intended, for the

most part, to be sold and exchanged." S.E.C. v. Geswein, 2011 WL 4565898, at *15 (N.D.Ohio

Aug. 5, 2011), adopted in relevant part, 2011 WL 4541303, at *2 (N.D.Ohio Sept. 29, 2011).

This is sufficient to find that the SEC has adequately stated a claim against Mudd and

Dallavecchia under Section 17(a)(2).

V.    Aiding and Abetting Liability Under Section 20(e)

To state a claim under Section 20(e), the SEC "must prove: '(1) the existence of a

securities law violation by the primary (as opposed to the aiding and abetting) party; (2)

'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance'

by the aider and abettor in the achievement of the primary violation.'" S.E.C. v. DiBella, 587

F.3d 553, 566 (2d Cir. 2009) (quoting Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754

F.2d 57, 62 (2d Cir.1985)). For the reasons discussed above, the SEC has adequately alleged

that FNMA and Mudd committed a primary securities law violation by materially misstating

FNMA's subprime and Alt-A exposure, and that the Defendants had actual knowledge of this

violation.

"[T]o satisfy the 'substantial assistance' component of aiding and abetting, the SEC must

show that the defendant 'in some sort associate[d] himself with the venture, that he participate[d]

in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make

it succeed.'" S.E.C. v. Apuzzo, No. 11-696-cv, 2012 WL 3194303, at *1 (2d Cir. Aug. 8, 2012)

(quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir.1938)). In other words, the defendant

must "consciously assist[ ] the commission of the specific crime in some active way." Id. at *6

n.8 (quoting <u>United States v. Ogando</u>, 547 F.3d 102, 107 (2d Cir.2008)). "Inaction on the part of

the alleged aider and abettor ordinarily should not be treated as substantial assistance, except

when it was designed intentionally to aid the primary fraud or it was in conscious and reckless

violation of a duty to act." <u>Armstrong v. McAlpin</u>, 699 F.2d 79, 91 (2d Cir.1983).

     The SEC has plausibly alleged that Mudd, Dallavecchia, and Lund consciously assisted

the venture to misstate FNMA's subprime and Alt-A exposure in an active way.  Lund and

Dallavecchia were the sole Single Family and Chief Risk Office representatives, respectively, on

the Disclosure Committee (Compl. ¶¶ 49, 54).  Lund, Dallavecchia, and Mudd received and

reviewed FNMA's periodic filings.  (<u>Id.</u> ¶¶ 45, 50, 55.)  Dallavecchia drafted FNMA's first

definition of subprime, contained in its Form12b-25.  (<u>Id.</u> ¶ 56.)  Mudd commented on multiple

drafts of each periodic filing.  (<u>Id.</u> ¶ 45.)  Mudd met with Lund and Dallavecchia individually to

discuss the SEC filings.  (<u>Id.</u>)  Mudd signed, and Dallavecchia and Lund sub-certified, all of

FNMA's 10-Ks and 10-Qs during the Relevant Period, and approved FNMA's Form 12b-25.

(Compl. ¶¶ 20, 21, 45.)  Mudd and Dallavecchia spoke to investors on conference calls and

repeated FNMA's misleading disclosures while emphasizing that FNMA's subprime exposure

was "immaterial," and constituted approximately "zero percent" of FNMA's book of business.

(<u>Id.</u> ¶¶ 93, 146.)[12]  These allegations are sufficient at this juncture to show that Defendants

associated themselves with the venture, participated in it as in something that he wished to bring

about, and sought by his actions to make it succeed.  <u>See</u> <u>S.E.C. v. Global Express Capital Real</u>

<u>Estate Inv. Fund, I, LLC</u>, 289 Fed. App'x 183, 188 (9th Cir. 2008) (holding that defendant

"substantially assisted Global Securities' violations by reviewing, approving, and certifying the

Global Securities' misleading public filings."); <u>S.E.C. v. Fehn</u>, 97 F.3d 1276, 1293-1294 (9th Cir.

---

[12] Any warnings that Dallavecchia may have given on the same investor conference call are insufficient at
this juncture to foreclose liability.  <u>See</u> <u>supra</u> n. 12.

1996) (holding that defendant "hand in the editing the Form 10–Q's," "fail[ure] to properly

advise" others of the "material omissions" in the Form 10-Q's, and submission of those forms to

the SEC was sufficient to demonstrate "substantial assistance").[13]

## CONCLUSION

For the reasons above, the Defendants' motion to dismiss is DENIED.  The Clerk of

Court is directed to terminate this motion.

Dated:  New York, New York                              SO ORDERED
   August 10, 2012

                     PAUL A. CROTTY
                     United States District Judge

---

[13] Alternatively, given Defendants high degree of actual knowledge of the primary violation, the SEC's allegations are sufficient to plausibly show that Defendants' inaction was designed intentionally to aid the primary violation.  While the SEC also argues that Defendants' positions "as corporate officers and fiduciaries" creates a duty to correct or report the fraudulent statements (Opp. at 39), it has not plausibly shown that Defendants had any such duty.  See S.E.C. v. Apuzzo, No. 11-696-cv, 2012 WL 3194303, at *10 ("If the allegations were merely that [defendant] failed to report the fraud . . . and if [defendant] lacked a duty to report, he would not be liable.").  Notably, the SEC does not cite any case in support of its argument.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 30, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re FANNIE MAE 2008 SECURITIES           :       *08 Civ. 7831 (PAC)
LITIGATION                                 :       *09 MDL. 2013 (PAC)
------------------------------------------------------------x
COMPREHENSIVE INVESTMENT                   :
SERVICES, INC.,                            :       *09 Civ. 6102 (PAC)
                                           :
            Plaintiff,                     :       OPINION & ORDER
                                           :
      v.                                   :
                                           :
DANIEL H. MUDD, ET AL.,                    :
                                           :
            Defendants.                    :
------------------------------------------------------------x
EDWARD SMITH,                              :       *10 Civ. 2781(PAC)
                                           :
            Plaintiff,                     :
                                           :
      v.                                   :
                                           :
FEDERAL NATIONAL MORTGAGE                  :
ASSOCIATION, ET AL.,                       :
                                           :
            Defendants.                    :
------------------------------------------------------------x
LIBERTY MUTUAL INSURANCE                   :
COMPANY, ET AL.,                           :       *10 Civ. 9184 (PAC)
                                           :
            Plaintiffs,                    :
                                           :
      v.                                   :
                                           :
GOLDMAN, SACHS & CO.,                      :
                                           :
            Defendant.                     :
------------------------------------------------------------x

1

HONORABLE PAUL A. CROTTY, United States District Judge:

The above captioned private securities actions allege, generally, that Federal National Mortgage Association ("FNMA"), its executives, and certain underwriters made material misstatements in FNMA's filings with the Securities and Exchange Commission ("SEC") and in various securities offerings, concerning FNMA's (1) subprime and Alt-A exposure; (2) risk management controls; and (3) core capital financials. While many of the private action plaintiffs have joined the securities class action ("Class Action"), Comprehensive Investment Services, Inc. ("CIS"), Edward Smith ("Smith"), and Liberty Mutual Insurance Co., Liberty Mutual Fire Insurance Co., Peerless Insurance Co., SafeCo Corp., and Liberty Life Assurance Co. of Boston (collectively, "Liberty") are pursuing their own individual actions.[1]

The eight defendants bring fourteen motions to dismiss the second amended complaints.[2] Defendants' motions are GRANTED IN PART and DENIED IN PART.

## THE SECOND AMENDED COMPLAINTS

**I.    Class Action's Second Amended Complaint in 08 Civ. 7831**

The Court previously held that the Class Action's allegations regarding FNMA's alleged deficient risk control measures were sufficient to state Section 10(b) and Rule 10b-5 claims against FNMA, Daniel H. Mudd ("Mudd"), and Enrico Dallavecchia ("Dallavecchia"), and Section 20(a) claims against Mudd and Dallavecchia. See In re Fannie Mae 2008 Sec. Litig., 742 F.Supp.2d 382, 399 (S.D.N.Y. 2010). Familiarity with the Court's prior opinion is assumed.

---

[1] These cases were transferred and consolidated in this District by the Judicial Panel on Multidistrict Litigation ("JPML").

[2] These fourteen motions include: FNMA's motions to dismiss (1) the Class Action's, (2) Smith's, and (3) CIS's second amended complaints ("SACs"); Mudd's motions to dismiss (4) the Class Action's, (5) Smith's, and (6) CIS's SACs; Dallavecchia's motions to dismiss (7) the Class Action's, (8) Smith's and (9) CIS's SACs; (10) Robert J. Levin's motion to dismiss CIS's SAC; (11) Stephen M. Swad's motion to dismiss CIS's SAC; (12) the Smith Underwriters' motion to dismiss; (13) the CIS Underwriters' motion to dismiss; and (14) Goldman's motion to dismiss Liberty's SAC.

The Class Action's Second Amended Complaint adds new factual allegations that defendants failed to disclose adequately FNMA's level of exposure to subprime and Alt-A loans.

