# 12-3859-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆ ◆

IN RE: FANNIE MAE 2008 SECURITIES LITIGATION

JOHN A. GENOVESE, ROBERT M. ROLLINS, NICHOLAS CRISAFI, STELLA CRISAFI, FOGEL CAPITAL MANAGEMENT, INC., DENNIS SANDMAN, KAREN ORKIN, ANTHONY ESPOSITO, FRANK MCALONAN, WILLIAM R. WHITE, STEVE LATIMER, BRIAN JARMAIN, MALKA KRAUSZ, DONALD W. MCCAULEY, DAVID L. FRANKFURT, FRANKFURT FAMILY LTD., THE DAVID FRANKFURT 2000 FAMILY TRUST, THE DAVID FRANKFURT 2002 FAMILY TRUST, CHERYL STRONG, WILLIAM BERMAN, STEPHEN H. SCHWEITZER, LINDA P. SCHWEITZER, LYNN WILLIAMS, STEVEANN WILLIAMS, SUSAN KRAUS, PHILLIP MELTON, DANIEL KRAMER, DAVID GWYER, COMPREHENSIVE INVESTMENT SERVICES, INC., MARY P. MOORE, Individually and on behalf of all others similarly situated, EDWARD SMITH,

*Plaintiffs,*

(*caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF DEFENDANT-APPELLEE GOLDMAN, SACHS & CO.

JONATHAN K. YOUNGWOOD, ESQ.
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

*Attorneys for Defendant-Appellee
Goldman, Sachs & Co.*

LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, PEERLESS INSURANCE COMPANY, SAFECO CORPORATION, LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,

*Plaintiffs-Appellants,*

—against—

STEPHEN B. ASHLEY, DANIEL H. MUDD, STEPHEN M. SWAD, ROBERT J. LEVIN, LEHMAN BROTHERS, INC., J.P. MORGAN SECURITIES INC., CITIGROUP GLOBAL MARKET INC., MERRILL LYNCH, PIERCE FENNER & SMITH INCORPORATED, MORGAN STANLEY & CO. INCORPORATED, UBS SECURITIES LLC, WACHOVIA CAPITAL MARKETS LLC, WASHINGTON MUTUAL BANK, FA, FEDERAL NATIONAL HOME MORTGAGE ASSOCIATION, DENNIS BERESFORD, DENNIS BERESFORD, LOUIS FREEH, BRENDA GAINES, FREDERICK B. HARVEY, III, DAVID HISEY, KAREN HORN, BRIDGET MACASKILL, PETER NICULESCU, LESLIE RAHL, JOHN SITES, JR., GREG SMITH, H. PATRICK SWYGERT, JOHN WULFF, BANC OF AMERICA SECURITIES LLC, BARCLAYS CAPITAL INC., DEUTSCHE BANK SECURITIES INC., FTN FINANCIAL SECURITIES CORP., WELLS FARGO SECURITIES LLC, BEAR STEARNS & CO. INC., FEDERAL NATIONAL MORTGAGE ASSOCIATION, AKA FANNIE MAE, FITCH RATINGS, MOODY'S INVESTORS SERVICE, INC., HERBERT M. ALLISON, DAVID C. BENSON, BRIAN COBB, JUDITH C. DUNN, JOHN DOES, 1-10, LINDA K. KNIGHT, ANTHONY F. MARRA, BRIAN P. MCQUAID, ANNE F. PANKAU, DAVID H. SIDWELL, BETTY THOMPSON, CHRISTINA A. WOLF, ROBERT T. BLAKELY, ENRICO DALLAVECCHIA, JPMORGAN CHASE & CO., FANNIE MAE,

*Defendants,*

GOLDMAN, SACHS & CO.,

*Defendant-Appellee.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Appellee certifies as follows:

Goldman, Sachs & Co. is an indirectly wholly-owned subsidiary of The Goldman Sachs Group, Inc., which is a corporation organized under the laws of Delaware and whose shares are publicly traded on the New York Stock Exchange. To our knowledge, no publicly held company owns 10 percent or more of the common stock of The Goldman Sachs Group, Inc.

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED ..................................................................1

STATEMENT OF THE CASE ...............................................................................1

STATEMENT OF FACTS ....................................................................................4

      A.     The Parties .................................................................................4

      B.     The Allegations In The SAC ........................................................5

      C.     FNMA, The Offerings, And The Market Conditions.................................7

      D.     Procedural History ....................................................................13

      E.     The District Court's Opinion And Order....................................................15

      F.     This Appeal ..............................................................................16

STANDARD OF REVIEW....................................................................................17

SUMMARY OF ARGUMENT................................................................................18

ARGUMENT ...................................................................................................22

      I.     The District Court Correctly Dismissed The State Law Claims Because Liberty Failed To Allege One Or More Necessary Elements Of Each Claim ......................................................................................22

      A.     The District Court Correctly Concluded That Liberty Failed To Allege Any Misstatement ..........................................................22

              1.     The District Court Properly Considered The Allegations In The SAC And Its Previous Decision Regarding FNMA's Capitalization.......................................................................23

              2.     The District Court Properly Disregarded Purported Expert Reports Submitted With The Motion To Dismiss Briefing...........26

              3.     The District Court Properly Found That Liberty Failed To Allege Any Misstatements In FNMA's SEC Filings ...................27

      B.     The District Court Properly Dismissed Counts II, IV, and VI Because Goldman Made No Statements At All .........................................28

C.  The District Court Correctly Dismissed Counts IV, VI, And VII Because Plaintiffs Failed To Allege That They Reasonably Relied On Any Misstatement In Purchasing FNMA Securities ...........................35

II.  Alternatively, Dismissal Should Be Affirmed Because Liberty Fails To Plead Other Elements Of Its State Law Claims.....................................................38

A.  Counts II, III, V, VI, And VII Fail Because Liberty Fails To Plead That Goldman Knew, Or Should Have Known, That FNMA Was Not Adequately Capitalized In November 2007 ......................................38

1.  Liberty's Allegations That Goldman "Must Have Known" Due To Its Role As An Underwriter Are Entirely Conclusory.................................................................................40

2.  Liberty's Allegations That Goldman "Must Have Known" Due To Its Activities In The Subprime Market Also Fail .............41

B.  Counts II and VII Fail Because Liberty's Conclusory "Solicitation" Allegations Are Insufficient To Plead A Claim In Light Of The Lack Of Privity Between Goldman And Liberty ......................................44

C.  Counts III, V, VI, And VII Fail Because Liberty Does Not Plead Any Injury Caused By Goldman .................................................47

III.  The District Court Erred In Not Dismissing The State Law Claims Because They Are Precluded By SLUSA ...........................................................48

A.  The Liberty Action Is Part Of A "Covered Class Action" ........................49

1.  *Liberty* And The Class Action Were Pending In The Same Court ...................................................................................50

2.  *Liberty* Involves Common Questions Of Fact With The Class Action....................................................................................50

3.  *Liberty* Was Consolidated With The Class Action And The Actions Were Proceeding Jointly Prior To *Liberty*'s Dismissal ......................................................................................51

4.  The Group Of Lawsuits Now Pending For Pre-Trial Purposes In The FNMA MDL Seek Damages For More Than Fifty Persons........................................................................54

B.  Liberty's State Law Claims Concern A "Covered Security" ...................56

C.  Liberty Alleges State Law Claims In Connection With The Purchase Or Sale Of A Covered Security.....................................................56

ii

CONCLUSION ................................................................................................................59

# TABLE OF AUTHORITIES

### Cases

*380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15 (S.D.N.Y. 2009) ........................28

*Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82 (2d Cir. 2002) ........................................................................................................................38

*Adler v. Berg Harmon Assocs.*, 790 F. Supp. 1222 (S.D.N.Y. 1992) ...............................37, 40, 42

*Alki Partners, L.P. v. Windhorst*, 472 Fed. Appx. 7 (2d Cir. 2012) .............................................28

*Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493 (S.D.N.Y. 2009) ......................................52

*Andresen v. Hunt*, 951 F.2d 358 (9th Cir. 1991) ...................................................................18, 29

*Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696 (9th Cir. 2001) ............47

*Baddeley v. Seek*, 156 P.3d 959 (Wash. Ct. App. 2007)..............................................................47

*Barrett Assocs., Inc. v. Aronson*, 190 N.E.2d 867 (Mass. 1963)................................................28

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007).......................................................................17

*Bergeron v. Ridgewood Sec. Corp.*, 610 F. Supp. 2d 113 (D. Mass. 2009) ...........................39, 47

*Bertin v. United States,* 478 F.3d 489 (2d Cir. 2007).............................................................20, 38

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212 (2d Cir. 2004)......................................................................................................27

*BP West Coast Prods., LLC v. Shalabi*, No. C11-1341MJP, 2012 WL 2277843 (W.D. Wash. June 14, 2012)............................................................................................................38

*Capital Ventures Int'l v. UBS Sec. LLC*, No. 11-11937-DJC, 2012 U.S. Dist. LEXIS 140663 (D. Mass Sept. 28, 2012) ...................................................................................34, 45

*Cummings v. HPG Int'l, Inc.*, 244 F.3d 16 (1st Cir. 2001) ..........................................................39

*Cyril v. Neighborhood P'ship II Housing Dev. Fund, Inc.*, 124 Fed. Appx. 26 (2d Cir. 2005) ....................................................................................................................................27

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25 (2d Cir. 2005).....................54

*Daley v. Twin Disc, Inc.*, 440 F. Supp. 2d 48 (D. Mass. 2006)....................................................39

*Dalis v. Buyer Adver., Inc.*, 636 N.E.2d 212 (Mass. 1994) ............................................................34

*Dilorenzo v. Costco Wholesale Corp.*, 515 F. Supp. 2d 1187 (W.D. Wash. 2007) ......................47

*Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624 (S.D.N.Y. 2012) ......................43

*Fidelity Mortgage Corp. v. Seattle Times Co.*, 128 P.3d 621 (Wash. Ct. App. 2005) ................47

*First Md. Leasecorp v. Rothstein*, 864 P.2d 17 (Wash. Ct. App. 1993) ......................................47

*Goel v. Jain*, 259 F. Supp. 2d 1128 (W.D. Wash. 2003) ..............................................................29

*Golber v. BayBank Valley Trust Co.*, 704 N.E.2d 1191 (Mass. Ct. App. 1999) ....................33, 46

*Gordon Partners v. Blumenthal*, No. 02 Civ. 7377(LAK), 2007 WL 1438753
  (S.D.N.Y. May 16, 2007)............................................................................................................52

*Haberman v. Wash. Pub. Power Supply Sys.*, 744 P.2d 1032 (Wash. 1987) ...............................33

*Hines v. Data Line Sys., Inc.*, 787 P.2d 8 (Wash. 1990)..............................................................46

*Hoffer v. Washington,* 776 P.2d 963 (Wash. 1989) ......................................................................34

*HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59 (1st Dept. 2012) ..........................35, 37, 43, 44

*In re Access Cardiosystems, Inc.*, 404 B.R. 593 (Bankr. D. Mass. 2009).....................................29

*In re Air West, Inc. Sec. Litig.*, 384 F. Supp. 609 (J.P.M.L. 1974) .............................................24

*In re AOL Time Warner Inc. Sec. Litig.*, 503 F. Supp. 666 (S.D.N.Y. 2007).............................55

*In re Citigroup ERISA Litig.*, 662 F.3d 128 (2d Cir. 2011)..........................................................17

*In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222 (S.D.N.Y. 2005)............21, 49, 57

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 535 F.3d 325 (5th Cir. 2008) .....................50

*In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382 (S.D.N.Y. 2010)................14, 19, 23, 26

*In re Fannie Mae 2008 Sec. Litig.*, No. 08 Civ. 07831(PAC), 2009 WL 4067259
  (S.D.N.Y. Nov. 24, 2009) ..........................................................................................................13

*In re Fed. Nat'l Mortgage Assoc. Sec., Derivative, and "ERISA" Litig.*, 503 F. Supp.
  2d 25 (D.D.C. 2007) ..................................................................................................................53

*In re Healthco Int'l., Inc. Sec. Litig.*, 777 F. Supp. 109 (D. Mass. 1991) ...................................18

*In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741 (S.D.N.Y. 2001)................40

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001).........................57

*In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260 (E.D. Wash. 2007) ................................56

*In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1 (D. Mass 1999) ................36

*In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579 (S.D.N.Y. 2006) ....................................................................................................................57