## II.    CIS's Second Amended Complaint in 09 Civ. 6102

In May 2008, CIS purchased 600,000 shares of FNMA's Series T Preferred Stock from Wachovia Securities for $15 million.  (CIS SAC ¶¶ 2, 14-15.)  On May 13, 2009, CIS filed a single-plaintiff lawsuit in the United States District Court for the Southern District of Texas, against FNMA; Mudd, Dallavecchia, Robert J. Levin ("Levin") and Stephen M. Swad ("Swad") (collectively, the "Individual CIS defendants"); and the CIS Underwriters.[3]  CIS alleges that FNMA, the Individual CIS defendants, and the CIS Underwriters violated the Texas Fraud in Real Estate and Stock Transaction statute, Section 27.01 of the Texas Business & Commerce Code ("TBCC"), as both primary violators and as aiders and abettors; Wachovia Securities and FNMA committed primary violations of the Texas Securities Act ("TSA"), Texas Revised Civil Statute article 581-33A(2); the Individual CIS defendants violated 581-33F(1) of the TSA; Dallavecchia, Mudd, and the CIS Underwriters violated article 581-33F(2) of the TSA; FNMA, Dallavecchia, and Mudd committed common law fraud; FNMA, the Individual CIS defendants, and the CIS Underwriters made negligent misrepresentations; FNMA, Mudd and Dallavecchia violated Section 10(b) of the Exchange Act and Rule 10b-5; and Mudd and Dallavecchia violated Section 20(a) of the Exchange Act.  On July 9, 2009, this action was transferred to this Court.

## III.    Smith's Second Amended Complaint in 10 Civ. 2781

Smith purchased FNMA's Series S Preferred Stock on or about December 6, 2007, and thereafter suffered substantial losses.  (Smith SAC ¶ 13.)  On February 26, 2010, Smith filed this action in the United States District Court for the Southern District of California, against FNMA;

---

[3] "CIS Underwriters'" includes defendants Wachovia Capital Markets, LLC and Citigroup Global Markets, Inc.

Mudd and Dallavecchia (collectively, the "Individual Smith defendants"); and the Smith

Underwriters.[4] Smith claims that: FNMA and the Individual Smith defendants violated Section

10(b) and Rule 10b-5, committed common law fraud, and violated Sections 1572, 1709 and 1710

of California's Civil Code; FNMA violated Sections 25400 and 25500 of California's Corporate

Code; the Individual Smith defendants violated Section 20(a) of the Exchange Act; and all

defendants made negligent misrepresentations.  On March 12, 2010, this action was transferred

to this Court.

### IV.    Liberty's Second Amended Complaint in 10 Civ. 9184

Liberty raises claims only against Goldman, Sachs & Co. ("Goldman"), which served as

lead underwriter for FNMA's Series S and P offerings, and had solicited Liberty's purchase of

FNMA's Series S and Series P preferred stock offerings.  (Liberty SAC ¶¶ 130, 142.)  Liberty

claims that Goldman: violated Section 10(b) and Rule 10b-5; violated Massachusetts' securities

fraud statute, M.G.L. c. 110A Section 410, and Washington's securities fraud statute, Wash.Rev.

Code Sections 21.20.010 and 21.20.430; committed deceptive trade practices in violation of

M.G.L. c. 93A, Section 11, and Wash. Rev. Code. Sections 19.86.020 and 19.86.090; committed

common law fraud; and made negligent misrepresentations.  On December 9, 2010, the case was

transferred to this Court.

### GENERAL LEGAL STANDARDS

### I.    General Motion to Dismiss Standard

When considering a Fed. R. Civ. P. 12(b)(6) motion, the court "must accept as true all of

the factual allegations contained in the complaint," and construe the complaint in the light most

---

[4] "Smith Underwriters'" includes: Banc of America Securities LLC, Citigroup Global Markets Inc.,
Deutsche Bank Securities Inc., Goldman, JPMorgan Securities LLC (f/k/a JPMorgan Securities, Inc.),
JPMorgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co. LLC (f/k/a
Morgan Stanley & Co. Incorporated), and UBS Securities LLC.

favorable to the plaintiff.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 (2007); see Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009).  The court only "assess[es] the legal feasibility of the complaint"; it does not "assay the weight of the evidence which might be offered in support thereof."  Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003).

To state a facially plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (citation omitted).

## II. Heightened Pleading Standards of Rule 9(b) and the PSLRA

Fed. R. Civ. P. 9(b) requires a heightened pleading standard for complaints alleging fraud: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  See In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 632–33 (S.D.N.Y. 2008).  This standard requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999).

## III.   Elements of Claims under Section 10(b) and Rule 10b-5

Securities fraud claims under Section 10(b) and Rule 10b-5 must also meet the heightened pleading standards set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA").  15 U.S.C. § 78u-4(b).  Among other requirements, the PSLRA requires "plaintiffs to state with particularity both the facts constituting the alleged [securities fraud] violation" and

the other elements of the Section 10(b) cause of action. Tellabs, 551 U.S. at 313. To effectuate

Congress's intent to eliminate baseless lawsuits through the application of rigorous pleading

standards, the PSLRA mandates that a plaintiff alleging a Section 10(b) action must: (1) specify

each statement alleged to have been misleading and the reason or reasons why the statement is

misleading, and (2) state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(1)-(2); Novak v. Kasaks,

216 F.3d 300, 306 (2d Cir. 2000).

Section 10(b) of the Exchange Act prohibits any person from using or employing "any

manipulative or deceptive device or contrivance in contravention" of SEC rules. 15 U.S.C. §

78j(b). Rule 10b-5 prohibits "any device, scheme, or artifice to defraud" and "any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the

statements made . . . not misleading . . . ." 17 C.F.R. § 240.10b-5. To state a claim under Rule

10b-5, plaintiffs must allege that defendants "(1) made misstatements or omissions of material

fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which

plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell

v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005).

## IV.    Materiality

A complaint alleging a Rule 10b-5 claim fails if it relies on statements or omissions "that

a reasonable investor would [not] have considered significant in making investment decisions."

Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). "'[T]here must be a substantial

likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available.'" Basic

Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426

6


U.S. 438, 449 (1976)). "An omitted fact may be immaterial if the information is trivial, or is so basic that any investor could be expected to know it." Ganino, 228 F.3d at 162 (internal citations omitted).

## V. Scienter Pleading Standards in Fraud Claims

A plaintiff claiming fraud can plead scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290–91 (2d Cir. 2006). To satisfy Rule 9(b), a plaintiff asserting common law fraud must allege "facts that give rise to a strong inference of fraudulent intent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). "Although speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'" Ganino, 228 F.3d at 169.

Recklessness sufficient to establish scienter involves conduct that is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996). The allegations must approximate an actual intent to defraud. Id. "[A] plaintiff pleading a § 10(b) violation based on defendant's recklessness faces two stiff challenges in this Circuit: the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud, *and* the inference of recklessness must be at least as compelling as any opposing inferences." In re Bayou Hedge Fund Litig., 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007).

## VI.   Loss Causation

In order to successfully allege loss causation, a plaintiff must adequately plead facts which, if proven, would show that its loss was caused by the fraud and not by other intervening events.  Lentell, 396 F.3d at 174; see also 15 U.S.C. § 78u-4(b)(4). Where a "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," making it more difficult for a plaintiff to establish loss causation.  Lentell, 396 F.3d at 173.  To survive a motion to dismiss, however, a plaintiff must only allege either: "(i) facts sufficient to support an inference that it was a defendant's fraud — rather than other salient factors — that proximately caused plaintiff's loss," id. at 177, or (ii) "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to . . . [the defendant's fraud]."  Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007).

## ANALYSIS

### I.   Subprime and Alt-A Disclosures

The Class Action, CIS, Smith, and Liberty have all amended their complaints to add allegations regarding FNMA's quantitative subprime and Alt-A exposure disclosures, which closely track (1) allegations made in an SEC action against Mudd, Dallavecchia, and Thomas Lund, and (2) statements made in a Non-Prosecution Agreement ("NPA") FNMA entered into with the SEC.[5]  Defendants move, pursuant to Fed. R. Civ. P. 12(f), to strike portions of the plaintiffs' amended pleadings that repeat allegations contained in the SEC complaint and the NPA.

---

[5]  The ERISA plaintiffs, in 09 Civ. 1350, have also amended their complaint to incorporate allegations from the SEC action.  The Class Action, CIS, and Smith use such allegations to bring federal securities law claims against FNMA, Mudd, and Dallavecchia.  Liberty and the ERISA Class Action Plaintiffs do not raise any claims on this basis, but rather incorporate these factual allegations to bolster other claims.

A. *Defendants' Motions to Strike*

Under Fed. R. Civ. P. 12(f), a court is permitted to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "To prevail on a motion to strike, a party must demonstrate that '(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant.'" S.E.C. v. Lee, 720 F.Supp.2d 305, 340-341 (S.D.N.Y. 2010) (Daniels, J.) (quoting Roe v. City of N.Y., 151 F.Supp.2d 495, 510 (S.D.N.Y. 2001)).

In Lipsky v. Commonwealth United Corp., 551 F.2d 887 (2d Cir. 1976), this Circuit struck a complaint's reference to a SEC consent decree because it was inadmissible under Fed. R. Evid. 410 and, thus, the private action plaintiff could not derive any evidentiary benefit from it. Id. at 893. The Circuit, however, reiterated the strong presumption against striking portions of the pleadings and cautioned that its holding was limited to "the facts of this case." Id. 893-94. Lipsky does not, as defendants argue, stand for the proposition that any factual allegation derived from a government investigation or pleading must be stricken from a private plaintiff's complaint. "There is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings in order to meet the Rule 9(b) and PSLRA thresholds." Lee, 720 F.Supp.2d at 341 (citing Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F.Supp.2d 385, 395 (S.D.N.Y. 2005) (holding that an SEC complaint is an adequate source for a factual allegation)). Thus, "there is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA." Id. Indeed, "[i]t makes little sense to say that information from . . . a study [or investigation]— which the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony — is

immaterial simply because it is conveyed in an unadjudicated complaint." In re Bear Stearns

Mortgage Pass-Through Certificates Litig., No. 08 Civ. 8093 (LTS)(KNF), 2012 U.S. Dist.

LEXIS 45679, at *53-55 (S.D.N.Y. Mar. 30, 2012).