*In re: Lehman Brothers Sec. and ERISA Litig.*, No. 09-md-2017, docket no. 1102 (S.D.N.Y. Dec. 17, 2012)......................................................................................53

*Instituto de Prevision Militar v. Merrill Lynch*, 546 F.3d 1340 (11th Cir. 2008) ..................50, 53

*Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011).................passim

*Johnson v. Harrigan-Peach Land Dev. Co.*, 489 P.2d 923 (Wash. 1971) ....................................33

*Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257 (W.D. Wash. 2011)................................................18

*Knapp v. Neptune Towers Assocs.*, 892 N.E.2d 820 (Mass. App. Ct. 2008)................................33

*Lambert v. Leary*, No. 053422, 2006 WL 541040 (Mass. Super. Feb. 15, 2006).........................37

*Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101 (2d Cir. 2001) ..................................57

*Langnes v. Green*, 282 U.S. 531 (1931) ........................................................................................38

*Lawyers Title Ins. Corp. v. Baik*, 55 P.3d 619 (Wash. 2002) ......................................................46

*Lincoln Ventures, Inc. v. FSL Assocs., Inc.*, 21 Mass. L. Rptr. 161 (Mass. Super. 2006)............37

*Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017 (Mass. 2004) ....................................34

*Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74 (2d Cir. 1999) .........................................28

*McKernan v. Burek*, 118 F. Supp. 2d 119 (D. Mass. 2000) .........................................................47

*Millares Guiraldes de Tineo v. United States*, 137 F.3d 715 (2d Cir. 1998) ...............................38

*Miller Inv. Trust v. Morgan Stanley & Co.*, No. 1:11-cv-12126-JLT, 2012 U.S. Dist. LEXIS 102537 (D. Mass. July 24, 2012)...............................................................34

*Murphy v. First Reliance Standard Life Ins. Co.*, No. 08-CV-3603 (DRH)(WDW), 2010 WL 2243356 (E.D.N.Y. June 1, 2010) ...........................................................27

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (S.D.N.Y. 2012) .................................................................................................44

*Nycal Corp. v. KPMG Peat Marwick LLP*, 688 N.E.2d 1368 (Mass. 1998)..................................46

*Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010)..................30, 32

*Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885 (Wash. 2009)..................................33

*Plumbers & Steamfitters Local 773 Pension Fund v. CIBC*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010)..................................................................................42

*Presidio Group, LLC v. GMAC Mortgage, LLC*, No. C08-5298RBL, 2008 WL 5110845 (W.D. Wash. Dec. 3, 2008)..................................................39

*Puget Sound Nat'l Bank v. McMahon*, 330 P.2d 559 (Wash. 1958) ..................................36

*Reale v. Ernst & Young, LLP*, No. 43932-4-I, 2000 Wash. App. LEXIS 1239 (Wash. Ct. App. July 10, 2000)..................................................................34

*Russo's Marine Mart, Inc. v. Valley Forge Ins. Co.*, No. 09-P-2163, 2011 WL 1367953 (Mass. App. Ct. April 12, 2011) ..................................................47

*S.E.C. v. Tambone*, 597 F.3d 436 (1st Cir. 2010)..................................................30

*Schaaf v. Highfield*, 896 P.2d 665 (Wash. 1995) ..................................................46

*Scritchfield v. Paolo*, 274 F. Supp. 2d 163 (D.R.I. 2003) ..................................................36

*Stern v. Gen. Elec. Co.*, 924 F.2d 472 (2d Cir. 1991)..................................................18

*Stewart v. Fields (In re Pac. Nw. Storage LLC)*, 386 B.R. 764 (Bankr. W.D. Wash. 2007) ..................................................................................39

*Stichting Pensioenfonds ABP v. Merck & Co., Inc.*, No. 05-5060 (SRC), 2012 WL 3235783 (D.N.J. Aug. 1, 2012)..................................................53

*Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997) ..................................................37

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ..................................................17

*Tandiama v. NovaStar Mortgage, Inc.*, No. C03-909JRL, 2005 WL 1287996 (W.D. Wash. May 31, 2005)..................................................................36

*Wells v. Monarch Capital Corp.*, No. 91-10575-MA, 1991 WL 354938 (D. Mass Aug. 23 1991) ..................................................................................37

*Wessa v. Watermark Paddlesports, Inc.*, No. C06-5156 FDB, 2006 WL 1418906 (W.D. Wash. May 22, 2006)..................................................................18

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) ..................................................30

*Zak Law Offices, P.C. v. Reed*, No. 10-10333-LTS, 2010 WL 2802068 (D. Mass. July 13, 2010) ..................................................................................................................18

*Zuckerman v. McDonald's Corp.*, 35 F. Supp. 2d 135 (D. Mass. 1999)......................................28

## Statutes

12 U.S.C. § 4501 ..........................................................................................................................7

12 U.S.C. § 4513(a)(1) .................................................................................................................8

15 U.S.C. § 77p ...................................................................................................................21, 49

15 U.S.C. § 77r ..........................................................................................................................56

15 U.S.C. § 78bb ............................................................................................................49, 54, 56

M.G.L. c. 110A § 410 ..............................................................................................................5, 28

M.G.L. c. 93A § 11 ........................................................................................................................5

Wash. Rev. Code § 19.86.020 .......................................................................................................5

Wash. Rev. Code § 19.86.090 .......................................................................................................5

Wash. Rev. Code § 21.20.010 ...........................................................................................5, 29, 39

Wash. Rev. Code § 21.20.430 ...........................................................................................5, 29, 39

## Rules

Fed. R. Civ. P. 12(b)(6) ................................................................................................................17

Fed. R. Civ. P. 8(a) .....................................................................................................................17

Fed. R. Civ. P. 9(b)................................................................................................................passim

## STATEMENT OF ISSUES PRESENTED

1.      Whether the District Court properly dismissed Liberty's Massachusetts and Washington state law claims relating to Liberty's purchases of FNMA Preferred Securities where Liberty failed to allege any actionable misstatement by Goldman (one of the many underwriters) or that Liberty relied on any purported misstatements in purchasing FNMA Preferred Securities.[1]

2.      Alternatively, whether dismissal should be affirmed because Liberty failed to plead other essential elements of its Massachusetts and Washington state law claims.

3.      Alternatively, whether dismissal should be affirmed because Liberty's Massachusetts and Washington state law claims are precluded under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").

## STATEMENT OF THE CASE

This case concerns Liberty's investment decision to purchase FNMA preferred securities nearly a year before FNMA was placed into government conservatorship.  In seeking to recover damages from losses allegedly incurred on its holdings, Liberty did not bring claims against either FNMA or any of its officers.  Rather, Liberty has curiously targeted only Goldman, simply one of the many underwriters of FNMA securities, even though Goldman was neither the

---

[1]      For ease of reference, Defendant-Appellee Goldman, Sachs & Co. uses the abbreviations set forth in the Table of Abbreviations in the Appellants' Brief, at ix.

1

issuer of the subject securities nor the author of the Offering Documents, and despite the fact that Liberty did not even allege that it purchased FNMA securities from Goldman. The District Court correctly found that Liberty's fraud-based complaint against Goldman fell far short of pleading a cause of action under Section 10(b) of the Exchange Act as well as similar state law claims because, among other deficiencies, Liberty alleged no misstatement in FNMA's Offering Documents, Goldman did not make or supply any of the relevant statements, and Liberty did not plead that it relied on any false statements. Accordingly, the District Court dismissed the Second Amended Complaint ("SAC") in its entirety on August 30, 2012. This appeal followed.

Apparently recognizing the import of the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), limiting the target of Section 10(b) claims to "makers" of misstatements (rather than underwriters and others merely involved in the offering process), Plaintiffs have not appealed the dismissal of their central Section 10(b) count. In abandoning that claim, Liberty has conceded – as it must – that Goldman did not make any false or misleading statements in FNMA's Offering materials regarding the securities at issue. The remaining state law claims were properly dismissed by the District Court for this exact same reason.

Beyond the threshold flaw that there are no actionable misstatements at all, and none *by Goldman*, the dismissal of all of Liberty's state law counts could also be affirmed for a number of additional reasons – some of which the District Court adopted and others which were argued, but not adopted, below. *First*, Liberty has not plead that it purchased the subject securities from Goldman. Nor has it plead that it reasonably relied on Goldman in making the purchase. Liberty's failure to plead privity and reliance is unsurprising given that, among other things, Liberty regularly touts its own investment expertise and investment resources and does not contend that it purchased the securities from Goldman. *Second*, Liberty has failed to plead numerous other basic elements of the state law claims. For example, Liberty's SAC does not allege (certainly not with particularity) how Goldman would have known that FNMA's financial statements were allegedly false at the time of the offerings, exclusively relying instead on hindsight pleading and casting irrelevant aspersions against Goldman. *Finally*, the District Court did not even need to reach the substantive deficiencies with each of the state law claims because all those claims are precluded by SLUSA given that the *Liberty* action was consolidated with the main class action, *In re Fannie Mae 2008 Securities Litigation*, Master File No. 08 Civ. 7831-PAC, No. 09-md-2013-PAC (the "Class Action"), in which Goldman had obtained a dismissal at the motion to dismiss stage.

3

For all of these reasons, the District Court's dismissal of the SAC was warranted and should be affirmed.

## STATEMENT OF FACTS

### A.    The Parties

Liberty Mutual Holding Company, the parent company of the Liberty Mutual Group of companies, some of whom are plaintiffs-appellants here, is a diversified global insurer and the third-largest property and casualty insurer in the United States.  A877.[2]  It is also the quintessential sophisticated investor and an active market participant, with more than $54 billion in invested assets as of December 31, 2007.  A908.  In its public filings Liberty Mutual touts its investment expertise and deep resources.  *See, e.g.*, A859 ("The Company's investment policy and strategy are reviewed and approved by the Investment Committee of its Board of Directors, which meets on a regular basis to review and consider investment activities, tactics and new investment classes.  In addition, the Company has an experienced team of investment personnel responsible for managing and administering the investment portfolios of its domestic and foreign insurance operations.").  Liberty alleges that it invested in FNMA preferred stock issued in September and December of 2007.  A206 ¶ 1.

---

[2]      The company ranked 82nd on the Fortune 100 list of largest corporations in the U.S. based on 2010 revenue; as of December 31, 2010, Liberty Mutual Group had $112.35 billion in assets and $33.193 billion in annual consolidated revenue.  *See* A877.

Despite being singled out by Liberty, Defendant-Appellant Goldman, Sachs & Co. was merely one of ten underwriters of the FNMA Series P and Series S Preferred Stock Offerings. A1183; A1149. Specifically, Goldman was a senior co-manager for the Series S Offering and a placement agent for the Series P Offering. *Id*. Liberty does not allege that it purchased the securities from Goldman.

### B.    The Allegations In The SAC

Liberty's SAC includes a federal Section 10(b) claim and numerous similar state law claims. A243-250 ¶¶ 116-160. The claims are as follows:

- *Count I*: Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.
- *Count II*: Violation of M.G.L. c. 110A § 410(a)(2) (Massachusetts Uniform Securities Act).
- *Count III*: Violation of M.G.L. c. 93A § 11 (Massachusetts Unfair Trade Practices Statute).
- *Count IV*: Violation of Wash. Rev. Code § 21.20.010 and § 21.20.430 (Washington Securities Act).
- *Count V*: Violation Of Wash. Rev. Code § 19.86.020 and § 19.86.090 (Washington Unfair Business Practices Statute).
- *Count VI*: Common Law Fraud.
- *Count VII*: Common Law Negligent Misrepresentation.

*Id.*

The gravamen of Liberty's complaint is that FNMA's Series P Private Placement Memorandum and Series S Offering Circular were "false and misleading because they claim that Fannie Mae's core capital exceeded the

statutory minimum requirement and exceeded the OFHEO-directed 30% minimum capital requirement when, in fact, it did not." A222 ¶ 56. Liberty's theory of fraud is that because FNMA's conservator (FHFA) took large write-downs and set aside additional loss reserves nearly a year after the Offerings, that "these higher write-downs and loss reserves should have been established at the time of the Offerings." Appellants' Br. at 30.

With regard to the four Massachusetts-based Liberty Plaintiffs, absent any allegations that shares were purchased from Goldman, Liberty states only vaguely and conclusorily that Goldman "successfully solicited the Plaintiffs' purchase" when it performed its duties as underwriter and in some unidentified manner "communicated with the Plaintiffs about the offering and Plaintiffs' purchase." A245 ¶ 130. With regard to the Washington-based Plaintiff, the SAC alleges, without any support, that Plaintiffs believe that Goldman "*would have contacted* the Plaintiff's investment advisor to inform them of the offering and communicated with the Plaintiff's investment advisor to take the order." A247 *¶* 143 (emphasis added).