      The defendants have not satisfied the three elements to prevail on a motion to strike.

First, while the SEC complaint and the NPA are not admissible, there is evidence in support of

the factual allegations contained within these documents that would be admissible.  The Class

Action plaintiffs have documentary support for some of their allegations from their limited

discovery.  In addition, some of the publicly available information supports plaintiffs'

allegations.[6]  Second, the new factual allegations relate to the issues previously raised in the

private securities actions.[7]  Third and finally, it would not prejudice defendants to allow

plaintiffs' new allegations to stand because many of these defendants must defend themselves

against such claims in the SEC's enforcement action in any event.  Defendants' motions to strike

the allegations derived from the SEC complaint and NPA are therefore DENIED.

    B.  *The Class Action, CIS, and Smith Have Stated A Claim Against FNMA, Mudd, and*
        *Dallavecchia For Misstating FNMA's Subprime And Alt-A Exposure*

      Defendants argue that plaintiffs' Section 10(b) and Rule 10b-5 claims premised

on FNMA's quantitative subprime and Alt-A exposure disclosures fail to state a claim for

a number of reasons.  Almost all of their arguments are identical to those raised in the

---

[6] Contrary to defendants' arguments, however, the publicly available information did not correct, clarify or render immaterial FNMA's subprime and Alt-A exposure disclosures, because it was not clear to investors at that point that FNMA's subprime and Alt-A exposure excluded EA, MCM and lender-selected low-documentation loans, as discussed in this Court's prior opinion.  See SEC v. Mudd, 11 Civ. 9202, 2012 WL 3306961 (S.D.N.Y. Aug. 10, 2012).
[7] The Class Action previously alleged that FNMA's disclosure of its subprime exposure was false and misleading.  The Court found the Class Action's prior factual allegations to be insufficient to state a claim at that time. In re Fannie Mae 2008 Sec. Litig., 742 F.Supp.2d at 402.  The SEC, however,  raises new factual allegations which are sufficient to state a claim.  See S.E.C. v. Mudd, 11 Civ. 9202, Dkt. No. 40.


SEC enforcement action and, therefore, are rejected for the reasons stated in the Court's prior opinion, familiarity with which is assumed.  SEC v. Mudd, 11 Civ. 9202, --- F. Supp. 2d ---, 2012 WL 3306961 (S.D.N.Y. Aug. 10, 2012).  Dallavecchia argues, however, that he did not "make" the misstatements at issue within the meaning of Janus Capital Grp., Inc., v. First Derivative Traders, 131 S.Ct. 2296, 2305 (June 13, 2011).

In Janus, the Supreme Court considered whether Janus Capital Management, which served as an investment adviser and administrator for Janus Investment Fund, made the misstatements contained in Janus Investment Fund's mutual fund prospectus. The Supreme Court held that, in a private Section 10(b) or Rule 10b-5 action, "the maker of a statement is the person or entity with the ultimate authority over the statement, including its content and whether and how to communicate it."  Id. at 2305.  The Court held that while Janus Capital Management "was significantly involved in preparing the prospectus," it did not "make" the statements contained in the prospectus because it did not have ultimate control over the statements, it did not file the prospectus with the SEC, and the statements in the prospectus were not attributed to it.  Id.

Plaintiffs allege that Dallavecchia made misstatements on conference calls with investors and in FNMA's SEC filings.  Dallavecchia can be found liable for his statements on conference calls because "[o]ne 'makes' a statement by stating it . . . . Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit—or blame—for what is ultimately said."  Janus, 131 S.Ct. at 2302; see also In re Pfizer Secs. Litig., No. 04 Civ. 9866(LTS), 2012 U.S. Dist. LEXIS 39454, at *20-21 (S.D.N.Y. Mar. 22, 2012) (holding that Janus did not foreclose liability for statements the officer defendants made


themselves).  Plaintiffs adequately allege that Dallavecchia made material misstatements

during conference calls with investors on February 27, 2007, May 2, 2007, and August

17, 2007.  On February 27, 2007, for example, Dallavecchia stated that only 0.2% of

FNMA's Single Family book of business consisted of subprime loans, which he

described as "immaterial" and a "prudent engagement."  (Class Action SAC ¶¶ 140, 317.)

    While it is correct that Dellavecchia did not sign any of the SEC filings at issue,

he still may be found to have made a misstatement.  In the post-Janus world, an executive

may be held accountable where the executive had ultimate authority over the company's

statement; signed the company's statement; ratified and approved the company's

statement; or where the statement is attributed to the executive.  See In re Merck & Co.,

Sec., Derivative & "ERISA" Litig., MDL No. 1658(SRC), 2011 U.S. Dist. LEXIS 87578,

at *102-103 (D.N.J. Aug. 8, 2011) (finding Executive Vice President could be liable for

misstatements in SEC filings, which he signed, and quotes attributed to him appearing in

articles and reports); In re Pfizer Secs. Litig., 2012 U.S. Dist. LEXIS 39454, at *20-21

(holding that executive defendants could be liable for statements in press releases because

they "approved" or "ratified" such statements).

    Given Dallavecchia's position as Chief Risk Officer, his knowledge of FNMA's

subprime and Alt-A exposure, his participation in drafting relevant disclosures, his

position on the disclosure committee, his review of draft filings, the fact that he had

individual discussions with Mudd about the SEC filings, and his sub-certification (and,

thus, approval) of the SEC filings, a question of fact exists as to whether Dallavecchia

had ultimate authority over the misstatements, or ratified and approved the

misstatements, contained in FNMA's SEC filings.  See In re Pfizer Secs. Litig., 2012

U.S. Dist. LEXIS 39454, at *20-21.  Dallavecchia's arguments thus fail at this juncture.

   C.  *The Class Action, CIS and Smith Have Stated A Claim For Control Person*
       *Liability, Under Section 20(a)*

       The Class Action, CIS, and Smith allege that Mudd and Dallavecchia are liable as control

persons, under Section 20(a) of the Exchange Act, for FNMA's false and misleading quantitative

subprime and Alt-A disclosures.  "While a party cannot be held liable for both a primary

violation and as a control person, alternative theories of liability are permissible at the pleading

stage."  In re Am. Intern. Grp., Inc. 2008 Sec. Litig., 741 F.Supp.2d 511, 534-535 (S.D.N.Y.

2010).

       "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show:

(1) a primary violation by a controlled person; (2) control of the primary violator by the

defendant; and (3) 'that the controlling person was in some meaningful sense a culpable

participant' in the primary violation."  Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.1998)

(quoting SEC v. First Jersey Sec., Inc.,101 F.3d 1450, 1472 (2d Cir.1996).

       The first element is satisfied because plaintiffs plausibly allege that FNMA made material

misstatements regarding its level of exposure to subprime and Alt-A loans.  Second, the Court

already determined that Mudd and Dallavecchia "did indeed have control over FNMA."  In re

Fannie Mae, 742 F.Supp.2d at 416.  Finally, having already determined that Mudd and

Dallavecchia acted with scienter, as detailed in the Court's opinion SEC v. Mudd, 2012 WL

3306961, at *11-13, plaintiffs have adequately alleged culpable participation.  See In re Take–

Two Interactive Sec. Litig., 551 F.Supp.2d 247, 308 (S.D.N.Y. 2008) ("[B]ecause the Court has

determined that [Plaintiff] adequately pleads [Defendant's] scienter ... [plaintiffs] sufficiently

alleges [Defendant's] culpable participation in that fraud as well.").  Accordingly, Mudd and


Dallavecchia's motions to dismiss the Class Action, Smith and CIS's Section 20(a) claims are DENIED.

**II. Motions To Dismiss CIS and Smith's Federal Claims**

*A. Section 10(b) and Rule 10b-5 Claims*

    1. <u>Accounting "Shenanigans"</u>

CIS alleges that FNMA, Mudd, and Dallavecchia misstated FNMA's core capital financials by engaging in "accounting fraud" and "accounting shenanigans." (<u>See</u> CIS SAC ¶ 246.) The Class Action previously raised similar claims, based on similar facts, which the Court dismissed as insufficient to state a claim. <u>See</u> <u>In re Fannie Mae</u>, 742 F.Supp.2d at 408-10.

CIS argues that two new sources cure the previous inadequacies. First, the Federal Crisis Inquiry Commission ("FCIC") Report references a March 8, 2008 email from a White House economist, Jason Thomas, to a Treasury official, Robert Steel, stating: "A realistic assessment of Fannie's capital position would show the company is currently insolvent. Accounting fraud has resulted in several asset categories . . . being overstated, while guarantee obligations liability is understated. These accounting shenanigans add up to tens of billions of exaggerated net worth." (CIS SAC ¶¶ 140, 267.) Second, Morgan Stanley conducted a review of FNMA's financials and concluded that FNMA overvalued its deferred tax assets ("DTAs"). (CIS SAC ¶ 142.)

Despite CIS's arguments, neither Thomas's email, nor the Morgan Stanley report, remedies the prior deficiencies. Thomas's conclusory statements regarding FNMA's insolent capital position, accounting fraud, and accounting shenanigans do not plausibly explain why FNMA's core capital financials were incorrect. CIS has not shown that FNMA committed any GAAP violation, that the governing accounting rules were not sufficiently flexible to cover

FNMA's interpretation of them during this period, or that any federal regulator has since asked for a restatement. See In re Fannie Mae, 742 F.Supp.2d at 408.[8]

Likewise Morgan Stanley's statements concerning FNMA's DTAs do not warrant the inference that FNMA committed fraud, by believing that it could earn sufficient income over a 20-year period to realize the DTAs before they expired. Rather, Morgan Stanley's statements merely further a fraud-by-hindsight theory that was previously rejected by the Court. See In re Fannie Mae, 742 F.Supp.2d at 409-10.[9]

CIS has failed to remedy the previously delineated inadequacies; its claims that defendants misstated FNMA's core capital base are dismissed.