While it presumably purchased the shares from another underwriter or dealer (the SAC is silent on this point), Liberty attempts to hold Goldman alone – among all the underwriters – accountable for FNMA's Offering Documents by alleging that: "Goldman knew that the representations in the [Offering Documents] that

Fannie Mae exceeded its statutory and OFHEO minimum capital requirements were false" and "Goldman failed to disclose to investors that if adequate write-downs and loss reserves had been reported at the time of the [Offerings], Fannie Mae could not meet its minimum capital requirements."  A223-224 ¶¶ 59, 61. According to Liberty, "if Plaintiffs had been informed of the true state of Fannie Mae's capitalization, they would never have purchased the Series P and Series S preferred shares" which are now "virtually worthless."  A207 ¶ 2.

Rather than meeting the elements of their state law claims, Liberty spends the majority of its SAC repeating contested allegations made by others regarding Goldman's experience in the subprime market wholly unrelated to its role as an underwriter for FMNA's Offerings.  A215-218 ¶¶ 34-43; A225-239 ¶¶ 66-98.  At the same time, Liberty neglects to allege, among other things, that FNMA's Offering Documents or SEC filings contained any misstatements at all, or that Goldman was aware of any misstatements.

### C.    FNMA, The Offerings, And The Market Conditions

As a Government Sponsored Enterprise ("GSE") statutorily vested with "an affirmative obligation to facilitate the financing of affordable housing for low- and moderate-income families in a manner consistent with [its] overall public purpose[]," 12 U.S.C. § 4501,  FNMA is heavily exposed to the residential

mortgage market.[3]  Throughout 2007, the period at issue, FNMA was also extensively regulated by the federal government and was required to maintain a certain amount of capital in excess of its assets.  *See* 12 U.S.C. § 4513(a)(1).

The subprime mortgage market began to experience some dislocation in late 2006, though its severity was far from clear.  Nevertheless, throughout 2007 FNMA took the steps it deemed necessary to address the evolving market and economic challenges.  *First*, throughout 2007, FNMA wrote down the value of its assets and increased its loan reserves.[4]  *Second*, FNMA issued warnings about the risks it faced as the markets continued to experience turmoil.[5]  *Third*, in September and December of 2007, FNMA issued two series of preferred stock offerings,

---

[3]    FNMA carries out its mission by purchasing residential mortgages in the secondary mortgage market and bundling the majority of these mortgages into securitized pools.  A211 ¶ 19.  FNMA also purchases mortgage-related securities created by others for its own investment portfolio.  *Id*.

[4]    *See, e.g.*, A978.

[5]    *See, e.g.*, A1046-1047 ("Mortgage and housing conditions, which significantly affect our business and our financial performance, have worsened since the end of 2006.  The housing market downturn that began in the second half of 2006 continued through the three quarters of 2007 and into the fourth quarter of 2007…. These challenging market and economic conditions caused a material increase in mortgage delinquencies and foreclosures during 2007…. The rising number of mortgage defaults and foreclosures, combined with declining home prices on a national basis and weak economic conditions in some regions, has resulted in significant increases in credit losses…. We expect housing market weakness to continue in 2007 and 2008.  We believe the continued downturn in housing will lead to further declines in mortgage originations in 2007 and 2008, and contribute to slower growth in U.S. residential mortgage debt outstanding ("MDO") in 2007 and 2008.").

raising about $8 billion to shore up its finances amidst the turbulence.  *See* A214 ¶¶ 27-28.

As part of its capital raising campaign to shore up its financial situation, FNMA issued 40 million Series P preferred shares through a private placement on September 28, 2007, raising nearly $1 billion.  *See* A214 ¶ 27.  The Series P Private Placement Memorandum reported that, as of June 2007, FNMA's core capital exceeded the statutory minimum requirement by $12 billion and exceeded the OFHEO-directed minimum capital requirement by $2.9 billion.  *See* A1164. The Series P Private Placement Memorandum, which was issued nearly a year before the unprecedented financial meltdown (but after market turbulence had begun in some sectors), explained the risks that could negatively impact FNMA's capital base in the future, including:

- "Our financial condition and results of operations may be adversely affected by changes in general market and economic conditions in the U.S. and abroad."  A1154.

- "Changes in market and economic conditions could adversely affect us in many ways, including the following … an economic downturn or rising unemployment in the U.S. could decrease homeowner demand for mortgage loans and increase the number of homeowners who become delinquent or default on their mortgage loans … An economic downturn could also increase the risk that our counterparties will default on their obligations to us, resulting in an increase in our liabilities and a reduction in our earnings."  *Id.*

On December 11, 2007, FNMA issued another 280 million shares of Series S preferred shares in a public offering, raising nearly $7 billion.  *See* A214 ¶ 28. The Series S Offering Circular reported that, as of September 30, 2007, FNMA's core capital exceeded the statutory minimum by $11.41 billion and exceeded the OFHEO-directed minimum capital requirement by $2.319 billion.  A1210.  The Series S Offering Circular, issued as the credit markets continued to erode, not only reiterated the risk warnings but also spelled out graphically adverse trends that had emerged:

- "Increased delinquencies and credit losses relating to our mortgage assets and the mortgage loans that back our Fannie Mae MBS continue to adversely affect our results of operations and could affect our financial condition."  A1189.

- "We are subject to increased credit risk exposures related to subprime and Alt-A mortgage loans that back our private-label mortgage-related securities investments, and any increased delinquency rates and credit losses could adversely affect the yield on or value of our investments, which could negatively affect our earnings and financial condition."  *Id*.

- "Our potential exposure to the risks associated with our dependence on the institutional counterparties to provide services that are critical to our business has increased in recent months, and our earnings and liquidity may be reduced if one or more of our institutional counterparties defaults on its obligations to us."  *Id*.

- "We are experiencing increasing mortgage loan delinquencies and credit losses."  *Id.*

- "Our results of operations are subject to uncertainty based upon continuing developments in the housing and mortgage markets,

10

making it more difficult for us to operate our business and manage risk." *Id.*

- "The current disruption in the housing and mortgage markets may continue or worsen. The disruption may adversely impact the U.S. economy in general and the housing and mortgage markets in particular." *Id.*

- "A continuing, or broader, decline in home prices or in activity in the U.S. housing market could negatively impact our earnings and financial condition." A1193.

FNMA's capital at the time of the issuances was no guarantee of future capital adequacy, and events following the issuance had significant negative effects on FNMA's capital position – events that shook the business world to the core.

Liberty well knew of the potential negative market conditions when it made its FNMA purchases. Liberty said so in its own 2007 annual report, filed on December 31, 2007. *See* A1232 ("As we enter 2008, the general business climate is, of course, *quite negative*. The reverberations of the subprime debacle and the ensuing constriction in credit availability have the potential for dampening economic growth, *if not causing a recession*.") (emphasis added).

Despite the seemingly daily failing of iconic American institutions, leaders continued to minimize the depth and severity of the crisis; even after the economy began to falter, leaders repeatedly expressed their belief that the crisis was contained. For example:

- Then-Treasury Secretary Henry Paulson (May 6, 2008): "[T]he worst is likely to be behind us." A1272.

- Former Federal Reserve Chairman Alan Greenspan (June 13, 2008): "The worst is over in the financial crisis or will be very soon. . . . There is a reduced possibility of a large, intense recession." A1276.

The optimistic sentiments concerning the overall economy extended to the general outlook for FNMA. Even in August 2008, long after the Offerings at issue and one month prior to FNMA's placement into a conservatorship, then Treasury Secretary Paulson stated, "*We have no plans to insert money into either of those two institutions*." A1278 (emphasis added). His statements echoed those of Federal Reserve Chairman Bernanke from July 16, 2008 – nearly eight months after the Series P and S issuances – that FNMA and Freddie Mac "*are adequately capitalized. They are in no danger of failing.*" A1300 (emphasis added).

While FNMA's raising additional capital to address deteriorating market conditions was met with optimism by financial lenders and the investing public, it ultimately proved ineffective to withstand the unprecedented financial meltdown that enveloped the global financial market, and FNMA eventually lapsed into conservatorship. A214 ¶ 30. On September 6, 2008, the Department of the Treasury placed FNMA (and Freddie Mac) into conservatorship because "[i]t became apparent . . . that market conditions were deteriorating more quickly than the companies had anticipated and more quickly than they could respond to by adjusting their models and forecasts." *See* A1409. In November 2008, FNMA announced a $29 billion loss for the third quarter of 2008, resulting from, *inter*

12

*alia*, the housing market downturn, increased illiquidity in the credit markets, wider credit spreads, lower business and consumer confidence, and concerns about corporate earnings and the solvency of many financial institutions.  A1432.

### D.    Procedural History

Shortly after FNMA was placed into governmental conservatorship, 19 putative class actions were filed against FNMA, its officers and directors, and/or the underwriters of several of its securities offerings, asserting violations of federal and state securities laws and ERISA.  A69-70.  On February 11, 2009, the Judicial Panel on Multidistrict Litigation ("J.P.M.L.") ordered pre-trial consolidation or coordination of the cases in the Southern District of New York (the "Class Action").  *Id*.

In July 2009, defendants in the consolidated Class Action, including numerous underwriter defendants, filed a motion to dismiss the 1933 Act claims because FNMA's securities are exempt under the 1933 Act.  The District Court granted the motion.  *In re Fannie Mae 2008 Sec. Litig*., No. 08 Civ. 07831(PAC), 2009 WL 4067259 (S.D.N.Y. Nov. 24, 2009).  The underwriters, who were named *only* in 1933 Act counts, including Goldman, were dismissed from the Class Action entirely.  *Id.*  The remaining defendants moved to dismiss the 1934 Act claims.  The District Court granted in part and denied in part the motions on September 30, 2010, finding that Lead Plaintiffs failed to allege a Section 10(b)

13

claim regarding FNMA's subprime and Alt-A risk exposure in its financial statements, but stated, as to FNMA and two individual defendants, a sufficient claim related to allegations about risk management and internal controls. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 417 (S.D.N.Y. 2010).

In a separate action, Liberty has focused its sights not on FNMA or its officers, but only on Goldman alone among the many underwriters, in an apparent effort to avoid consolidation with other FNMA cases – even though they all relate to FNMA's disclosures.  A210 ¶ 17.  Indeed, Liberty twice brought these claims in Massachusetts courts, naming Goldman but not FNMA, and necessitating two costly removal and transfer proceedings before the J.P.M.L.[6]  Liberty then amended its complaint twice more, most recently filing the Second Amended Complaint ("SAC") on March 2, 2012.  A206-258.  Goldman moved to dismiss on April 4, 2012, and, on August 30, 2012, the District Court granted the motion.  A62-63.  On September 27, 2012, Liberty filed this appeal.  A64.

---

[6]     Liberty voluntarily dropped its first complaint while its opposition to transfer was before the J.P.M.L., shortly after the J.P.M.L transferred its parallel Freddie Mac case to the Southern District of New York. *See Liberty Mutual Ins. Co. et al. v. Goldman, Sachs & Co. et al.*, No. 09-cv-10668, docket no. 23 (D. Mass.); *In re: Freddie Mac Sec. Litig.*, No. 09-md-2072, docket no. 1 (S.D.N.Y.).  Liberty then re-filed a year later, causing another round of transfer proceedings before being transferred to the Southern District of New York.  A130-131.

### E.    The District Court's Opinion And Order

On August 30, 2012, the District Court dismissed the SAC in its entirety. SPA65.  The District Court dismissed the Section 10(b) claim, holding that (1) Liberty failed to allege a misstatement at all, and (2) even if Liberty had alleged a misstatement, none of the statements was made by Goldman.  SPA54-60.  In doing so, the District Court considered and rejected Liberty's arguments that Goldman had "ultimate authority and control" over FNMA's Offering Documents (SPA57), the statements in the Offering Documents were attributed to Goldman (SPA57-58), Goldman was liable for omitting material information in the Offering Documents (SPA58-59), and that Goldman had engaged in a scheme to defraud which included failing to disclose information in FNMA's Offering Documents (SPA59-60).  Among other things, the District Court applied the Supreme Court's recent decision in *Janus*, 131 S. Ct. 2296 (2011).  SPA54-59.  In *Janus*, the Supreme Court held that a mutual fund that issued prospectuses containing alleged misstatements – not the defendant, its investment adviser and administrator – "made" the statements, and, therefore, plaintiff failed to state a Section 10(b) claim.  *Id.* at 2305.  Despite the "uniquely close relationship" between the two entities, the fact that the two had overlapping officers, and the fact that the investment adviser was "significantly involved" in preparing the prospectuses, the

15

investment adviser was not liable for them because it did not issue or file them. *Id.* at 2304-05.