### 2. Representations Regarding Risk Management

#### i.    Material Misstatements

CIS, which bought stock in May 2008, and Smith, who purchased stock in connection with a December 6, 2007 offering, allege that FNMA, Mudd, and Dallavecchia made numerous material misrepresentations concerning FNMA's risk management controls throughout 2006, 2007, and 2008; and specifically, in connection with the Series S and T offerings. The Court previously found the same alleged misstatements are sufficient to state a claim. See In re Fannie

---

[8] The Court previously found that the "OFHEO, Fannie's federal regulator prior to conservatorship, reported repeatedly that Fannie was adequately capitalized"; "the FHFA has since scrutinized Fannie's financials and has not asked for a restatement of any of its financials" for the relevant period; and that "without a sufficiently pleaded misstatement, there can be no finding of scienter." In re Fannie Mae 2008 742 F.Supp.2d at 408.

[9] Indeed, CIS's own allegations suggest that FNMA intended to hold its securities until the market recovered, and was optimistic with respect to its long-term performance. (See CIS SAC ¶ 117 (alleging that during a February 28, 2008 conference call, Mudd stated: "2007 was a tough year.  2008 will be tough as well.  And 2009 we do not anticipate will be particularly rosy, so throughout this period, capital remains king and we want to remain long capital . . ."); CIS SAC ¶ 126 (stating FNMA was seeking to "maintain a strong, conservative balance sheet through the housing correction, pursue growth opportunities to enhance long-term shareholder value, and provide liquidity to the secondary market"); id. ¶ 120 (Mudd stated: "As the market recovers, we will be a prime beneficiary . . . when the housing market finally stabilizes, the company will 'feast' on the mortgages it is currently buying.").

Mae 2008 Sec. Litig., 742 F.Supp.2d at 405-06.[10]  FNMA, Mudd, and Dallavecchia argue that the

allegations are insufficient to state a claim for a number of reasons.  All of their arguments,

however, are without merit.[11]

Defendants argue that since Dallavecchia's October 28, 2006 and July 16, 2007 emails

discussing FNMA's serious problems with risk controls, see supra n. 8, pre-date the Series S and

T offering circulars that:  they cannot be used to show defendants' viewpoints at the relevant

time; they were not made "in connection with" the offerings; and they were too far removed

given the intervening market events to create liability here.  Dallavecchia's July 16, 2007 email,

however, references FNMA's risk control measures for 2008, and thus plausibly reflects

defendants' viewpoint throughout the relevant time.  (See CIS SAC ¶¶ 165-66; Smith SAC ¶

54.)  Courts routinely find that misstatements in SEC filings, press releases, and conference calls

are made "in connection with" the purchase or sale of a security.  See, e.g., S.E.C. v. Solucorp

---

[10] Specifically, CIS and Smith allege that FNMA, Mudd, and Dallavecchia falsely represented that
FNMA's risk management controls were adequate.  For example, on a February 27, 2007 conference
call, Dallavecchia said that "from a control and risk underwriting standpoint, we want to continue
maintaining prudent underwriting standards."  (CIS Compl. ¶ 274; Smith SAC ¶ 134.)  On November 9,
2007, FNMA issued a press release stating: "During the last year, we vastly reduced our material
weakness in internal controls, [and] expanded our risk-management functions . . . . The Company is in
solid shape to support the market, and is in better shape to benefit when the market correction ends."
(CIS SAC ¶ 202.)  FNMA's 2007 10K states that "controls are in place to better manage our risks."
(CIS SAC ¶ 196.)  On a February 27, 2008 conference call, Mudd stated: "On credit, we're taking
additional steps to protect the book by controlling our risks and losses."  (CIS SAC ¶¶ 197.)

Meanwhile, on October 28, 2006 Dallavecchia emailed Mudd stating:  "I have a seri[ous] problem with
the control process around subprime limits. . . . There is a pattern emerging of inadequate regard for the
control process."  (See CIS SAC ¶ 164; Smith SAC ¶ 52.)  On July 16, 2007 Dallavecchia forwarded an
email to Mudd stating:  "The company has one of the weakest control processes I [have] ever
witness[ed] in my career. . . This company really doesn't get it, we are not even current and we are
already back to the old days of scraping controls and people."  "I do not even think that with what I was
given for 2008 is adequate for the current risk, considering how far we already are from adequate
market practices.  I have been saying that we are not even close to having proper control process for
credit market and operational risk.  I got a 60 percent budget cut.  Do I look stupid?"  (See CIS SAC ¶¶
165-66; Smith SAC ¶ 54.)

[11] Dallavecchia's argument that he cannot be held liable for any of the alleged risk management
statements because he did not "make" these statements under Janus, is rejected for the reasons
discussed above.  See supra, s. I.B. at 11-13.

Indust., Ltd., 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003).  Finally, the intervening market

conditions did not improve FNMA's risk management controls, but rather made FNMA's ability

to control risk more crucial.  Since all of the emails, viewed together, plausibly suggest that

FNMA, Mudd, and Dallavecchia maintained a constant view that FNMA's internal risk

management controls were inadequate—a view that was not communicated to the public during

this time frame—their risk control statements are actionable.

FNMA argues that plaintiffs' are improperly relying on a fraud-by-hindsight theory of

liability.  "The incantation of fraud-by-hindsight will not defeat an allegation of

misrepresentations and omissions that were misleading and false at the time they were made."  In

re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 763 F.Supp.2d 423, 487 (S.D.N.Y.

2011).  Since the above emails plausibly suggest that FNMA, Mudd, and Dallavecchia knew that

FNMA's risk management representations were false at the time the statements were made,

FNMA's fraud-by-hindsight argument fails.

Dallavecchia argues that his statements were literally true.  In analyzing whether the

statements in the SEC filing were false or misleading "the court must 'read [them] as a whole'

. . . [because the] 'central issue . . . is not whether the particular statements, taken separately,

were literally true, but whether defendants' representations, taken together and in context, would

have misl[ed] a reasonable investor about the nature of the' securities."  In re Lehman Bros. Sec.

& ERISA Litig., 09 MD 2017(LAK), 2011 U.S. Dist. LEXIS 82119, at *152 (S.D.N.Y. July 27,

2011).  Accordingly, even if Dallavecchia's statements were literally true (a proposition that may

be doubted), he can still be found liable for the overall misleading impression his statements

created.


FNMA and Mudd argue that FNMA disclosed sufficient information and provided sufficient warnings regarding its risk control measures to correct, clarify, or render immaterial the purported misstatements. "To be 'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.' " In re Bear Stearns, 763 F.Supp.2d at 495 (quoting In re Immune Response Sec. Litig., 375 F.Supp.2d 983, 1033 (S.D.Cal. 2005)).[12]  FNMA's and Mudd's warnings to investors about future risks and losses do not foreclose their liability for allegedly failing to disclose FNMA's currently inadequate risk control measures.  In addition, there is insufficient evidence at this juncture to find that any warnings reduced the risk of deception to nil.

The Court determines that CIS and Smith have adequately alleged that FNMA, Mudd, and Dallavecchia made material misstatements concerning FNMA's risk management controls.

*ii.    Scienter*

The Court has already determined that the above emails are sufficient to show that Mudd and Dallavecchia were reckless in making misstatements concerning FNMA's risk control measures.[13]  Specifically, the Court held that these emails:

> suggest that FNMA was conscious of its internal inability to manage the risks
> associated with subprime loans.  Proceeding headlong into an unfamiliar market

---

[12] To the extent Defendants are raising a "truth on the market" argument, under which "a misrepresentation [can be found to be] immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market," their argument fails at this juncture.  A truth on the market defense will preclude liability only when the corrective information is "conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000) (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir.1989)).  Making such a showing is "intensely fact-specific." Id.  Thus, the truth-on-the-market defense "is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." Id. at 167-68.  At best, defendants' arguments create a question of fact which cannot be resolved at this juncture.

[13] Mudd and Dallavecchia argue that their purchase of preferred stock in November 2007 negates a finding of scienter.  Purchases, however, only address a 'motive and opportunity' theory of scienter, not a recklessness theory.  See In re Regeneron Pharms., Inc. Sec. Litig., 03 Civ. 3111(RWS), 2005 U.S. Dist. LEXIS 1350, at *66-71 (S.D.N.Y. Feb. 1, 2005).


> and telling investors that risk controls are in place while working, according to
> Dallavecchia's emails, without the internal ability to analyze the risks associated
> with that market is certainly enough of 'an extreme departure from the standards
> of ordinary care' to show an inference of scienter and therefore survive a motion
> to dismiss.

In re Fannie Mae, 742 F.Supp.2d at 406-07.  Accordingly, "the inference of recklessness here is

greater than that of 'garden-variety fraud,' and Plaintiffs' allegation of recklessness is at least as

compelling as any other inference."  Id.  The same emails warrant the same inferences here.

"When the defendant is a corporate entity, the law imputes the state of mind of the

employees or agents who made the statement(s) to the corporation."  In re Vivendi Universal,

S.A. Sec. Litig., 765 F.Supp.2d 512, 543 (S.D.N.Y. 2011) (citing Teamsters Local 445 Freight

Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008)).  Accordingly,

Mudd and Dallavecchia's scienter can be attributed to FNMA.

    *iii.*    *Reliance*

Smith alleges that he actually relied on the false statements, as read and interpreted by his

investment advisor, including "the Individual Defendants' contemporaneous communications."