After dismissing Liberty's central claim, the District Court dismissed the state law claims, finding that Liberty failed to adequately allege (i) "that the Series S Offering Circular and Series P Private Placement Memorandum contained any false information," (ii) that Goldman supplied SEC filings referred to in the Offering Documents to Liberty "or otherwise represented such facts to Liberty," or (iii) that Liberty relied on statements contained in FNMA's SEC filings in purchasing the securities. SPA61. In dismissing the state law claims on these grounds, the Court did not need to reach additional grounds for dismissal presented by Goldman – namely that Liberty failed to plead that Goldman knew or should have known that any of FNMA's statements were false and misleading, that Liberty purchased the stock from Goldman, or that Goldman caused Liberty's injuries. The Court rejected Goldman's alternative argument that it need not even reach the substantive deficiencies in the SAC because Liberty's claims were precluded by SLUSA. SPA50-51.

**F.    This Appeal**

Liberty appeals only the District Court's dismissal of the state law claims. Appellants' Br. at 1. In failing to contest the dismissal of the Section 10(b) claim, Liberty concedes that the District Court correctly held that Goldman did not make

16

any statements in the relevant Offering Documents. Despite this concession, and despite the Supreme Court's ruling in *Janus*, Liberty now bases almost its entire appellate brief on the discredited allegation that Goldman – as simply one of the many underwriters of these offerings – effectively made the statements in the Offering Documents. Liberty asserts on appeal that the District Court erred in (i) holding that the Complaint failed to adequately state Washington and Massachusetts state law claims against Goldman and (ii) relying on an earlier decision in the same MDL. Appellants' Br. at 1-2.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6)." *In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011). Under Rule 8(a), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. Conclusory assertions are inadequate; a complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quotation marks omitted).

17

Furthermore, Liberty's state law claims sound in fraud and therefore must be pleaded with particularity under Rule 9(b).  *See, e.g.*, *Stern v. Gen. Elec. Co.*, 924 F.2d 472, 476-477 (2d Cir. 1991) ("In a federal complaint . . . [state law] allegations of fraud must be supported by particular statements indicating the factual circumstances on which the theory of fraud is based."); *In re Healthco Int'l., Inc. Sec. Litig.*, 777 F. Supp. 109, 110-111, 113 (D. Mass. 1991) (Massachusetts fraud); *Zak Law Offices, P.C. v. Reed*, No. 10-10333-LTS, 2010 WL 2802068, at *4 (D. Mass. July 13, 2010) (Massachusetts Unfair Trade Practices statute); *Wessa v. Watermark Paddlesports, Inc.*, No. C06-5156 FDB, 2006 WL 1418906, at *2-3 (W.D. Wash. May 22, 2006) (Washington fraud and negligent misrepresentation claims); *Andresen v. Hunt*, 951 F.2d 358, at *2 (9th Cir. 1991) (Washington Securities Act); *Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257, 1265 n.8 (W.D. Wash. 2011) (Washington Unfair Business Practices statute), *reconsideration granted on other grounds*, No. C09-1485RSL, 2011 WL 2790471 (W.D. Wash. May 17, 2011).

## SUMMARY OF ARGUMENT

This Court should affirm the District Court's dismissal of the SAC. Plaintiffs have elected not to appeal the dismissal of their Section 10(b) claim – thereby conceding that Goldman did not actually make any statements in the relevant Offering Documents – and the remaining state law claims were properly

dismissed for this as well as for several additional reasons the District Court did not reach.

*First*, Liberty's claims fail for the reasons correctly held by the District Court – namely, that there is no actionable misstatement, in particular no statement made by Goldman, and Liberty has not and cannot plead that it relied on Goldman in these circumstances, given its undeniable sophistication and failure to allege that it purchased the FNMA securities from Goldman.

With regard to purported misstatements, the District Court properly concluded that Liberty has not plead that there is a misstatement at all in the Offering Documents.  SPA56.  Dismissal of *all Counts* was therefore appropriate because each of the state law claims require, at the very least, that defendant "supplied" false and/or misleading information to Liberty.  Liberty's allegations regarding FNMA's capitalization have already been considered and rejected by the District Court with respect to the issuer – FNMA – and former officers.  *See In re Fannie Mae Sec. Litig*, 742 F. Supp. 2d 382 (S.D.N.Y. 2010).  Liberty's gratuitous allegations attempting to demonstrate that Goldman participated in and had knowledge of the subprime market generally do not change that there are no misstatements *with respect to FNMA's capitalization* in the Offering Documents, and Liberty does not allege any misstatements in FNMA's SEC filings.

Furthermore, the District Court was correct in finding that even if there were some misstatement in FNMA's Offering Documents, no misstatement was made *by Goldman*. SPA57-58. Dismissal of *Counts II, IV, and VI* should be upheld for the additional reason that any statements in FNMA's Offering Documents were made by FNMA, not Goldman. Goldman was simply one of several underwriters of the offerings at issue. A1183; A1149.

With regard to the lack of reliance, the District Court properly concluded that Liberty failed to plead reliance on any allegedly false statements. SPA61. Nor can it plead reasonable reliance on any statement made by Goldman, where, as here, Goldman was one of several underwriters – not the issuer – and there was no relationship between Goldman and Liberty relating to the investments alleged with particularity. *Counts IV, VI, and VII* must be dismissed for this additional reason.

*Second*, in addition to the rationales explained by the District Court, this Court should affirm the dismissal on certain alternative grounds that were presented to, but either not relied on or rejected by, the District Court. *Bertin v. United States,* 478 F.3d 489, 491 (2d Cir. 2007) ("We may, of course, affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely.") (internal quotation omitted). Five of the six state law claims (*Counts II, III, V, VI, and VII*) require a showing that Goldman knew or should have known that FNMA was making a

20

misstatement or omitting material information.  Despite the SAC's irrelevant

allegations that relate to Goldman's general role as an underwriter and Goldman's

unrelated activities in the subprime market, A215-239 ¶¶ 34-98, Liberty has not

plead – certainly with the particularity required by Rule 9(b) – that Goldman knew

or should have known that FNMA's specific representations that it was adequately

capitalized were false when made.  Liberty's vague allegations that Goldman

"successfully solicited" Liberty's purchases likewise fail because they are

conclusory and do not support its Massachusetts Securities Act claim or negligent

misrepresentation claims (*Counts II and VII*).  And most of Liberty's claims fail

for the additional reason that Liberty does not sufficiently allege that Goldman

caused any actual injury to Liberty *(Counts III, V, VI, and VII)*.

*Finally*, the Court need not even reach the sufficiency of the elements of

each claim discussed above in order to dismiss *all counts* because the state law

claims are precluded under SLUSA.  The Liberty action is consolidated with the

Class Action and several other individual actions.  Therefore, it is a 1) "covered

class action;" 2) which alleges claims based upon state law; 3) concerns a "covered

security;" and 4) alleges either a misrepresentation or omission of a material fact or

a manipulative or deceptive device or contrivance that is "in connection with the

purchase or sale of a covered security."  *See* 15 U.S.C. § 77p(b); *see also In re*

*Eaton Vance Mut. Funds Fee Litig*., 380 F. Supp. 2d 222, 241 (S.D.N.Y. 2005).

# ARGUMENT

I.    **The District Court Correctly Dismissed The State Law Claims Because Liberty Failed To Allege One Or More Necessary Elements Of Each Claim**

The District Court correctly dismissed the SAC for the reasons detailed in its Opinion and Order – *i.e.*, that there is no actionable misstatement, Plaintiffs did not allege and could not allege any statement made by Goldman, and Liberty has not pled that it purchased from or relied on Goldman.  SPA54-61.

A.    **The District Court Correctly Concluded That Liberty Failed To Allege Any Misstatement**

All of the state law claims require that Liberty at least plead that there was a false statement supplied to Liberty.[7]  The District Court, however, correctly found that "Liberty failed to adequately allege that the Series S Offering Circular and Series P Private Placement Memorandum contained any false information …."  SPA61.  Liberty's allegations that FNMA misstated its core capital, because it should have taken write-downs and accounted for loan loss reserves at an earlier time, are wholly conclusory and constitute fraud by hindsight.  Indeed, FNMA's historical financials have never been restated to this day.  A215 ¶ 33.  Given that the District Court had previously considered and rejected these same allegations

---

[7]    To state a claim under the Massachusetts and Washington unfair practices statutes or for Massachusetts or Washington negligent misrepresentation or Washington common law fraud, Liberty must show, at a minimum, that Goldman "supplied" or "employed" false information or misrepresentations to Liberty.  *See* SPA61.  The Massachusetts and Washington securities statutes and Massachusetts common law fraud claim require that Goldman actually made the misrepresentation to Liberty.  *See* Section I.B.

22

related to FNMA and some of its former officers, it adopted its earlier decision in

*In re Fannie Mae Sec. Litig*, 742 F. Supp. 2d 382 (the "FNMA Decision").  The

FNMA Decision was correct and properly applied here.

> **1.    The District Court Properly Considered The Allegations In The SAC And Its Previous Decision Regarding FNMA's Capitalization**

In the FNMA Decision, the District Court considered the Class Action

plaintiffs' allegations that FNMA's "financial statements materially misstated the

amount of [its] Core Capital and concealed [FNMA's] failure to meet its Core

Capital requirements."  *Id.* at 407.  The Class Action complaint alleged that FNMA

misrepresented its Core Capital by violating GAAP, including by failing to take

appropriate write-downs and loan loss reserves.  *Id.*  The District Court analyzed

each allegation in detail, and concluded that, "[t]he Court finds no facts sufficient

to identify any violations of GAAP – or any inference that Fannie was

unreasonable in its judgments" regarding the accounting of deferred tax assets,

other than temporary income, or loan loss reserves or the adequacy of its Core

Capital.  *Id.* at 408.  Liberty does not dispute that this decision was correct as

applied to the Class Action complaint, and the Class Action plaintiffs conceded

that any new information that has become available since the FNMA Decision

would not lead to a different result on this issue by not raising it in their amended

complaint.  On the same day Liberty filed the SAC, the Class Action plaintiffs also

amended their complaint to include information from the SEC Complaint against

former FNMA officers and the Non-Prosecution Agreement.  The amended Class

Action complaint re-alleged that FNMA's subprime and Alt-A exposure was

misstated but *did not* re-allege that FNMA misstated its Core Capital by failing to

take write-downs and account for loan loss reserves sooner.  Nor do the SEC

Complaint and Non-Prosecution Agreement mention Core Capital.

Liberty argues that the District Court erred in dismissing its claims because

the District Court relied "solely" on the FNMA Decision.  Appellants' Br. at 28,

34.  However, as an initial matter, Liberty's suggestion that the District Court

relied "solely" on the FNMA Decision is incorrect.  The District Court specifically

addressed the differences between Liberty's allegations and the allegations in the

complaint at issue in the FNMA Decision, including that Liberty attempts to allege

that "FNMA had far greater exposure to risky subprime and Alt-A loans then

publicly disclosed."  SPA57.

The District Court also did not commit error, as Liberty contends

(Appellants' Br. at 34), in incorporating an earlier finding in the same MDL that

concerned the same issues and similar allegations.  The purpose of consolidating

these cases before one judge in the FNMA MDL was to "promote the just and

efficient conduct" of the litigation, and one established reason for the existence of

the MDL process is to "eliminate any possibility of inconsistent determinations . . .

."  *In re Air West, Inc. Sec. Litig.*, 384 F. Supp. 609, 610-11 (J.P.M.L. 1974).

To the extent that Liberty now claims that the cases involve different "parties, claims and factual allegations," Appellants' Br. at 34, any such differences are irrelevant. The question at issue in each case was whether FNMA's Offering Documents misstated FNMA's capitalization because write-downs and loss reserves should have been taken prior to the Offerings. Though Liberty adds numerous irrelevant allegations about Goldman's own activity in the subprime market and what Goldman "must have known," none of that changes what was supposedly misstated about FNMA. At bottom, the SAC alleges – just as the Class Action plaintiffs – that FNMA's Offering Documents were false and misleading because FNMA misstated its Core Capital and should have taken write-downs sooner. *See* A130 (transferring *Liberty* because it "involves common questions of fact" with "actions involving allegations that [FNMA] was undercapitalized and defendants concealed this fact from investors in order to raise capital.").