(Smith SAC ¶ 14).  This "alone is a sufficient allegation of actual reliance for purposes of

surviving a motion to dismiss."  Maverick Fund v. Comverse Tech., 10-CV-4436 (JG) (JO),

2011 U.S. Dist. LEXIS 74601, at *30-31 (E.D.N.Y. July 12, 2011) (finding allegation that

plaintiff "read and/or listened to and relied upon the defendants' false and misleading statements

before investing" was sufficient to show reliance).

CIS alleges generally that it relied on the false statements and total mix of information.

(CIS SAC ¶¶ 353, 355, 368, 368.)  Under the fraud-on-the-market presumption, plaintiffs can

assume "that all publicly available information is reflected in the stock price of any security that

is traded on an efficient market."  Maverick Fund, 2011 U.S. Dist. LEXIS 74601, at *34-35.

"[I]f the market price was inflated because of defendants' material misstatements, the presumption allows anyone who purchased shares on an efficient market to claim that he or she relied on the misstatements by relying on the integrity of the market to reflect all publicly available information." Id.

FNMA, Mudd, and Dallavecchia argue that CIS and Smith could not have relied on any of the purported misstatements because they were not included in the offering circulars, which contained the following disclaimer:

> You should rely on only the most up-to-date information . . . [W]e are not incorporating in this Offering Circular all of the information available on [FNMA's or the SEC's websites]. You should rely only on the information included or incorporated by reference or deemed to be incorporated by reference in this Offering Circular in deciding whether or not to invest in the Preferred Stock.

(Kramer Decl. Ex. 1 at 3). The Series T offering expressly incorporated FNMA's 2007 10-K and first quarter 2008 10-Q. (CIS SAC ¶ 243.) The Series S offering expressly incorporated FNMA's 2006 10-K and its 2007 10-Qs for the first, second, and third quarters.

Even if the Court were to limit its analysis to those SEC filings expressly incorporated by reference, it would still find purported misstatements. (See Smith SAC ¶ 152 (misstatements alleged in the 2006 10-K and 2007 10-Qs); CIS SAC ¶ 196 (misstatements alleged in the 2007 10K).) Accordingly, the disclaimers of reliance do not bar Smith and CIS's claims.

Dallavecchia raises a truth-on-the-market defense, arguing that by the time Smith and CIS purchased stock, the market wide problems—and specifically the value and characteristic of FNMA's subprime holdings—were already well known, negating reliance under a fraud-on-the market theory. This defense, however "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." Ganino, 228 F.3d at 167; see also supra n. 9. Moreover, even if the value and characteristics of FNMA's subprime holdings were well known,

this would not necessarily affect an investor's reliance on FNMA's risk management statements. Accordingly, Defendants' arguments are rejected.

*iv.    Loss Causation*

"[A]llegations that Defendants' misstatements regarding internal risk management and controls, which, in turn, resulted in government conservatorship, caused a stock price drop, which consequently caused their losses" is sufficient to allege loss causation at this stage, because "[t]he Court need not make a final determination as to what losses occurred and what actually caused them," it only needs to find that plaintiffs' allegations are plausible. In re Fannie Mae, 742 F.Supp.2d at 382 (quoting In re Bristol Myers, 586 F.Supp.2d at 166).

CIS and Smith have thus adequately alleged all elements to state Section 10(b) and Rule 10b-5 claims against FNMA, Mudd, and Dallavecchia for materially misstating the state of FNMA's risk management controls.

*B.  Section 20(a) Claims*[14]

The first element to a section 20(a) claim is satisfied here because CIS and Smith plausibly alleged that FNMA made material misstatements regarding its risk management controls. The Court already found the second element is satisfied because "Mudd, as CEO, was not only FNMA's most senior officer, but he signed the 10-Ks and 10-Qs that contained many of FNMA's purported misstatements; Dallavecchia, as Executive Vice President and Chief Risk Officer, was responsible for FNMA's risk controls and for reviewing and approving the methodology and amount of FNMA's combined loss reserves, and also contributed to FNMA's misstatements." In re Fannie Mae, 742 F.Supp.2d at 416.  Finally, the Court has already held that the scienter allegations, detailed above, are sufficient to show that Mudd and Dallavecchia

---

[14] For a recitation of the elements to a Section 20(a) claim, see supra, at 14.

are culpable participants in the primary violations.  See id.  Accordingly, Mudd and

Dallavecchia's motions to dismiss Smith and CIS's Section 20(a) claims are DENIED.

**III.    Defendants' Motions To Dismiss Plaintiffs' State Law Claims Under SLUSA**

Defendants argue that CIS, Smith and Liberty's state law claims are preempted by the

Securities Litigation Uniform Standards Act of 1998 ("SLUSA").  "SLUSA provides that a state

law claim must be dismissed as completely preempted if: 1) the lawsuit is a 'covered class

action'; 2) the claim is based upon state law; 3) the claim concerns a 'covered security'; and 4)

the plaintiff alleges either a misrepresentation or omission of a material fact or a manipulative or

deceptive device or contrivance that is 'in connection with the purchase or sale of a covered

security.'"  In re Eaton Vance Mut. Funds Fee Litig., 380 F.Supp.2d 222, 240-241 (S.D.N.Y.

2005) (quoting 15 U.S.C. §§ 77p(b), 78bb(f)(1)).  "SLUSA does not actually pre-empt any state

cause of action. . . .[i]t simply denies plaintiffs the right to use the class-action device to

vindicate certain claims."  Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 87

(2006).

There is no dispute that the second, third, and fourth elements are satisfied here: CIS,

Smith, and Liberty raise state law claims; FNMA's securities were listed and traded on the New

York Stock Exchange during the relevant time; and the purported misrepresentations occurred in

connection with FNMA's securities offerings.  Only the first element—whether the lawsuits are

a "covered class action"—is disputed.

A "covered class action" includes a "group of lawsuits filed in or pending in the same

court and involving common questions of law or fact," in which (a) "damages are sought on

behalf of more than 50 persons" and (b) the lawsuits are "joined, consolidated, or otherwise

proceed as a single action for any purpose."  15 U.S.C. § 78bb(f)(5)(b).

With respect to the "joined, consolidated, or otherwise proceeding as a single action for any purpose" requirement, SLUSA is triggered where a group of actions are formally consolidated for *any* purpose (discovery, pre-trial, trial, etc.). See Gordon Partners v. Blumenthal, No. 02 Civ. 7377(LAK), 2007 WL 1438753, at *3 (S.D.N.Y. May 16, 2007). Alternatively, the actions "need not have been formally joined or consolidated with other actions" to trigger SLUSA, so long as they "proceed as a single action *for any purpose*." Amorosa v. Ernst & Young LLP, 672 F.Supp.2d 493, 517 (S.D.N.Y. 2009) aff'd 409 Fed. App'x 412, 417 (2d Cir. 2011); accord Krys v. Sugrue (In re Refco Inc. Sec. Litig.), 07 MDL 1902(JSR), 2012 U.S. Dist. LEXIS 65385, at *42 (S.D.N.Y. May 9, 2012) ("Although these actions have not been formally consolidated or joined, they are proceeding as a single action through coordinated pre-trial proceedings in this Multi-District Litigation.").

Under Second Circuit law, a court must conduct a claim-by-claim analysis of SLUSA preemption. Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 47 (2d Cir.2005), rev'd as to other grounds, 547 U.S. 71 (2006). "Any claim may trigger SLUSA preemption if the basis of that claim sounds in fraud or relies on alleged misstatements or omissions." In re Merkin, 817 F. Supp. 2d 346, 359 (S.D.N.Y. 2011).

CIS and Smith's state law claims against FNMA, Mudd, and Dallavecchia are precluded under SLUSA. CIS, Smith, and the Class Action constitute a group of lawsuits pending in the same court that raise almost identical questions of fact, in which damages are sought on more than 50 persons. On April 16, 2009, the Honorable Gerald E. Lynch ordered that any "*action pertaining to FNMA . . . hereafter transferred* to this Court, including the actions transferred to this Court pursuant to the Judicial Panel of Multidistrict Litigation . . . brought under the federal securities laws or state laws relating to the issuance, purchase or sale of securities . . . *are*

*consolidated for pretrial purposes . . .*" (See 08-cv-7831, Apr. 16, 2009 Order (emphasis

added)).  After this order, on June 19, 2009 and March 12, 2010, CIS's and Smith's actions,

respectively, were transferred to this Court through the JPML.  Judge Lynch's formal

consolidation of these cases for pre-trial purposes triggers SLUSA.  See Gordon Partners, 2007

WL 1438753, at *3; In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, and "ERISA" Litig., 503

F.Supp.2d 25, 32 (D.D.C. 2007) (finding "plaintiffs' state law claims are unquestionably part of

a 'covered class action' under SLUSA because the . . . plaintiffs' claims have been consolidated

with a larger MDL proceeding that includes class action securities claims under federal law.")

Alternatively, ever since plaintiffs amended their pleadings to incorporate allegations raised in

the SEC action, all of the securities actions have proceeded on the same motion schedule, which

is also sufficient to trigger SLUSA.[15]  Amorosa, 672 F.Supp.2d at 517; Krys, 2012 U.S. Dist.

LEXIS 65385, at *42.  CIS, Smith, and the Class Action thus collectively represent a "covered

class action" under SLUSA.  Each of CIS and Smith's state law claims against FNMA, Mudd

and Dallavecchia sound in fraud.  See e.g., Newman v. Family Mgmt. Corp., 748 F.Supp.2d 299,

311–13 (S.D.N.Y.2010) (dismissing common law fraud, negligent misrepresentation, breach of

fiduciary duty, gross negligence and mismanagement, unjust enrichment, malpractice and

professional negligence, and aiding and abetting breach of fiduciary duty claims as barred by

SLUSA).  Accordingly, CIS and Smith's state law claims against FNMA, Mudd, and

Dallavecchia are barred by SLUSA and thus DISMISSED.