In its FNMA Decision, the District Court summarized the Class Action complaint's allegations and, just like Liberty, the Class Action plaintiffs alleged that "despite mounting evidence of the deterioration of the subprime and Alt-A mortgage markets, Fannie failed to [write off assets] for fear that accurate financial reporting would disclose Fannie's failure to meet its Core Capital requirements," and "the probability of Fannie's credit losses had substantially increased due to its heightened exposure to high risk mortgages and the sharp downturn of the housing

market" which "required Fannie to make corresponding increases in its loss reserves." *In re Fannie Mae Sec. Litig*, 742 F. Supp. 2d at 408, 411. Because the District Court had already analyzed and addressed these same central allegations, it properly adopted its previous opinion and held that Liberty's allegations regarding FNMA's capitalization were "insufficient to show that FNMA made a misstatement" and were in turn "insufficient to show that Goldman made a misstatement by conveying these statements to Liberty." SPA57.

> **2.  The District Court Properly Disregarded Purported Expert Reports Submitted With The Motion To Dismiss Briefing**

Liberty also contends that the District Court overlooked its allegations regarding OFHEO's review of FNMA's books by relying on its previous finding that OFHEO "reported repeatedly that [FNMA] was adequately capitalized" and that FHFA had not asked for a restatement of FNMA's financial statements. Appellants' Br. at 38-39. As Liberty notes, however, these allegations were based on a gratuitous "expert" declaration submitted with Liberty's motion to dismiss briefing. *Id.* at 39. Not only are this and another "expert" declaration Liberty submitted to the District Court (*id.* at 12 n.6) wholly inappropriate on a motion to dismiss, they amount to an admission that Liberty's SAC is deficient on its face. While a court should consider the facts and allegations contained in a complaint and any documents that are attached or incorporated into a complaint, *see, e.g.*, *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide,*

*Inc.*, 369 F.3d 212, 217 (2d Cir. 2004), consideration of expert declarations

submitted in opposition to a motion to dismiss is inappropriate under clear Second

Circuit precedent.  *See Cyril v. Neighborhood P'ship II Housing Dev. Fund, Inc.*,

124 Fed. Appx. 26, 27 n.2 (2d Cir. 2005) (consideration of "affidavits in ruling

upon the motion to dismiss . . . would have been improper"); *see also Murphy v.*

*First Reliance Standard Life Ins. Co.*, No. 08-CV-3603 (DRH)(WDW), 2010 WL

2243356, at *5 (E.D.N.Y. June 1, 2010) (finding it "impermissible" to consider an

expert affidavit in "ruling on a motion under Rule 12(b)(6)"); *Fin. Acquisition*

*Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006).  The District

Court properly disregarded the unauthorized expert reports.[8]

### 3. The District Court Properly Found That Liberty Failed To Allege Any Misstatements In FNMA's SEC Filings

In focusing only on Goldman's supposed knowledge of the mortgage

market, Liberty neglected to allege in the SAC that FNMA's Offering Documents

or SEC filings contained any false or misleading statements about FNMA's

subprime or Alt-A exposure.  After the District Court dismissed the SAC on these

grounds (SPA57) Liberty now argues for the first time on appeal that FNMA's

SEC filings were false.  Appellants' Br. at 17.  Liberty did not allege falsity of

---

[8]     In any event, the opinions Liberty's "expert" expounds are irrelevant.  It remains true, as the District Court found in the FNMA Decision, SPA56-57 n.17, that FNMA's regulators found it adequately capitalized prior to conservatorship and never called for a restatement after conservatorship.

those documents in the SAC and may not re-amend its complaint through its

briefing on appeal.[9]  *See, e.g.*, *Alki Partners, L.P. v. Windhorst*, 472 Fed. Appx. 7,

9 (2d Cir. 2012) (affirming dismissal of claims in part because "a plaintiff cannot

amend the complaint through an appellate brief").[10]  It is telling that Liberty

supports its argument solely with cites to the SEC Complaint against former

FNMA officers, rather than to its SAC.  Appellants' Br. at 17.

### B.    The District Court Properly Dismissed Counts II, IV, and VI Because Goldman Made No Statements At All

As the District Court found, Liberty must show that Goldman "made" a

materially false representation to state a claim under the Massachusetts and

Washington securities fraud statutes or for Massachusetts common law fraud:

- Massachusetts common law fraud claims require that defendant made a "false representation."  *Barrett Assocs., Inc. v. Aronson*, 190 N.E.2d 867, 868 (Mass. 1963); *Zuckerman v. McDonald's Corp.*, 35 F. Supp. 2d 135, 144 (D. Mass. 1999).

- MGL c. 110A § 410(a)(2) requires that defendant made an untrue statement of a material fact, or omitted to state a material

---

[9]     On appeal, Liberty should not be permitted to re-amend to correct the deficiencies in its SAC.  Liberty did not request that it be permitted to re-re-plead either before the District Court or in the Appellants' Brief.  Dismissal with prejudice is thus appropriate where Liberty has been given numerous opportunities to re-plead and has still failed to state a claim.  *See, e.g.*, *380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 37 (S.D.N.Y. 2009) (dismissing with prejudice where plaintiffs had one chance to replead, but still failed to plead with the requisite particularity).

[10]    Aside from the plain insufficiency of the allegations in the Complaint, it is also inappropriate to raise new issues for the first time on appeal – as Appellants have done here.  *See, e.g.*, *Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 79-80 (2d Cir. 1999) ("[A]n appellate court will not consider an issue raised for the first time on appeal") (internal quotation omitted).

fact necessary to make the statement not misleading. *In re Access Cardiosystems, Inc.*, 404 B.R. 593, 641 (Bankr. D. Mass. 2009).

- Washington Rev. Code § 21.20.010 requires that defendant made an untrue statement of material fact or omitted to state a material fact necessary to make the statement not misleading. *See Goel v. Jain*, 259 F. Supp. 2d 1128, 1139 (W.D. Wash. 2003).

- To succeed on a Washington Rev. Code § 21.20.430 claim, a plaintiff must first allege a valid § 21.20.010 claim. Therefore, that defendant made an untrue statement is also required under § 21.20.430. *See* Washington Rev. Code § 21.20.430; *Andresen v. Hunt*, 951 F.2d 358, at *3 (9th Cir. 1991) (21.20.430 claim is predicated on a 21.20.010 claim).

Given this requirement, the state law claims all suffer first and foremost from the same fatal defect as Liberty's Section 10(b) claim – that Goldman did not make any of the alleged misstatements in the Offering Documents.

Liberty's decision to forego an appeal of its Section 10(b) claim does not cure this material deficiency with respect to the remaining state law claims. Rather, by abandoning its Section 10(b) claim on this appeal, Liberty effectively concedes that Goldman made no statements in the relevant Offering Documents. Though the District Court found no misstatement at all, the Court also determined that even if Plaintiffs had alleged a misstatement in the Offering Documents, Goldman could not have been deemed to have "made" those statements because Goldman did not have "ultimate authority" over any of FNMA's statements. SPA57*; see Janus*, 131 S. Ct. at 2303 ("[T]he maker of a statement is the person or

29

entity with ultimate authority over the statement . . . ."); *Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 148 (2d Cir. 2010) ("[A] secondary actor can be held liable in a private damages action brought pursuant to Rule 10b-5(b) *only* for false statements attributed to the secondary-actor defendant at the time of dissemination.") (emphasis added) (footnote omitted); *S.E.C. v. Tambone*, 597 F.3d 436, 447-48 (1st Cir. 2010) (en banc) (holding that securities professionals do not impliedly make a representation to investors that statements in a prospectus are truthful and complete); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (holding that "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)" and "the misrepresentation must be attributed to that specific actor at the time of public dissemination").  In addition, the District Court considered and rejected Plaintiffs' other arguments that Goldman had a duty to disclose or correct FNMA's statements and that Goldman engaged in a scheme to defraud.  SPA58-60.

Liberty admits that an essential part of its state law claims is that Goldman "made" the allegedly false and misleading statements by relying heavily in its brief on conclusory allegations that Goldman "wrote," "authored," "prepared," or "drafted" the offering circulars.  *See* Appellants' Brief (stating that Goldman "wrote," "authored," "prepared," or "drafted" the offering circulars *twenty-three* (*23*) times).  However, Liberty's conclusory declarations do not cause the

30

statements relating to FNMA to have been made by or attributed to Goldman.  The

statements made in the Offering Documents were expressly and unambiguously

made by FNMA alone, as the District Court found:

- "*Our* common stock is registered with the SEC under the Exchange Act, and *our* SEC filings are available on *our* website at www.fanniemae.com . . . ."  A1150, 1185 (emphasis added).

- "*Our* Charter Act restricts the ability of *our* Board of Directors to declare dividends in certain circumstances, depending on whether or not *we* meet or exceed certain capital standards set by [OFHEO], *our* current federal safety and soundness regulator."  A1188, 1153 (emphasis added).

- "*[W]e have agreed to sell* to each of the underwriters named below, and the underwriters … have severally agreed to purchase from *us*, the number of shares of Preferred Stock set forth below."  A1215 (emphasis added).

 "Our," which appears more than 550 times in the Offering Documents, and "we,"

which appears more than 250 times, refer only to FNMA; they do not include

Goldman or other underwriters.  *See* A1149-1181; A1183-1227.  Thus, Liberty

does not and cannot point to any individual – by name or otherwise – who is both

employed by Goldman and allegedly made a statement.  Nor can it point to any

statement that is attributed to Goldman.

Nevertheless, straining to keep the focus on Goldman, Liberty persists in

relying on legally deficient allegations that (i) Goldman *made* the statements in

Offering Documents simply by virtue of being "a lead underwriter" and by having

"conducted the marketing" because those statements "*would be considered by investors* to be Goldman's statements," and (ii) Goldman *understood* that "Plaintiffs and other investors expected Goldman to perform a reasonable due diligence investigation to ensure that the Offering Documents did not include any false or misleading statements of material information, or omit any material information."  A218-221 ¶¶ 45, 47, 50; Appellants' Br. at 11, 18 (emphasis added). Those allegations defy the reasoning of *Janus* and *Mayer Brown*, and cannot change the indisputable fact that the statements were unambiguously made by FNMA.

Liberty also incorrectly asserts that "the district court recognized … that *Janus* has no application to Liberty's state law claims."  Appellants' Br. at 58.  The District Court simply stated that it would not rely on *Janus* because there is "no case law discussing *Janus*'s impact on securities claims raised under Massachusetts or Washington State laws," SPA61 n.19, but found nonetheless that "all of the purported misrepresentations in the offering documents are couched in terms of "we" and "our," which clearly refer to FNMA, not Goldman," A2104. The statements themselves make clear, even without relying on precedent relating to parallel federal securities law claims, that they were made by FNMA.

As for Liberty's arguments that Goldman is liable under the Massachusetts and Washington common law for "participating in the misrepresentation,

authorizing it, or causing it to be made" and/or had a duty to disclose, they also

fail.  Appellants' Br. at 50-51.  Liberty cites no cases finding that an underwriter

faces liability for those claims by virtue of merely participating in an offering.  *See*

*Johnson v. Harrigan-Peach Land Dev. Co.*, 489 P.2d 923, 927 (Wash. 1971)

(defendants were not underwriters but co-owners of corporation that set up sales

program in which they instructed sales agents to provide misrepresentations);

*Haberman v. Wash. Pub. Power Supply Sys.*, 744 P.2d 1032, 1045, 1067-68

(Wash. 1987) (the "professional" defendants did not include underwriters, and,

regardless, were alleged to have supplied the issuer with false information that the

issuer then incorporated into the offering documents); *Knapp v. Neptune Towers*

*Assocs.*, 892 N.E.2d 820, 824 (Mass. App. Ct. 2008) (defendants were not

underwriters and duty to disclose existed because of fiduciary relationship); *Golber*

*v. BayBank Valley Trust Co.*, 704 N.E.2d 1191, 1193 (Mass. Ct. App. 1999)

(defendant was not an underwriter; investor could not provide half-truths to a

potential investor).