CIS, Smith, and Liberty also raise claims against defendants who are not defendants in

the Class Action:  CIS raises claims against Levin and Swad; and CIS, Smith, and Liberty raise

claims against certain underwriters.  Viewed on a claim-by-claim basis, Dabit, 395 F.3d at 47,

---

[15] While Smith argues that the actions were merely "coordinated," actions that are "coordinated with the consolidated class action" can be treated as part of the "covered class action" for SLUSA purposes. In re Merkin, 817 F.Supp.2d at 349 n.1, 360.

the Court finds that there are not more than 50 person seeking damages against Levin, Swad and the underwriters. Accordingly, SLUSA does not bar plaintiffs' claims against these defendants.

## IV. CIS's State Law Claims Against Levin and Swad

CIS's original complaint, filed in Texas state court, raised claims against FNMA, Mudd, Dallavecchia, Levin, and Swad under the Exchange Act. CIS subsequently voluntarily dismissed all of its federal claims against Levin and Swad, prompting their challenge to this Court's personal jurisdiction.

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." Penguin Group (USA) Inc. v. American Buddha, 609 F.3d 30, 34 -35 (2d Cir. 2010). "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006). Such a showing entails making "legally sufficient allegations of jurisdiction," including "an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) (per curiam) (internal quotation marks and ellipsis omitted).

CIS argues that the Court has personal jurisdiction over Levin and Swad because: (1) the federal claims provide "pendent personal jurisdiction" over their state law claims; and (2) Levin and Swad's misstatements and omissions on nationwide conference calls are sufficient, under Texas law, to confer personal jurisdiction over them.

### A. Pendent Personal Jurisdiction

"[P]endent personal jurisdiction is not explicitly authorized by statute and remains, at least in the view of most commentators, 'a federal common law doctrine.'" U.S. v. Botefuhr, 309 F.3d 1263, 1272-1273 (10th Cir. 2002) (quoting 4A Charles Alan Wright & Arthur A. Miller,

Federal Practice & Procedure § 1069.7, at 227 (3d ed.2002).) "[U]nder the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and state claims 'derive from a common nucleus of operative fact', see United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available." IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056 (2d Cir. 1993). In other words, "once a district court has personal jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction. A defendant who already is before the court to defend a federal claim is unlikely to be severely inconvenienced by being forced to defend a state claim whose issues are nearly identical or substantially overlap the federal claim." Rolls-Royce Corp. v. Heros, Inc., 576 F.Supp.2d 765, 783 (N.D.Tex. 2008).

Having voluntarily dismissed all federal claims against Levin and Swad, there are no potentially related federal claims pending against them upon which CIS can 'piggyback' its state law claims. Accordingly, the Court rejects this basis for personal jurisdiction.

   *B. Texas's Long Arm Jurisdiction*

Since this is a multi-district litigation proceeding, "the forum state . . . is the district court where the action was originally filed, and therefore that state's law must be applied." In re Ski Train Fire In Kaprun, Austria on Nov. 11, 2000, 257 F.Supp.2d 717, 723 (S.D.N.Y. 2003). Texas law thus governs the Court's personal jurisdiction analysis.

Texas long arm jurisdiction extends as far as the constitutional requirements of due process permit. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex. 2002).

26


Accordingly, "[p]ersonal jurisdiction over nonresident defendants is constitutional when two

conditions are met: (1) the defendant has established minimum contacts with the forum state, and

(2) the exercise of jurisdiction comports with traditional notions of fair play and substantial

justice." Id.  Minimum contacts require "purposeful availament"—"some act by which the

defendant purposefully avails itself of the privilege of conducting activities within the forum

State, thus invoking the benefits and protections of its laws." Michiana Easy Livin' Country,

Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005).  Under a minimum contacts analysis, a

defendant's contacts with a forum state can give rise to either general or specific jurisdiction.

CSR Ltd. v. Link, 925 S.W.2d 591, 595 (Tex. 1996).

 CIS alleges that Levin made misstatements on a February 27, 2008 conference call with

investors (CIS SAC ¶ 334); and Swad made misstatements on two conference calls with

investors, occurring on November 9, 2007 and February 27, 2008 (CIS SAC ¶ 343).  Their

occasional participation on nationwide conference calls, however, is insufficient to confer

specific jurisdiction under Texas law.  See Guillory v. JK Harris & Co., 2007 WL 7239890, at *3

(S.D.Tex. Aug. 24, 2007).  Specific jurisdiction does not exist where "[t]he sole connection to

Texas was that it was the state in which [plaintiff] received the communications," Buffet

Partners, L.P. v. Sheffield Square, L.L.C., 256 S.W.3d 920, 924 (Tex.App. Dallas 2008), because

"personal jurisdiction cannot be based on the mere fortuity that a plaintiff resides in the forum

state." Guillory, 2007 WL 7239890, at *3.

 "To make a prima facie showing of general jurisdiction, a plaintiff must produce

evidence affirmatively demonstrating that the defendant's contacts with the forum state are

substantial, continuous, and systematic." Guillory, 2007 WL 7239890, at *4.  Levin and Swad's

participation on two "national . . . telephone conferences alone do not constitute a showing of


extensive contacts." Id.  Since CIS has not established any other connection between the State of Texas and Levin and Swad that would warrant the exercise of personal jurisdiction, the Court must dismiss all claims against these defendants.

## V.    **Underwriters' Motions To Dismiss**

Goldman, the CIS Underwriters, and the Smith Underwriters moved to dismiss all claims raised against them.

### A. *Goldman's Motion to Dismiss*

#### 1.  Federal Claims

Liberty brings Section 10(b) and Rule 10b-5 claims against Goldman for failing to disclose, in the Series S and P preferred stock offerings, that FNMA had not met its core capital requirements, in part due to its exposure to risky subprime and Alt-A mortgage loans.  Liberty claims that Goldman violated subparts (a), (b), and (c) of Rule 10b-5 by (1) making an untrue statement of material fact, (2) omitting to state material facts, and (3) employing a scheme to defraud.

##### i.  *Making a Misstatement*

As discussed above, in Janus, the Supreme Court held that for purpose of a private action under Section 10(b):

> the maker of a statement is the person or entity with the ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.

Janus, 131 S.Ct. at 2305.  The Supreme Court rejected the argument that the person who "suggests what to say" or drafts the language can be liable as the "maker" of the statement.  Id.

While the Supreme Court's analysis did not pertain explicitly to underwriters, its holding is instructive here.

In SEC v. Tambone, 597 F.3d 436 (1st Cir. 2010) (en banc), the First Circuit applied similar logic and held that two executives of a mutual fund underwriter, Columbia Funds Distributor, Inc., were not subject to primary liability under Rule 10b-5 for "making" misstatements contained in a prospectus issued by the mutual funds' sponsor, Columbia Management Advisors, Inc., the underwriter's sister company. Id. 438-40. The First Circuit held that "using" a statement is not the same as "making" a statement for purposes of a Rule 10b-5 claim, and thus the underwriters were not liable for "us[ing] and disseminati[ng] prospectuses created by others" in selling the mutual funds. Id. 442-47. The Circuit further held that the underwriters were not liable, under Rule 10b-5, for "directing the offering and sale of securities on behalf of an underwriter, thus making an implied statement that he has a reasonable basis to believe that the key representations in the relevant prospectus are truthful and complete." Id. at 442. To find an underwriter makes an implied representation would "impose primary liability under Rule 10b-5 on [ ] securities professionals whenever they fail to disclose material information not included in a prospectus. . . . [which] would be tantamount to imposing a free-standing and unconditional duty to disclose. The imposition of such a duty flies in the teeth of Supreme Court precedent." Id. at 447-48.

The Second Circuit's opinion in Pac. Invest. Mgmt. Co. v. Mayer Brown LLP, 603 F.3d 144, 148 (2d Cir. 2010) is likewise consistent with Janus, and instructive here. In this case the Second Circuit held that an outside law firm and lawyer "can be held liable in a private damages action . . . only for false statements attributed to the secondary-actor defendant at the time of the dissemination. Absent attribution, plaintiffs cannot show that they relied on defendants' own

false statements, and participation in the creation of those statements amounts, at most, to aiding and abetting securities fraud." Id. The Circuit held that the "mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient." Id. at 155.

Liberty argues that since Goldman was the lead underwriter for the offerings, it made the purported misstatements that FNMA exceeded its core capital requirements. Liberty's arguments, however, fail for a number of reasons.

First, Liberty has not alleged an actionable misstatement (made by anyone) in the offering materials. Liberty claims that Goldman falsely stated that FNMA exceeded its core capital requirements, because FNMA should have taken a larger write down against its subprime and Alt-A exposure, which were overvalued assets at the time of the offerings. (Liberty SAC ¶¶ 52, 56-58.) Liberty claims that "Goldman knew that a relatively small impairment of these mortgages and mortgage-backed securities could wipe out the capital of Fannie Mae." (Liberty SAC ¶ 54.) The Court, however, already considered and rejected allegations that: FNMA committed fraud by failing to take write-downs at an earlier point, In re Fannie Mae, 742 F.Supp.2d at 409;[16] "Fannie should have, based upon 'expectations about the future,' increased its loan loss reserves in early 2007, which would have, in turn, reduced Fannie's Core Capital," id. at 411; and that FNMA committed fraud by falsely representing that it was adequately capitalized during the relevant period, id. at 408.[17] Given the Court's holding that these

---

[16] The Court held: "the Court will not intervene in a business and accounting judgment simply because Plaintiffs allege that the write-down in the third quarter of 2008 should have occurred earlier. The fact that a financial item is accounted for differently, or in a later period, does not support an inference that a previously filed financial statement was fraudulent. This is an allegation of fraud by hindsight, which is insufficient to withstand a motion to dismiss. See Slayton v. Am. Express Co., 604 F.3d 758, 776 (2d Cir.2010)." In re Fannie Mae, 742 F.Supp.2d at 409 (internal citations omitted)

[17] The Court held that: "OFHEO, FNMA's federal regulator prior to conservatorship, reported repeatedly that FNMA was adequately capitalized. Further, the FHFA has since scrutinized FNMA's financials and


allegations are insufficient to show that FNMA made a misstatement, they are insufficient to

show that Goldman made a misstatement by conveying these statements to Liberty.  While

Liberty attempts to bolster its argument by alleging that FNMA had far greater exposure to risky

subprime and Alt-A loans then publicly disclosed, Liberty does not allege that the Series S and P

offering materials contained any statements regarding FNMA's subprime and Alt-A exposure.