　　　　Liberty simply ignores key distinctions in the cases upon which it relies for

its state securities and unfair practices act claims.  For example, Liberty relies on

cases that have nothing to do with underwriters or securities offerings at all, *see*

*Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885 (Wash. 2009) (en banc) (does

not apply the statute in the context of a securities action generally or to

underwriters specifically); *Dalis v. Buyer Adver., Inc.*, 636 N.E.2d 212 (Mass. 1994) (same), or cases that focus on issuers and the actual makers of the subject statement, *see Hoffer v. Washington,* 776 P.2d 963 (Wash. 1989) (en banc) (defendant was state of Washington and high ranking elected officials—not an underwriter—where state utility defaulted on bonds); *Marram v. Kobrick Offshore Fund, Ltd*., 809 N.E.2d 1017, 1021 (Mass. 2004) (defendants were a mutual fund, its investment manager, and its corporate managing entity).  In the cases that do involve underwriters, the underwriter had actually sold the securities to the plaintiff, presumably engaging in communication and making direct statements in the process.  *See infra* p. 44-45 (distinguishing *Capital Ventures Int'l v. UBS Sec. LLC*, No. 11-11937-DJC, 2012 U.S. Dist. LEXIS 140663, at *46 (D. Mass Sept. 28, 2012) and *Miller Inv. Trust v. Morgan Stanley & Co*., No. 1:11-cv-12126-JLT, 2012 U.S. Dist. LEXIS 102537, at *8 (D. Mass. July 24, 2012).  Likewise, Liberty attempts to rely heavily on a case where Rule 9(b) was not applicable.  *See, e.g.*, *Reale v. Ernst & Young, LLP*, No. 43932-4-I, 2000 Wash. App. LEXIS 1239, at *10, *13 (Wash. Ct. App. July 10, 2000) (reversing dismissal of Washington Securities Act and unfair practices act claims against underwriters under *notice pleading* standard, unlike Rule 9(b) standard which applies here).  None of these cases support Liberty's claims here.

**C.    The District Court Correctly Dismissed Counts IV, VI, And VII Because Plaintiffs Failed To Allege That They Reasonably Relied On Any Misstatement In Purchasing FNMA Securities**

After holding that Liberty failed to allege that the Offering Documents contained any false information, the District Court also correctly concluded that Liberty failed to allege that it relied on any purported false statements – a necessary element of its claims for its common law fraud (*Count VI*), negligent misrepresentation (*Count VII*), and Washington Securities Act claims (*Count IV*). SPA61.  Dismissal on this ground was proper for at least two reasons.  *First*, Liberty alleged no false and misleading statement upon which it could rely. *Second*, Liberty's conclusory allegations that it reasonably relied upon representations made by Goldman – despite the fact that it is an undeniably sophisticated investor with its own investment team and it does not allege that it even purchased the subject securities from Goldman – fell far short of its particularized pleading burden and were implausible.  *See* A239-241 ¶¶ 99-107.

In conclusorily claiming that it relied on Goldman, Liberty would have this Court ignore the fact that it is a sophisticated investor that touts its investment expertise and deep investment resources.  *See supra* at 4.  As other courts have done, New York's First Department recently rejected such a claim by a sophisticated CDO investor which purchased a CDO investment through UBS. *See HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 61 (1st Dept. 2012).  There, the First Department held that sophisticated plaintiffs like Liberty cannot show

35

justifiable reliance where information in the market place regarding investment risks would have been available to plaintiffs by conducting ordinary due diligence of, among other things, market conditions.  *See id*. at 70.  The same result is even more appropriate here where Liberty was not only equally sophisticated but did not even buy the securities from Goldman.  *See Puget Sound Nat'l Bank v. McMahon*, 330 P.2d 559, 561 (Wash. 1958); *Tandiama v. NovaStar Mortgage, Inc.*, No. C03-909JRL, 2005 WL 1287996, at *3 (W.D. Wash. May 31, 2005) ("A party with expert knowledge and experience to evaluate that which he sees and appreciate the obvious falsity of the claimed representation' cannot rely reasonably on another party's representation.") (internal quotation omitted).

Beyond its sophistication, Liberty cannot reasonably rely on statements "couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference."  *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 21-22 (D. Mass 1999) (finding no reasonable investor would view a statement as material when it was sufficiently disclaimed by cautionary language); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 177-78 (D.R.I. 2003).   Here, as discussed above, *see supra* at 9-11, FNMA explicitly warned of the risks to its financial position.  Having been warned of the precise contingencies that ultimately came to pass, Liberty may not now complain

that had it known, it "would not have purchased" the preferred stock.[11]    A240 ¶

101; *see HSH Nordbank AG*, 941 N.Y.S.2d at 61, 69-70; *Adler v. Berg Harmon*

*Assocs.*, 790 F. Supp. 1222, 1231 (S.D.N.Y. 1992).

Finally, Liberty argues that failure to plead reasonable reliance is

inappropriate at this stage of the litigation.  *See* Appellants' Br. at 54, 61.

However, reasonable reliance is a fundamental element of three of the state law

claims, and Liberty's inability to supply particularized allegations under Rule 9(b)

that its reliance on Goldman (rather than FNMA) was reasonable (in light of its

undeniable sophistication) is fatal at the motion to dismiss stage.  *See Wells v.*

*Monarch Capital Corp.*, No. 91-10575-MA, 1991 WL 354938, at *12-13 (D. Mass

Aug. 23 1991) (dismissing Massachusetts common law fraud and negligent

misrepresentation claims for failing to adequately plead reliance); *Lincoln*

*Ventures, Inc. v. FSL Assocs., Inc.*, 21 Mass. L. Rptr. 161, at *3-4 (Mass. Super.

2006) (dismissing misrepresentation and § 93A claims and holding that plaintiff

could not reasonably rely on defendant's allegedly false statement); *Lambert v.*

*Leary*, No. 053422, 2006 WL 541040, at *5 (Mass. Super. Feb. 15, 2006); *BP West*

*Coast Prods., LLC v. Shalabi*, No. C11-1341MJP, 2012 WL 2277843, at *5 (W.D.

---

[11]    To the extent Liberty complains that FNMA did not accurately project the extent of credit losses, Appellants' Br. at 30-31, 33-34, reliance on predictions and forecasts is not justified as a matter of law.  *See Suna v. Bailey Corp.*, 107 F.3d 64, 70-72 (1st Cir. 1997).

Wash. June 14, 2012) (dismissing plaintiff's fraud claims for failing to show

justifiable reliance).

## II.    Alternatively, Dismissal Should Be Affirmed Because Liberty Fails To Plead Other Elements Of Its State Law Claims

This Court may affirm the judgment on any ground raised below, even if it

was not relied upon by the District Court. *Bertin*, 478 F.3d at 491.[12]  The Court

should affirm the dismissal of the SAC for the following additional reasons

Goldman demonstrated below: (i) Liberty failed to plead that Goldman knew or

should have known that FNMA was not adequately capitalized; (ii) Liberty did not

properly plead that Goldman solicited these transactions; and (iii) Liberty has not

pleaded that Goldman caused Liberty's purported injury.

### A.    Counts II, III, V, VI, And VII Fail Because Liberty Fails To Plead That Goldman Knew, Or Should Have Known, That FNMA Was Not Adequately Capitalized In November 2007

As Goldman argued below, Liberty's allegations are also insufficient to

plead with particularity that Goldman knew or should have known of any alleged

misstatements.  Accordingly, the claims involving the Massachusetts Securities

Act (*Count II*), the Massachusetts and Washington unfair practices statutes (*Counts

III and V*), the Massachusetts and Washington fraud (*Count VI*) and the negligent

---

[12]    *See also Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82, 88 (2d Cir. 2002); *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998) (*citing Langnes v. Green*, 282 U.S. 531 (1931) for the proposition that "appellee may, without filing a cross-appeal, advance any theory in support of the judgment that is supported by the record, whether it was ignored by the court below or flatly rejected").

misrepresentation (*Count VII*) all fail. *See*, *e.g.*, *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 23-25 (1st Cir. 2001) (Massachusetts fraud and negligent misrepresentation); *Stewart v. Fields (In re Pac. Nw. Storage LLC)*, 386 B.R. 764, 771, 774 (Bankr. W.D. Wash. 2007) (Washington fraud and negligent misrepresentation); *Daley v. Twin Disc, Inc.*, 440 F. Supp. 2d 48, 53 (D. Mass. 2006) (Massachusetts Unfair Trade Practices statute); *Presidio Group, LLC v. GMAC Mortgage, LLC*, No. C08-5298RBL, 2008 WL 5110845, at *4-5 (W.D. Wash. Dec. 3, 2008) (Washington Unfair Business Practices statute); *Bergeron v. Ridgewood Sec. Corp.*, 610 F. Supp. 2d 113, 132 (D. Mass. 2009) (Massachusetts Uniform Securities Act).[13]

Liberty states in conclusory fashion that it "alleges with particularity that Goldman knew, or should have known, that the statements in the Offering Documents were untrue." Appellants' Br. at 53. However, Liberty's circular allegations are based on nothing more than purported superior knowledge, expertise, experience, or "access" to information about FNMA specifically and the

---

[13]    Liberty's claim under Washington Rev. Code §§ 21.20.010 and 21.20.430 (*Count IV*) also fails because, for the reasons discussed above, Goldman could not have known about any alleged misrepresentations or omissions. Wash. Rev. Code § 21.20.430(3) (defendants not liable if they show they "did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist"). The misrepresentations as to capitalization and risk exposure simply did not exist; FHFA has never restated FNMA's capitalization and FNMA described the increasing risks of investing in the housing market in exhaustive detail in the Offering Documents.

subprime loan market generally.  *See* A225-239 ¶¶ 64-98.  Just as they were

inadequate to support the dismissed Section 10(b) claim that Liberty has declined

to raise on appeal, they are inadequate to support the state law claims.  *See Adler*,

790 F. Supp. at 1232-33 (dismissing state and federal claims for failure to plead

with particularity).

**1.    Liberty's Allegations That Goldman "Must Have Known" Due To Its Role As An Underwriter Are Entirely Conclusory**

Liberty's allegations that Goldman "had access to and would have reviewed

the books and records of Fannie Mae" (A227 ¶ 71), "had extensive knowledge,

including access to non-public information, about Fannie Mae's capital

inadequacy" (A226 ¶ 68), and must have known that the "write-downs of assets

and increases in loss reserves recorded by Fannie Mae were woefully inadequate"

(*id.*) are entirely conclusory and could be made of every investment bank and

every securities offering.  Accordingly, they do not show that Goldman "knew or

should have known" of problems with FNMA's capitalization.  *See In re Indep.*

*Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 764 (S.D.N.Y. 2001)

("status as the Company's underwriter cannot alone support an inference of

scienter as every underwriter is 'intimately familiar' with the issuing company"),

*abrogated on other grounds by In re Initial Public Offering Sec. Litig.*, 241 F.

Supp. 2d 281 (S.D.N.Y. 2003).

The most reliable and objective information that the members of the

40

underwriting syndicate had available to them confirmed that FNMA had adequate

capital and managed its risk appropriately.  Indeed, in its 2008 Report to Congress,

nearly a year *after* the Series P Offering and more than six months after the Series

S Offering, the government agency responsible for assuring that FNMA maintains

adequate capital concluded that FNMA was "*adequately capitalized*" for all four

quarters of 2007.  *See* A1677, 1688 (emphasis added).  The District Court properly

disregarded Liberty's conclusory allegations that OFHEO's determinations were

unreliable.  *See supra* at Section I.A.2.

**2.     Liberty's Allegations That Goldman "Must Have Known"
Due To Its Activities In The Subprime Market Also Fail**

Liberty continues to push its theory that Goldman "must have known" that

FNMA was not adequately capitalized in November 2007 with its allegations that

Goldman conducted a variety of business in 2007 and chose to reduce its own

exposure in multiple directions as the market began to slow.  *See, e.g.*, Appellants'

Br. at 20.  Liberty recites investigations and allegations made by others against

Goldman in totally different contexts to suggest that Goldman had unique vision

into the future, was able to predict the market implosion, and therefore "knew" that

FNMA's disclosures about its own financials were overly optimistic.  Liberty (i)

cherry-picks highly-disputed conclusions from the politically-charged United

States Senate's Permanent Subcommittee on Investigations and cites Goldman's

management of its own trading risk, and (ii) attempts to leverage off of the recent

41

filings by the FHFA of securities actions against Goldman's affiliates as well the

SEC Complaint against former FNMA officers and Non-Prosecution Agreement.

*See* Appellants' Br. at 21-25; A209 ¶ 8; A215-218 ¶¶ 34-43; A224-225 ¶¶ 62-63;

A228-230 ¶¶ 73-78.  Putting to the side the inaccuracy of those allegations, they

are simply irrelevant to this litigation; *none* relate in any way to the FNMA

Offerings.  *See Plumbers & Steamfitters Local 773 Pension Fund v. CIBC*, 694 F.