While the offering materials referenced certain SEC filings, statements regarding FNMA's

subprime and Alt-A exposure in such SEC filings were clearly made by FNMA, not Goldman.

Second, even if there were a misstatement in the offering materials, Liberty has not

plausibly alleged facts to show that Goldman is the "entity with the ultimate authority over the

statement[s], including its content and whether and how to communicate it."  Janus, 131 S.Ct. at

2305.  Any role Goldman served in the drafting process, or in preparing and publishing the

offering materials is insufficient to impose primary liability under Janus.  Id.  Moreover, it is

absolutely clear that FNMA, not Goldman, had ultimate authority over statements made in its

SEC filings incorporated by reference in the offering materials.

Third, the alleged misstatements in the Series S Offering Circular and Series P Private

Placement Memorandum concerning FNMA's core capital financials (Liberty SAC ¶¶ 51-55, 56,

59, 61); and the alleged misstatements in FNMA's quarterly and annual SEC filings, which were

incorporated by reference, were not attributed to Goldman.  (See, e.g., Liberty SAC  ¶¶ 57, 60,

63.)  "[A]ttribution within a statement or implicit from surrounding circumstances is strong

evidence that a statement was made by—and only by—the party to whom it is attributed."

Janus, 131 S.Ct. at 2305.  All of the purported misrepresentations in the offering documents are

couched in terms of "we" and "our," which clearly refer to FNMA, not Goldman.  "Absent

---

has not asked for a restatement of any of its financials for the Class Period."  In re Fannie Mae, 742
F.Supp.2d at 408 (internal citations omitted).


attribution, plaintiffs cannot show that they relied on defendants' *own* false statements, and participation in the creation of those statements amounts, at most, to aiding and abetting securities fraud." Pac. Invest. Mgmt, 603 F.3d at 148.

Finally, while Liberty cites cases where courts have allowed claims against underwriters to proceed—often based on the underwriters' participating in the drafting and/or decision making process—all of these cases pre-date, and likely do not survive Janus, Tambone, and Pacific Investment Management.[18] Moreover, in almost all of the cases Liberty cites, the purported misstatements were made in the offering materials, not in SEC filings incorporated by reference.

Accordingly, Liberty has not sufficiently alleged that Goldman made a material misstatement, under Rule 10b-5(b), in connection with the Series S and P Offerings.

ii.  *Omitting Material Information*

Liberty also alleges that Goldman is liable for omitting material information about FNMA's subprime exposure and core capital financials in the Series S and P offering materials. In support of its argument, Liberty cites cases holding that "[a]n underwriter must investigate and disclose material facts that are known or 'reasonably ascertainable.'" Dolphin and Bradbury, Inc. v. S.E.C., 512 F.3d 634, 641 (D.C. Cir. 2008).

Since Liberty's allegations are insufficient to show that FNMA's core capital financials were misstated, Goldman cannot be held liable for omitting information needed to make such statements accurate and complete.

---

[18] See, e.g., Washington Nat'l Ins. Co. v. Morgan Stanley & Co., 90 Civ. 3342 (TPG), 1999 U.S. Dist. LEXIS 10042 (S.D.N.Y. July 2, 1999) (denying underwriter defendants motion to dismiss claims premised upon misstatements contained in the offering materials); Flecker v. Hollywood Entm't Corp., 1997 U.S. Dist. LEXIS 5329 (D. Or. Feb. 12, 1997) (denying underwriters motion for summary judgment because their "superior access to non-public information and participation in both drafting and decision-making is sufficient to establish a triable primary liability claim under § 10(b)"). The '33 Act cases cited by Liberty are inapposite, as the '33 Act contains a distinct regulatory scheme whereby underwriters can be found strictly liable under §§ 11 and 12(a)(2).

Additionally, courts have rejected similar attempts to avoid Janus, by arguing that a

defendant had a duty to correct another company's misrepresentations. See Fulton County

Emples. Ret. Sys. v. MGIC Inv. Corp., 675 F.3d 1047, 1052 (7th Cir. 2012) (rejecting plaintiffs'

attempt to avoid Janus by arguing that defendant failed to correct another's misstatement,

because "no statute or rule creates such a duty—if there were one, Janus Capital itself would

have come out the other way," and finding that defendant "is no more liable than was Janus

Capital Management for keeping silent when someone else spoke.") As the First Circuit in

Tambone held, imposing "primary liability under Rule 10b-5 on [underwriters] whenever they

fail to disclose material information not included in a prospectus . . . would be tantamount to

imposing a free-standing and unconditional duty to disclose . . ." and "the imposition of such a

duty flies in the teeth of Supreme Court precedent." 597 F.3d at 441.  Since Goldman had no

freestanding duty to disclose, it cannot be held liable for materially omitting FNMA's

quantitative subprime and Alt-A exposure.  Accordingly, Liberty's material omission claim,

under Rule 10b-5(b), fails.

  *iii.  Scheme to Defraud*

  "In order for market activity to be manipulative, that conduct must involve

misrepresentation or nondisclosure." Wilson v. Merrill Lynch & Co.,671 F.3d 120, 130 (2d Cir.

Nov. 14, 2011).  As stated previously, Liberty has not sufficiently alleged that Goldman made

any misrepresentation or omission concerning FNMA's core capital financials; and has not

alleged that the offering materials contained any statement regarding FNMA's subprime and Alt-

A exposure.

  In addition, Liberty fails to set forth a plausible theory of market manipulation.  In

support of their claim, Liberty cites Dodona I, LLC v. Goldman, Sachs & Co., 10 Civ. 7497


(VM), 2012 U.S. Dist. Lexis 40968, at *50 (S.D.N.Y. Mar. 21, 2012), in which Judge Marrero

found plaintiffs' adequately alleged that Goldman "inaccurately represented the risk, of which

they were actually aware, associated with investing in the [synthetic] CDOs." The Court further

found that Goldman performed manipulative acts, but dismissed plaintiffs' claim for market

manipulation for failure to prove reliance, noting that "Defendants' alleged misconduct is more

appropriately suited for a claim of misrepresentations and omissions than market manipulation."

Id. at 63-66. Dodona I is similar to this Court's opinion in Richman v. Goldman Sachs Group,

Inc., No. 10 Civ. 3461, --- F. Supp. 2d --- , 2012 WL 2362539 (S.D.N.Y. June 21, 2012), holding

that Goldman materially mislead its shareholders by stating that it had measures in place to

address conflicts of interest and valued its reputation and integrity, while committing outright

fraud. The facts alleged in those cases are vastly different from the facts alleged here. Here:

there are no allegations that Goldman selected the assets in the offering; there are no allegations

that Goldman shorted FNMA stock; and there are no allegations that the purported misstatements

concerned Goldman's own conduct. Rather, Liberty's argument here is that by failing to

disclose that FNMA's subprime and Alt-A loans were over-valued, Goldman perpetuated its own

scheme to sell off its own securities. This theory of market manipulation is too attenuated to be

plausible, particularly given that there were no misstatement concerning FNMA's subprime or

Alt-A exposure in the offering materials, and Goldman had no independent duty to make such

disclosures. Accordingly, Liberty's Rule 10b-5(a) and (c) claims fail.

   2.   Goldman's Motion to Dismiss Liberty's State Law Claims

       Liberty also claims against Goldman under Massachusetts' and Washington's securities

fraud statutes and deceptive trade practice statutes, and for common law fraud and negligent

misrepresentation.

To state a claim under Massachusetts' securities fraud statute, Massachusetts common law fraud, or Washington's securities fraud statute, Liberty has to show Goldman "made" a materially false representation. See Wash.Rev. Code § 21.20.010; Stolzoff v. Waste Sys. Intern., Inc., 58 Mass.App.Ct. 747, 759 (Mass.App.Ct. 2003); Goel v. Jain, 259 F.Supp.2d 1128, 1139 (W.D.Wash. 2003).[19]  To state a claim for common law negligent misrepresentation under Massachusetts and Washington law, and common law fraud under Washington law, Liberty must show that Goldman "supplied false information" for the guidance of others, and that Liberty justifiably relied upon the false information to their detriment. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 60 (Mass. 2004); Harkey v. Kingen, 2008 WL 5377847, at *7 (Wash.App. Div. 1 2008); Haberman v. Washington Public Power Supply Sys., 109 Wash.2d 107, 167 (Wash.1987).  To state a claim for violations of Massachusetts' and Washington's deceptive trade practices, Liberty must show that Goldman supplied or presented the misrepresentations. See Marram, 442 Mass. at 60; Edmonds v. John L. Scott Real Estate, Inc., 87 Wash. App. 834, 844-49 (Wash. App. Div. 1 1997).