Supp. 2d 287, 300 (S.D.N.Y. 2010) (dismissing § 10(b) claim where plaintiff had

not "specifically identified any reports or statements or any dates or time frame in

which Defendants were put on notice of contradictory information") (internal

quotation omitted); *Adler*, 790 F. Supp. at 1232-33.

Allegations regarding the internal Goldman presentation dated September

17, 2007 and Goldman's short positions merely demonstrate that, far from making

a massive "short" bet, Goldman had reduced its own risk positions *in both*

*directions* (i.e., long *and* short) and maintained a relatively flat net exposure during

2007.  A234-235 ¶ 83.  Far from demonstrating knowledge or reason to know of

purported FNMA misrepresentations, the presentation outlined a reasonable risk-

management goal for a market participant facilitating both long and short trades for

numerous counterparties on a daily basis amidst the increasingly uncertain climate

that was prominently highlighted in the Offering Documents.   A1821-1835.

Similarly, Liberty's  musings about what Goldman *might* have learned in its

securitizations of Countrywide loans do nothing to show what Goldman did know (or should have known) when underwriting FNMA's Offerings.  *See* A215 ¶ 36; A219-220 ¶ 48; A225 ¶ 64; Appellants' Br. at 20-21.  Even assuming that loans failed to meet Countrywide's underwriting guidelines (A237 ¶ 92), that is not evidence of any failure to adequately perform due diligence in underwriting FNMA's Offerings.  And at any rate, by the time of the Offerings in late 2007, it was obvious to all that market conditions were deteriorating and that FNMA therefore needed more capital, as disclosed in the Offering Documents themselves. *See supra* at 8-11; *HSH Nordbank AG*, 941 N.Y.S.2d at 61 (rejecting fraud claim where the offering circular contained disclosures regarding the relevant risk).

Finally, the District Court considered and properly rejected Liberty's theory that Goldman was engaged in a scheme to defraud that included underwriting the FNMA preferred stock.  SPA59-60 (rejecting Liberty's theory of market manipulation).  The District Court compared the allegations here with those in *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624 (S.D.N.Y. 2012), which survived a motion to dismiss, and found them dissimilar and insufficient:

> Here: there are no allegations that Goldman selected the assets in the offering; there are no allegations that Goldman shorted FNMA stock; and there are no allegations that the purported misstatements concerned Goldman's own conduct.  Rather, Liberty's argument here is that by failing to disclose that FNMA's subprime and Alt-A loans were over-valued, Goldman perpetuated its own scheme to sell off its own securities.  *This theory of market manipulation is too attenuated to be plausible* … (emphasis added)

A2107.[14]  Liberty continues to rely on this type of argument by now pointing to

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145

(S.D.N.Y. 2012), *petition for cert. filed*, 81 U.S.L.W. 3249 (U.S. Oct. 26, 2012)

(No. 15-528), in addition to *Dodona*.  But any attempt to analogize *NECA-IBEW* to

this case also fails.  The discussion of class standing and injury sufficient for

purchasers of mortgage backed securities to plead 1933 Act claims says nothing

about what Goldman should have known about FNMA's capitalization.  *Id.* at 148.

### B.    Counts II and VII Fail Because Liberty's Conclusory "Solicitation" Allegations Are Insufficient To Plead A Claim In Light Of The Lack Of Privity Between Goldman And Liberty

Liberty does not allege that it purchased FNMA securities from Goldman.

Instead, it relies on conclusory allegations that Goldman "successfully solicited"

Liberty's purchases.  A245 ¶¶ 129-130; A247 ¶¶ 142-143.  This is fatal to both its

Massachusetts Securities Act (*Count II*) and its negligent misrepresentation claims

(*Count VII*).

Since Goldman did not transfer title of the securities at issue to Liberty,

Liberty must allege that Goldman "successfully solicited" Liberty's purchases to

---

[14]    Goldman also respectfully submits that the *Dodona* decision is incorrect in many respects, including because (i) the court failed to recognize or consider that Goldman had no unique ability to look into the future and correctly predict an impending market implosion of historic proportions, (ii) the offering documents at issue in *Dodona* did disclose that a Goldman affiliate would be taking a short position in the transaction at issue, and (iii) the decision appears to conflict with settled principles of New York law. *See HSH Nordbank AG*, 941 N.Y.S.2d at 66-69.

further Goldman's own financial interests. *See Capital Ventures*, 2012 U.S. Dist. LEXIS 140663, at \*46-47. In *Capital Ventures*, the District of Massachusetts recently rejected similar allegations that defendants who did not transfer title nonetheless "successfully solicited" plaintiffs' purchases and "profited from the sales." *Id.* at 47. The court held that to establish that a defendant "solicited" the purchase of securities, that defendant must have been more than a "substantial factor" in causing the sale. *Id.* at 50. Such a direct involvement in the sale is not established by Liberty's rote allegations that: "Goldman's solicitation activities for the [FNMA] Series P and Series S preferred stock generally would have included preparing and distributing the Offering Documents, contacting potential investors, taking orders and delivering the securities" (A245 ¶ 129), "Goldman successfully solicited the Plaintiffs' purchase … for its own benefit" (A245 ¶ 130), and "[a]s a lead underwriter, Goldman prepared and distributed the Offering Documents, performed due diligence, and communicated with the Plaintiffs about the offering and Plaintiffs' purchase" (*id.*).[15]

Liberty also contends that Massachusetts and Washington courts would allow an underwriter to be subjected to negligent misrepresentation liability for

---

[15]    The other case Liberty cites involving an underwriter is inapposite, as the plaintiff purchased the securities directly from the defendants, and thus was a seller under the Massachusetts state securities law. *See Miller Inv. Trust*, 2012 U.S. Dist. LEXIS 102537, at \*8.

claims brought by anyone who later purchases the securities underwritten, without privity or any showing that the plaintiff had a special relationship with the defendant or even bought the securities from the underwriter. *See* Appellants' Brief at 55-56. Liberty's cases, however, do not support this theory. In most of them, for example, the plaintiff had a close relationship with the defendant. *See, e.g.*, *Golber*, 704 N.E.2d at 1193 (plaintiff's "family and its businesses had been clients of the [defendant] bank for years"); *Lawyers Title Ins. Corp. v. Baik*, 55 P.3d 619, 620 (Wash. 2002) (en banc) (defendant law firm provided an opinion letter to plaintiff insurance company). This is not surprising because, under both Washington and Massachusetts law, only a limited class of individuals may bring a claim of negligent misrepresentation. *See Schaaf v. Highfield*, 896 P.2d 665, 670 (Wash. 1995) (en banc); *Nycal Corp. v. KPMG Peat Marwick LLP*, 688 N.E.2d 1368, 1372-73 (Mass. 1998). Because the "general investing public" is "too expansive for the plaintiff class in a negligent misrepresentation claim," *Schaaf*, 896 P.2d at 670, Liberty's allegations do not establish that it is within that limited class for a claim against Goldman. *See also Hines v. Data Line Sys., Inc*., 787 P.2d 8, 21 (Wash. 1990) (en banc). Importantly, Liberty cites no case which found liability for Massachusetts or Washington negligent misrepresentation simply on

the basis of an underwriter's participation in the offering alone – a fact that

Liberty's briefing glosses over.[16]

### C.    Counts III, V, VI, And VII Fail Because Liberty Does Not Plead Any Injury Caused By Goldman

Liberty's Massachusetts and Washington unfair practices statute (*Counts III and V*), common law fraud (*Count VI*), and negligent misrepresentation (*Count VII*) claims fail for the additional reason that Liberty does not allege how Goldman caused any actual injury.  *See McKernan v. Burek*, 118 F. Supp. 2d 119, 126 (D. Mass. 2000) (Massachusetts Unfair Trade Practices statute); *Russo's Marine Mart, Inc. v. Valley Forge Ins. Co.*, No. 09-P-2163, 2011 WL 1367953, at *2 (Mass. App. Ct. April 12, 2011) (same); *Dilorenzo v. Costco Wholesale Corp.*, 515 F. Supp. 2d 1187, 1198 (W.D. Wash. 2007) (Washington Unfair Business Practices statute), *Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 706 (9th Cir. 2001) (same); *Fidelity Mortgage Corp. v. Seattle Times Co.*, 128 P.3d 621, 625 (Wash. Ct. App. 2005) (same); *Bergeron*, 610 F. Supp. 2d at 142, 146 (Massachusetts common law fraud and negligent misrepresentation); *First Md. Leasecorp v. Rothstein*, 864 P.2d 17, 19 (Wash. Ct. App. 1993) (Washington common law fraud); *Baddeley v. Seek*, 156 P.3d 959, 962 (Wash. Ct. App. 2007)

---

[16]     That a Goldman employee may have informed Liberty about the Offerings or passed on FNMA's information regarding the Offerings does not suffice.  Appellants' Br. at 56.  Such communications would not form a relationship between Goldman and Plaintiffs such that Goldman is responsible for information issued by FNMA.

(Washington common law negligent misrepresentation).  Liberty does not allege that it was a customer of Goldman.  And the bald allegation that Goldman "successfully solicited" Liberty is entirely conclusory and falls short of Rule 9(b).  A245 ¶¶ 129-130; A247 ¶¶ 142-143.  Liberty cannot recover losses it suffered on its purchases of FNMA preferred stock from Goldman – which was not the issuer, did not sell the securities to Liberty, and was simply one of several underwriters of the offerings.

### III.   The District Court Erred In Not Dismissing The State Law Claims Because They Are Precluded By SLUSA

Liberty's state law claims can alternatively be dismissed as precluded by SLUSA because this action was consolidated and coordinated with the related Class Action, *In re Fannie Mae 2008 Securities Litigation*, Master File No. 08 Civ. 7831-PAC, No. 09-md-2013-PAC, which is pending before the District Court.  The District Court granted SLUSA preclusion for several other defendants below (SPA49) but declined to do so for Goldman in this instance because Goldman is the only defendant in the *Liberty* action and is not a defendant in the main Class Action.  SPA50-51.  The District Court erred in this ruling because SLUSA does not require that defendants overlap in order for a group of lawsuits to constitute a "covered class action."

As Goldman argued below, SLUSA provides that "a state law claim must be dismissed as completely preempted if: 1) the lawsuit is a 'covered class action'; 2)

48

the claim is based upon state law; 3) the claim concerns a 'covered security'; and 4) the plaintiff alleges either a misrepresentation or omission of a material fact or a manipulative or deceptive device or contrivance that is 'in connection with the purchase or sale of a covered security.'" *Eaton Vance*, 380 F. Supp. at 241 (quoting 15 U.S.C. § 77p(b)). Liberty's claims satisfy each of these requirements and are thus precluded.

### A.     The Liberty Action Is Part Of A "Covered Class Action"

While it correctly found that *Liberty* met the other requirements of SLUSA, the District Court held that *Liberty* was not part of a covered class action. *See* SPA48; SPA50-51. This finding is wrong as a matter of the law and should be reversed.

SLUSA broadly defines "covered class action" to include any "group of lawsuits filed in or pending in the same court and involving common questions of law or fact" seeking damages "on behalf of more than 50 persons" and which are joined, consolidated, or otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii). Thus, even cases not styled as class actions fall within this definition if they: (i) are pending in the same court; (ii) involve common issues of law or fact; (iii) when grouped together seek damages on behalf of more than 50 persons; and (iv) the "the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." *Instituto de Prevision Militar v. Merrill Lynch*,

49

546 F.3d 1340, 1346-47 (11th Cir. 2008) (internal quotation omitted); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 535 F.3d 325, 339-40 (5th Cir. 2008). *Liberty* satisfies all four requirements for a "covered class action."

### 1. *Liberty* And The Class Action Were Pending In The Same Court

On December 8, 2010, the J.P.M.L. transferred *Liberty* to the Southern District of New York – specifically, to the Honorable Paul A. Crotty – for consolidated or coordinated pretrial proceedings with the Class Action and the two previously transferred individual actions. A130-131. There is no doubt that, at the time the District Court issued the Opinion & Order that Liberty is appealing, the two cases were still pending in the same court. In fact, the Court considered the sufficiency of the allegations both in the Class Action and in *Liberty* in the single Opinion & Order. SPA27-66.