Liberty failed to adequately allege that the Series S Offering Circular and Series P Private Placement Memorandum contained any false information, as discussed above.  While Liberty notes that certain SEC filings were referred to in the offering materials, Liberty does not allege that Goldman supplied such filings or otherwise represented such facts to Liberty; nor does Liberty explicitly allege that it relied on statements contained in FNMA's SEC filings in purchasing the securities.  Since Liberty failed to allege an actionable misstatement contained in the offering circular, it cannot show that Goldman made or supplied false statements to Liberty.  Accordingly all of Liberty's state law claims fail.

---

[19] There is no case law discussing Janus's impact on securities claims raised under Massachusetts or Washington State laws.  Accordingly, the Court does not rely on Janus.

B.  Smith Underwriters' Motion to Dismiss

The Smith Underwriters move to dismiss Smith's California common law negligent misrepresentation claim—the sole claim against them.  "To state a claim for negligent misrepresentation, plaintiff must allege that the defendant: (1) made a misrepresentation of a material fact; (2) without reasonable grounds for believing it to be true; (3) with intent to induce another's reliance and that plaintiff (4) was ignorant of the truth, (5) justifiably relied on the misrepresentation and (6) suffered damages."  Helm v. Alderwoods Grp., Inc., 696 F.Supp.2d 1057, 1079 (N.D.Cal. 2009)(emphasis added).  A negligent misrepresentation claim must satisfy Rule 9(b)'s particularity requirements.  See Neilson v. Union Bank of California, N.A., 290 F.Supp.2d 1101, 1141 (C.D.Cal. 2003).

While Smith claims that the offering circular incorporated by reference misstatements made in SEC filings and in "other false and misleading statements" (Smith SAC ¶ 174), Smith does not specify even one misstatement contained in the offering circular.[20]  Since Smith has not alleged that the offering circular contained any misstatements, he has not shown that the Smith Underwriters "made a misrepresentation."  Accordingly, his negligent misrepresentation claims against the Smith Underwriters are dismissed.

C.  CIS Underwriters' Motion to Dismiss

The CIS Underwriters move to dismiss CIS's primary statutory fraud claim, under Section 27.01, CIS's negligent misrepresentation claims, and CIS's primary Texas Security Act violation claim against Defendant Wachovia.

---

[20] There is no case law addressing whether Janus should apply to California state law claims.  The Court declines to apply Janus here.

### 1.  Section 27.01 violations

To bring a statutory fraud claim under Section 27.01, CIS must allege that the defendant "made" a material representation.  See Brush v. Reata Oil and Gas Corp., 984 S.W.2d 720, 726, 984 S.W.2d 720 (Tex.App. 1998).  While CIS alleges that the offering circular materially misstated FNMA's core capital financials, this allegation fails for the reasons discussed above.  See supra s. II.A.2 at 15.  Other than FNMA's core capital financials, CIS does not identify any misstatement contained in the offering materials.  Since CIS has not plausibly alleged an actionable misstatement in the offering materials, its Section 27.01 primary liability claim fails.

In the alternative, CIS alleges that the CIS Underwriters are liable under Section 27.01(d).  "Section 27.01(d) addresses secondary liability."  See Haralson v. E.F. Hutton Grp., Inc., 919 F.2d 1014, 1033 (5th Cir. 1990), abrogated on other grounds, Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir.2001).  Since CIS has not stated a claim for primary liability, its Section 27.01(d) claim for aider and abettor liability also fails.  See In re Enron Corp. Sec., Derivative & Erisa Litig., 762 F.Supp.2d 942, 968-969, 1021 (S.D.Tex. 2010).

### 2.  TSA violations

CIS seeks to hold Wachovia liable as a primary violator of the TSA and, in addition or in the alternative, to hold both CIS Underwriters liable for aiding and abetting a violation of the TSA.  The TSA imposes primary liability "when a person 'offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.'"  Sterling Trust Co. v. Adderley, 168 S.W.3d 835, 839 (Tex. 2005) (quoting Tex. Rev. Civ. Stat. Ann. art. 581–33A(2).)  Courts will not read 581–33 broadly to "hold[] all sellers 'in the chain' liable and not require that Defendants make the false or misleading statements."

Billitteri v. Sec. Am., Inc., No. 09–CV–1568–F, 2010 WL 6785484, at *7 (N.D.Tex. July 26, 2010); R2 Inv. v. Phillips, No. Civ.A. 302CV0323N, 2003 WL 22862738, at *7 (N.D.Tex. Mar. 26, 2003) (holding that Plaintiffs "Texas Security Act claim fails because the pleadings do not allege that [defendant] made any untrue statements or omitted any material facts").

As discussed above, CIS has not sufficiently alleged that the offering materials contained any misstatement. Accordingly, CIS's primary TSA claim against Wachovia fails. See Billitteri, 2010 WL 6785484, at *7-8; R2 Inv., No2003 WL 22862738, at *7. Since CIS has not stated a primary violation against Wachovia or FNMA, its aiding and abetting claims against the CIS Underwriters also fails. See In re WorldCom, 2006 WL 1047130, at *5.

### 3. Negligent Misrepresentation

Texas courts limit negligent misrepresentation claims "to the person or one of a limited group of persons for whose benefit and guidance the defendant intends to supply the information or knows that the recipient intends to supply it." In re Enron Corp., 762 F.Supp.2d at 980. Where a plaintiff does not "allege facts showing that Plaintiffs were members of a limited group known to, and for whose benefit and guidance these Defendants supplied information and which they intended or knew Plaintiffs would rely upon, distinct from the much larger group or class of persons who might reasonably be expected sooner or later to have access to it and foreseeably take action in reliance upon it," then the plaintiff has not stated a negligent misrepresentation claim. Id. at 1022.

CIS premises its negligent misrepresentation claims on its allegation that the CIS Underwriters "made" false and misleading statements. (CIS SAC. ¶¶ 416, 418.) As discussed above, CIS has not sufficiently alleged that the offering materials contained misstatements, or that any such misstatement was made by the CIS Underwriters. Moreover, CIS has not alleged


Case 1:09-md-02013-PAC    Document 154    Filed 08/30/12    Page 39 of 40

facts to show that the CIS Underwriters intended to supply the purported misstatements to CIS alone or to a limited group that included CIS, rather than a large group or class of person who would be expected, sooner or later, to have access to FNMA's offering materials. Accordingly, CIS's negligent misrepresentation claims fail.

## CONCLUSION

To summarize the Court's holdings:

- Defendants' motions to strike are DENIED;

- FNMA, Mudd, and Dallavecchia's motions to dismiss the Class Action's, Smith's, and CIS's Section 10(b), Rule 10b-5 and Section 20(a) claims premised on FNMA's subprime and Alt-A exposure disclosures are DENIED;

- FNMA, Mudd, and Dallavecchia's motions to dismiss CIS's Section 10(b), Rule 10b-5 and Section 20(a) claims premised on FNMA's core capital financials are GRANTED;

- FNMA, Mudd, and Dallavecchia's motions to dismiss Smith's and CIS's Section 10(b), Rule 10b-5 and Section 20(a) claims premised on FNMA's risk management disclosures are DENIED;

- FNMA, Mudd, and Dallavecchia's motions to dismiss all state law claims as against them under SLUSA are GRANTED;

- Levin and Swad's motions to dismiss for lack of personal jurisdiction are GRANTED;

- Goldman's motion to dismiss Liberty's complaint in its entirety is GRANTED;

- The Smith Underwriters' motion to dismiss Smith's negligent misrepresentation claims is GRANTED; and

- The CIS Underwriters' motion to dismiss CIS's state law claims against them is GRANTED.

The Class Action, Smith and CIS's federal securities law claims against FNMA, Mudd, and Dallavecchia regarding FNMA's subprime and Alt-A exposure disclosures and risk management controls can proceed.

The Clerk of Court is directed to terminate the following motions:  08 Civ. 7831 Dkt. Nos. 353, 355, 357, 359, 362, 365, 368, 370, 372, 377, 378, 380, 382; 09 Civ. 6102 Dkt. Nos 83, 85, 88, 90, 93, 97, 98; 10 Civ. 2781 Dkt. Nos. 57, 60, 61, 67, 68; and 10 Civ. 9184 Dkt. No. 17. As all of Liberty's claims have been dismissed, the Clerk of Court is directed to close the 10 Civ. 9184 case.  The Clerk of Court is further directed to dismiss the following defendants from the 09 Civ. 6102 action:  Levin, Swad, Wachovia Capital Markets, LLC and Citigroup Global Markets, Inc.  The Clerk of Court is directed to dismiss the following defendants from the 10 Civ. 2781 action: Banc of America Securities LLC, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman, JPMorgan Securities LLC (f/k/a JPMorgan Securities, Inc.), JPMorgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co. LLC (f/k/a Morgan Stanley & Co. Incorporated), and UBS Securities LLC.

Dated: New York, New York
        August 30, 2012

                                    SO ORDERED

                                    _____
                                    PAUL A. CROTTY
                                    United States District Judge

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | **AFFIDAVIT OF SERVICE** |
| | ) ss.: | **BY OVERNIGHT EXPRESS** |
| COUNTY OF NEW YORK | ) | **MAIL** |

     I, _____, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above or at

**On November 16, 2012**

deponent served the  Opening Brief and Special Appendix for Plaintiffs-Appellants within**:**

     **upon:**

Jonathan Youngwood
George S. Wang
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

the address(es) designated by said attorney(s) for that purpose by depositing **2** true copy(ies) of same, enclosed in a postpaid properly addressed wrapper in a Post Office Official Overnight Express Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of New York.

This document was also submitted via the CM/ECF Case Filing System. All counsel of record in this case are registered CM/ECF users. Filing and service were performed by direction of counsel.

**Sworn to before me on November 16, 2012**

_____

     **Robyn Cocho**
**Notary Public State of New Jersey**
**No. 2193491**
**Commission Expires January 8, 2017**

Job # 244525