### 2. *Liberty* Involves Common Questions Of Fact With The Class Action

The core issue in *Liberty*, the Class Action, and the other cases in the MDL is whether FNMA issued misleading statements regarding its financial health. SPA28. When it transferred *Liberty* to the MDL relating to FNMA, the J.P.M.L. held that *Liberty* shares common issues of fact with the cases already before the District Court, namely that FNMA was "undercapitalized and defendants concealed this fact from investors in order to raise capital." A130.

**3.    *Liberty* Was Consolidated With The Class Action
And The Actions Were Proceeding Jointly Prior
To *Liberty*'s Dismissal**

The only argument Liberty made in contesting SLUSA preclusion before the

District Court was that it is not consolidated or coordinated with a class action.

This is belied by the facts.  Though Liberty had not yet participated in discovery at

the time it was dismissed, it was proceeding as a consolidated action with the Class

Action and the other individual actions.  The Consolidation Order that the District

Court entered in April 2009 made clear that any actions "hereafter transferred to

this Court, . . . brought under the federal securities laws or state laws relating to the

issuance, purchase or sale of securities ('Fannie Mae Securities Actions') are

consolidated for pretrial purposes in the manner described below (the

'Consolidated Securities Action')."  A79 ¶ 1.  *Liberty* relates to the issuance,

purchase, or sale of FNMA securities; as soon as the J.P.M.L. transferred *Liberty*

to the District Court on December 8, 2010, it was subject to the Consolidation

Order.[17]  A130-131.

---

[17]     The Consolidation Order further requests that counsel call to the court's attention
any other case that might be consolidated, stating that "[a]ny action involving
substantially related questions of law and fact hereinafter filed in or transferred to this
Court shall be consolidated under the master file number assigned to this case."  A79 ¶ 3.
Though Liberty may argue that its case is not "substantially related," as it did during oral
argument before the District Court, this argument is irrelevant given that paragraph one
of the Consolidation Order consolidated any action "brought under the federal securities
laws or state laws relating to the issuance, purchase or sale of securities," without
limitation.  Moreover, Liberty's case was and is substantially related, notwithstanding
that it named only Goldman.  *See supra* Sections I.A.1 and III.A.2.

In addition, *Liberty* was proceeding on the same track as the Class Action prior to dismissal. The District Court had set a single briefing and argument schedule for all actions, including *Liberty* and the parallel class action. A186; A193. The Court specifically stated that, "[e]verything is going to proceed ahead at one time." A190. Pursuant to the operative scheduling order, all plaintiffs, including Liberty and Lead Plaintiffs in the Class Action, filed amended complaints on March 2, 2012, all defendants moved to dismiss the complaints on April 4, 2012, all plaintiffs filed their opposition memoranda on May 21, 2012, and all parties argued the motions on July 18, 2012. A42-44; A61-63. In turn, the District Court considered all of the consolidated cases at the same time, and issued the single Opinion & Order that Liberty is appealing. A63-64; SPA27-66. The Opinion & Order addresses all of the motions in the consolidated action, including those related to *Liberty*. *Id.*

It is indisputable that *Liberty* and the Class Action were "joined, consolidated, or otherwise proceed[ing] as a single action for any purpose." *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377(LAK), 2007 WL 1438753, at *3 (S.D.N.Y. May 16, 2007), *aff'd*, 293 F. App'x 815 (2d Cir. 2008). Individual cases that are consolidated or proceeding jointly with shareholder class actions for pretrial purposes are considered covered class actions under SLUSA. *See, e.g.*, *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 517-18 (S.D.N.Y. 2009)

(holding that an opt-out case that was never formally coordinated or consolidated with a class action still "proceeded as a single action" with the class action and state law claims were therefore precluded by SLUSA), *aff'd sub nom. Amorosa v. AOL Time Warner Inc*., 409 Fed. Appx. 412, 417 (2d Cir. 2011) (summary order); *Gordon*, 2007 WL 1438753, at * 3 (dismissing common law fraud claims where the action was a "covered class action" because it was consolidated for pre-trial purposes with a class action brought on behalf of more than 50 people; the "plain language of the statute controls"); *In re: Lehman Brothers Sec. and ERISA Litig.*, No. 09-md-2017, docket no. 1102, slip op. at 3-6 (S.D.N.Y. Dec. 17, 2012); *Instituto de Prevision Militar*, 546 F.3d at 1346; *In re Fed. Nat'l Mortgage Assoc. Sec., Derivative, and "ERISA" Litig*., 503 F. Supp. 2d 25, 32-33 (D.D.C. 2007); *Stichting Pensioenfonds ABP v. Merck & Co., Inc.*, No. 05-5060 (SRC), 2012 WL 3235783, at *16 (D.N.J. Aug. 1, 2012) ("[T]he . . . coordinated proceedings make it abundantly clear that this case is part of a group of suits that 'proceed as a single action for any purpose' and thus, regardless of any formal consolidation with the Class Action, is covered by SLUSA.").  The District Court's finding that "Judge Lynch's formal consolidation of these cases for pre-trial purposes triggers SLUSA," (A2097), applies to *Liberty* just as it did to the other individual actions in the FNMA MDL.

**4.    The Group Of Lawsuits Now Pending
For Pre-Trial Purposes In The FNMA MDL
Seek Damages For More Than Fifty Persons**

The group of lawsuits now pending for pre-trial purposes in the FNMA

MDL seek damages on behalf of more than fifty persons.  The District Court erred

when it found that SLUSA does not bar Liberty's state law claims against

Goldman because there are not more than 50 people seeking damages against

Goldman specifically.  *See* SPA50-51.

*First*, Goldman was a defendant in the main class action, but was dismissed

by the District Court because the Class Action plaintiffs could not state a claim.

*See supra* p. 13.  The time to appeal that dismissal will not run until after a final

adjudication of the Class Action.

*Second*, the plain language of SLUSA sets out that the *group* of lawsuits

must seek damages on behalf of more than 50 persons involving common issues of

law or fact.  *See* 15 U.S.C. § 78bb(f)(5)(b).  It does not say that more than 50

persons must seek damages *from the same defendant*.

*Third*, the District Court stated that it must conduct a "claim by claim"

analysis, SPA50-51, but did not cite any case finding that SLUSA does not

preclude a claim on the basis that more than 50 persons were not seeking damages

from the same defendant, nor has Goldman identified any such case.  The claim-

by-claim analysis discussed in *Dabit v. Merrill Lynch, Pierce, Fenner & Smith,

Inc.*, 395 F.3d 25, 47 (2d Cir. 2005), which was vacated by the U.S. Supreme

Court, 547 U.S. 71 (2006), relates to the subject matter of the claim – *i.e.* whether each state law claim relies on alleged misstatements or omissions in connection with the sale or purchase of a security.  395 F.3d at 47.  The Court in *Dabit* was examining whether the claims alleged misrepresentations or omissions "in connection with" the purchase or sale of covered securities – *not* whether or not the actions were "covered class actions."  *Id.*  The Court found that SLUSA should not preclude state law claims that are wholly unrelated to claims alleging securities fraud.  *Id.*  Here, by contrast, Liberty does not dispute that its state law claims all rely on alleged misrepresentations and omissions in FNMA's offering documents and, thus, they are all precluded by SLUSA.

*Fourth and finally*, the position that there must be more than 50 persons seeking damages against any one defendant is contrary to cases that find individual plaintiffs' state law claims precluded, though they are the only plaintiffs seeking damages based on those particular claims.  For example, in *In re AOL Time Warner Inc. Securities Litigation*, plaintiffs argued that "none of the individual actions bring state law claims from any one state for more than 50 people."  503 F. Supp. 666, 672 (S.D.N.Y. 2007).  Rejecting this argument, the court stated that "this observation ignores the fact that the 'individuals actions,' once aggregated per SLUSA's instructions, are a 'covered class action' for purposes of SLUSA and are properly subject to the Act's limitation on mass actions," and held that

plaintiffs could not "through artful pleading … avoid the clear precepts of SLUSA

and its preemption of state law securities claims for damages."  503 F. Supp. at 672

(internal quotation marks omitted).  As SLUSA instructs, courts focus on whether

the *group* of lawsuits involving common questions of law or fact seek damages on

behalf of more than 50 persons, not whether damages are sought on behalf of 50 or

more persons for each claim or against each defendant.

> **B.**     **Liberty's State Law Claims Concern A "Covered Security"**

Under SLUSA, the term "covered security" is defined to include shares

listed, or authorized for listing, on the New York Stock Exchange ("NYSE"), or "a

security of the same issuer that is equal in seniority or that is a senior security to a

security" that is listed, or authorized for listing, on the NYSE.  15 U.S.C. §§

77r(b)(1)(A-C), 78bb(f)(5)(E).  Liberty alleges that its claims arise in connection

with the offering of FNMA's Series P and Series S Preferred Stock.  A206 ¶ 1.

Liberty has never disputed that the Preferred Stock are covered securities as

defined by SLUSA.  15 U.S.C. § 77r(b)(1)(C).  A1151; A1186-1187 ("The

Preferred Stock will be entitled to a preference … over the common stock."); *see*

*In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1299 (E.D. Wash. 2007).

> **C.**     **Liberty Alleges State Law Claims In Connection**
> **With The Purchase Or Sale Of A Covered Security**

It is well settled that SLUSA precludes state law claims if a "plaintiff alleges

either a misrepresentation or omission of a material fact or a manipulative or

deceptive device or contrivance that is 'in connection with the purchase or sale of a covered security." *Eaton Vance*, 380 F. Supp. 2d at 241 (internal quotation omitted); *see also Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 103-04, 114 (2d Cir. 2001) (holding that class action asserting Connecticut statutory and common law claims for, *inter alia*, fraud and negligent misrepresentation in connection with purchase of "covered securities," must be dismissed under SLUSA); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 603-04 (S.D.N.Y. 2006).

Here, Liberty's state law claims rely upon allegations that Goldman is responsible for misrepresentations and omissions made in connection with the public offering of the Preferred Stock. *See, e.g.*, A221 ¶¶ 51-53; A222 ¶¶ 55-56. Thus, Plaintiffs' state law claims are precluded by SLUSA. *See, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 442-43 (S.D.N.Y. 2001) (dismissing with prejudice claims for common-law fraud and negligent misrepresentation that were "grounded on alleged misstatements in [defendant's] Registration Statement, Prospectus, or . . . Press Releases made in connection with the sale" of covered securities as "clearly barred by [SLUSA]"); *Eaton Vance*, 380 F. Supp. 2d at 241-42.

*     *     *

Because Liberty's state law claims are precluded by SLUSA, the Court should affirm the District Court's dismissal of all of the state law counts (*Counts II – VII*).

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed in its entirety.

Dated:      New York, New York
            December 21, 2012

                           Respectfully submitted,

                           SIMPSON THACHER & BARTLETT LLP

                           By: /s/ Jonathan K. Youngwood
                               Jonathan K. Youngwood
                               Craig S. Waldman
                               Shannon Price Torres

                           425 Lexington Avenue
                           New York, New York  10017-3954
                           Telephone: (212) 455-2000
                           Facsimile:  (212) 455-2502
                           Email: jyoungwood@stblaw.com

                           *Attorneys for Defendant-Appellee*
                           *Goldman, Sachs & Co.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,980 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  I further hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman size 14-point font.

Dated:  New York, New York
December 21, 2012

By:    /s/ Jonathan K. Youngwood
       Jonathan K. Youngwood

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017-3954
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502
Email: jyoungwood@stblaw.com

*Attorneys for Defendant-Appellee*
*Goldman, Sachs & Co.*

## <u>CERTIFICATE OF SERVICE & CM/ECF FILING</u>

### 12-3859(CV)

I hereby certify that I caused the foregoing Brief of Defendant-Appellee Goldman, Sachs & Co., to be served on counsel for Plaintiffs-Appellants via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity pursuant to Local Appellate Rule 25.1 and one (1) copy via first class mail:

James R. Safley, Esq.
Robins, Kaplan, Miller & Ciresi LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8206


Christopher P. Sullivan, Esq.
Robins, Kaplan, Miller & Ciresi LLP
800 Boylston Street, 25th Floor
Boston, MA 02199
(617) 267-2300

Attorneys for Plaintiffs-Appellants



I certify that an electronic copy was uploaded to the Court's electronic filing system. Six hard copies of the foregoing Brief of Defendant-Appellee Goldman, Sachs & Co., were sent to the Clerk's Office by hand delivery to:

Clerk of Court
United States Court of Appeals, Second Circuit
United States Courthouse
500 Pearl Street, 3rd floor
New York, New York 10007
(212) 857-8500

on this 21st day of December 2012.

/s/ Keisha Boynton
Keisha Boynton